UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X
JOEL HERMAN,                                    )
                                                )    Case No. 15-cv-03059
                              Plaintiff,        )        (PKC) (PK)
                                                )
                -against-                       )
                                                )    **SECOND AMENDED**
                                                )    **COMPLAINT_____**
THE CITY OF NEW YORK; POLICE DETECTIVES         )
KENNETH WIEBER, ANTHONY D'ALTO in their         )
Individual & Official Capacities; POLICE SERGEANTS)
JOHN STEWART, EFRAIN PEREZ, PELLEGRINO          )
PASO, ROBERT MAMYS, LESLEY MALDONADO,           )
MCKINNEY and JOHN DOES 1-5, Supervisors in the  )    **JURY TRIAL**
90 PDU/Police Precinct, Identity Presently Unknown, )  **DEMANDED**
in their Official Capacity only; POLICE LIEUTENANT )
JAMES DOHERTY, Commanding Officer of 90 PDU, in )
his Official Capacity only; ROCHEL HERMAN, DAVID )
KLEIN, ARON GREENBERG, ARON MANDEL, JOEL )
TEITELBAUM, LEON EISNER & JOEL NAIM             )
YACOOB,                                         )
                              Defendants.        )
-----------------------------------------------------------------------X

Plaintiff, JOEL HERMAN, by his attorneys, THE SCHWARZ FIRM, PLLC,

complaining of the Defendants, alleges as follows:

## I.    INTRODUCTION

1.      This is an action pursuant to the Civil Rights Act of 1871, 42 U.S.C. §§

1983, 1985(3) and 1988 and the Constitution and laws of the State of New York, by the

Plaintiff, JOEL HERMAN ("Plaintiff" or "JOEL"), a victim of police misconduct and

wrongful and tortious acts resulting from an agreement, express or tacit, that entailed a

unity of purpose and joint action, or a conscious commitment to a common scheme which

was designed to achieve the unconstitutional acts complained of through joint activity

(the "conspiracy"), by and between members of the NYPD 90th Precinct, primarily

1

Police Detective KENNETH WIEBER ('WIEBER"), later joined by Police Officer, ANTHONY D'ALTO ("D'ALTO"), on the one hand, and JOEL's wife, Defendant, ROCHEL HERMAN ("ROCHEL"), together with her father, Defendant, DAVID KLEIN ("KLEIN"), friends of her father, Defendants, ARON GREENBERG ("GREENBERG") and ARON MANDEL("MANDEL"), paid defendants retained by KLEIN, JOEL TEITELBAUM ("TEITELBAUM") and LEON EISNER("EISNER") and ROCHEL's divorce attorney retained by KLEIN, JOEL NAIM YACOOB("YACOOB"), on the other hand, collectively referred to herein as the "Private Defendants."

2.      As demonstrated herein, the Private Defendants acted in concert with WIEBER, as willful participants in joint activity, later joined by D'ALTO, to violate JOEL's rights under the First and Fourth Amendments to the United States Constitution by way of three false arrests and imprisonment by WIEBER on three separate occasions on May, 26, 2014, May 27, 2014 and May 30, 2014, respectively, and two malicious prosecutions initiated by WIEBER by way of flagrantly false complaints presented to the Kings County District Attorney's Office, containing fabricated felony and misdemeanor charges in two separate criminal cases commenced on May 27, 2014 and May 31, 2014, respectively.

3.      All charges were ultimately dismissed by the criminal court at the request of the Kings County District Attorney to the New York City Criminal Court and the related prosecutions terminated in JOEL's favor, thanks to videotape footage at three different locations incident to the arrests and underlying charges that exposed their false and truly baseless nature. The first case, Case # 2014KN038594, was dismissed in part on September 3, 2014 and dismissed in full on November 17, 2014. The second case, Case #

2014KN040353, resulting in a second appearance on June 10, 2014, was dismissed on October 2, 2014.

4.     The ultimate objective and express purpose of the aforesaid conspiracy was to violate JOEL's rights under the First and Fourth Amendments to the United States Constitution, acting with malice or reckless indifference thereto, by harming and defaming JOEL through false arrests, malicious prosecutions and the filing of false and fraudulent complaints with the New York City Administration of Children's Services ("ACS"), in order to help ROCHEL (i) succeed in cutting off or greatly diminishing and restricting JOEL's visitation and access rights to the three minor Herman children and (ii)  prevail in a bitter custody/visitation rights in a New York State Supreme Court, Kings County divorce action, in violation of JOEL's rights under the United States Constitution.

5.     This Second Amended Complaint contains specific and direct allegations of face-to-face meetings and subsequent telephonic, text message and electronic (e-mail) communications between on or about April 27, 2014 and on or about May 21, 2014, between each of the Private Defendants and WIEBER, held together or between separate groups of the co-conspirators, later communicated to all of them, in which the conspiracy or meeting of the minds to implement specific planned arrangements and to achieve its ultimate objectives stated in the preceding paragraph 4 was formed and discussed.

6.     In addition to identifying the parties who participated in the conspiracy, the objectives, goals and desired results of the conspiracy, the commission of constitutional violations pursuant to the conspiracy, the approximate time period of the conspiracy, the principal roles and specific ways that the individual co-conspirators implemented the planned arrangements which were the subject of the conspiracy, the formation and

operation of the conspiracy; and the damages resulting from those wrongful acts, it also describes with some detail some of the meetings and follow-up communications between the co-conspirators.

7.   The more generalized direct conspiracy allegations are further supplemented and enhanced by detailed factual allegations surrounding (i) the planning arrangements, (ii) the ensuing three false arrests, (iii) the immediately following two malicious prosecutions in New York City Criminal Court and (iv) the immediate significant curtailment of JOEL's visitation rights based on secret police documents and other information clandestinely provided by WIEBER to YACOOB, in flagrant violation of police procedures during a purportedly legitimate ongoing criminal investigation and prosecution (*see    , infra*).  Thus, not only is the conspiratorial activity alleged in a general way, but also facts  tending to show how these activities were accomplished, the specific object and goals of the conspiracy, as well as the roles and specific actions by WIEBER, D'ALTO and each one of the Private Defendant at a particular time or times.

8.    The additional factual allegations not only sufficiently enhance the more generalized conspiracy allegations but also provide the underlying context that plausibly raises the suggestion of a preceding agreement, express or tacit, as the embodiment of such conspiracy. Viewed *in toto*, in light of common experience, the alleged behavior, conduct and role of each of the Private Defendants in furthering the objectives of the conspiracy by each of the Private Defendants, WIEBER and D'ALTO, as described herein, cannot be reasonably explained by any competing explanation of (i) *independent* police judgment, however faulty, and (ii) highly misleading but *independent* lies of the Private Defendants, which supposedly lead to JOEL's false arrests, malicious

prosecutions and the significant curtailment of access to his three children by divorce court action they engendered. Therefore, it is unreasonable to conclude that WIEBER's and the Private Defendants' allegedly conspiratorial actions could equally have been prompted by lawful, independent goals which do not constitute a conspiracy. In fact, the unreasonableness of the proffered competing explanation only accentuates the plausibility of the inference of a conspiracy and, hence, the claims made herein.

9.     The additional factual allegations not only provide plausible grounds to infer the conspiracy, but also raise a right to the relief sought by Plaintiff above the speculative level and support a reasonable expectation that discovery will reveal evidence of, at the very least, a tacit agreement and meeting of the minds between the Private Defendants and WIEBER to commit the unconstitutional acts which are the subject hereof.

## II.   JURISDICTION AND VENUE

10.     This Court has original jurisdiction over Plaintiff's constitutional and federal law claims pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343 in that this action is brought pursuant to 42 U.S.C. §§ 1983, 1985(3) and 1988, to redress the deprivation under color of law of Plaintiff's rights secured by the First, Fourth and Fourteenth Amendments to the United States Constitution.

11.     This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 of all ancillary state law claims that are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

12.     Venue is proper in in the Eastern District of New York pursuant to 28 U.S.C. § 1391 in that all the Defendants are subject to personal jurisdiction within the

Eastern District of New York and the events that gave rise to the claims asserted herein occurred within its boundaries.

### III.    THE PARTIES

13.    Plaintiff, JOEL HERMAN ("JOEL" or "Plaintiff"), was and is, at all times relevant to this action, a natural person and resident of Kings County, New York. He is the husband of Defendant ROCHEL HERMAN, and is also the defendant in a pending divorce action brought by ROCHEL HERMAN in New York State Supreme Court, Kings County, as described in ¶ 1 above.

14.    Defendant, CITY OF NEW YORK, is and was, at all relevant times, a municipal corporation duly incorporated under the laws of the State of New York pursuant to § 431 of its Charter. The CITY OF NEW YORK is authorized by law to maintain a police department (the "NYPD"), a municipal agency of the CITY OF NEW YORK with multiple police precincts including the 90th police precinct of the NYPD, which acts for it in the area of law enforcement within the designated geographic area or precinct, and for whose acts the CITY OF NEW YORK is ultimately responsible.

15.    The CITY OF NEW YORK assumes the risks incidental to the maintenance of a police force and the policies, procedures, and practices implemented through its various agencies, departments, and employees, and for injury occasioned thereby. It is the public employer of the police officers, detectives, supervisory and administrative personnel within the NYPD, which hired, supervised, trained, retained and controlled the police officers, detectives and supervisory personnel in the 90th police precinct of the NYPD who are named as individual Defendants herein and who have enforced the State laws at issue against Plaintiff.

16.     Defendant, KENNETH M. WIEBER ("WIEBER"), shield number 1755, is and was, at all relevant times, a Police Detective of the 90th PDU (Police Detective Unit) or Squad within the 90th police precinct of the NYPD, employed by the CITY OF NEW YORK.  WIEBER is sued in his individual and official capacities.

17.     Defendant, ANTHONY D'ALTO ("D'ALTO"), shield number 9117,  was, at all relevant times, a duly appointed Police Officer assigned to the 90th police precinct of the NYPD, employed by the CITY OF NEW YORK.  D'ALTO is presently employed as a police officer in the Suffolk County First Precinct, Town of West Babylon, New York. D'ALTO is sued in his individual and official capacities.

18.     Defendant, JOHN STEWART ("STEWART"), was, at all relevant times, a police officer of the 90th Police Precinct of the NYPD, holding the rank of Sergeant, and employed by the CITY OF NEW YORK. STEWART was the desk sergeant on the evening of JOEL's arrest on May 26, 2014 and approving supervisor of WIEBER in connection with one or more police reports related to the false arrests and subsequent prosecutions of the Plaintiff complained of herein. STEWART is sued in his official capacity only.

19.     Defendant, EFRAIN PEREZ ("PEREZ"), was at all relevant times, a police officer of the 90th Police Precinct of the NYPD, holding the rank of Sergeant, and employed by the CITY OF NEW YORK.  PEREZ  is sued in his official capacity only.

20.     Defendant, PELLEGRINO PASO ("PASO"), was at all relevant times, a police officer of the 90th Police Precinct of the NYPD, holding the rank of Sergeant, and employed by the CITY OF NEW YORK. PASO is sued in his official capacity only.

21.     Defendant, ROBERT MAMYS ("MAMYS"), was at all relevant times, a police officer of the 90th Police Precinct of the NYPD, holding the rank of Sergeant, and employed by the CITY OF NEW YORK. MAMYS is sued in his official capacity only.

22.     Defendant, LESLEY MALDONADO ("MALDONADO"), was, at all relevant times, a police officer of the 90th Police Precinct of the NYPD, holding the rank of Sergeant, and employed by the CITY OF NEW YORK. MALDONADO is sued in her official capacity only.

23.     Defendant, MCKINNEY ("MCKINNEY"), was, at all relevant times, a police officer of the 90th Police Precinct of the NYPD, holding the rank of Sergeant, and employed by the CITY OF NEW YORK. MCKINNEY is sued in his official capacity only.

24.     Defendants,  JOHN DOES ##1-5 were, at all relevant times, duly appointed police officers/detectives holding the rank of Sergeant within the 90th Police Precinct of the NYPD, employed by the CITY OF NEW YORK, and supervisors of WIEBER and D'ALTO in connection with the approvals of the three arrests at issue herein, as well as related domestic incident reports, investigation follow-up reports, arrest reports and other police reports related to the false arrests and subsequent prosecutions of the Plaintiff complained of herein. The true name of each is presently unknown or in doubt to Plaintiff and each is therefore sued by a fictitious name.  Plaintiff intends to amend this Complaint to show the true name of each such Defendant when the same has been ascertained. JOHN DOES 1-5 are sued in their official capacity only.

25.     At all times material to the allegations herein, Defendants WIEBER, D'ALTO, STEWART, PEREZ, PASO, MAMYS, MALDONADO, MCKINNEY,  and

JOHN DOES 1-5 acted in their official capacities as such, under color of state law, including the laws, statutes, ordinances, regulations, policies, customs and usages of the State of New York, the CITY OF NEW YORK and the NYPD.

26. Defendant, JAMES DOHERTY ("DOHERTY"), is and was, at all relevant times, the commanding officer of the 90th PDU (Police Detective Unit) or detective squad within the 90th Police Precinct of the NYPD, employed by the CITY OF NEW YORK. As such, DOHERTY was responsible for the implementation and promulgation of official policy over his subordinates within the 90th precinct detective squad.

27. At all times material to the allegations in this Complaint, DOHERTY acted in his capacity as such, and, upon information and belief, the source being police reports, approved the arrests and ensuing prosecutions complained of herein, while acting under color of state law, including the laws, statutes, ordinances, regulations, policies, customs and usage of the State of New York, the CITY OF NEW YORK and the NYPD. DOHERTY is sued in his official capacity only.

28. Defendant, ROCHEL HERMAN ("ROCHEL"), was and is, at all times relevant to this action, a natural person and resident of Kings County, New York. She is the wife of JOEL, the plaintiff in a pending divorce action brought by her against JOEL in New York State Supreme Court, Kings County, and the mother of three minor sons (the "Herman children" or the "Children").

29. Defendant, David Klein ("KLEIN"), was and is, at all times relevant to this action, a natural person and resident of Kings County, New York. He is the father of ROCHEL and has acted at all times herein as her alter-ego. Upon information and belief,

the source being numerous ACS reports, police reports, visitation supervisor reports, e-mails and common knowledge in the Williamsburg community, he has masterminded and controlled the conspiracy set forth herein, as well as all aspects of ROCHEL's life, marriage and children and the civil and criminal litigations which she has brought against JOEL.

30.     Defendant, ARON GREENBERG ("GREENBERG"), is a citizen and resident of Kings County, New York, and, upon information and belief, the source being ROCHEL's deposition testimony and common knowledge in the Williamsburg community, as arranged for by his friend, the defendant KLEIN, is a major supporter, financial backer and co-conspirator of ROCHEL.

31.     Defendant, ARON MANDEL ("MANDEL"), is a citizen and resident of Kings County, New York, and, upon information and belief, the source being ROCHEL's deposition testimony and common knowledge in the Williamsburg community, as arranged for by his friend, the defendant KLEIN, is a major supporter, financial backer and co-conspirator of ROCHEL, and holds a high administrative position in the private school in which the Herman children attend.

32.     Defendant, LEON EISNER ("EISNER"), is a citizen and resident of Kings County, New York, and, upon information and belief, the source being ROCHEL's deposition testimony and common knowledge in the Williamsburg community, as arranged for by the defendant KLEIN, a paid non-legal adviser to ROCHEL in connection with her divorce action and a co-conspirator of ROCHEL.

33.     Defendant, JOEL TEITELBAUM ("TEITELBAUM"), is a citizen and resident of Kings County, New York, and, upon information and belief, the source being

court records, is a client of Defendant YACOOB, an attorney at law, in a state divorce action, who arranged for TEITELBAUM's active role as a paid co-conspirator.

34.     Defendant, JOEL NAIM YACOOB ("YACOOB"), is a New York divorce attorney and, upon information and belief, the source being e-mails and common knowledge in the Williamsburg community, as arranged for by the defendant KLEIN, represents ROCHEL as plaintiff in the state divorce action described in ¶ 1 above. YACOOB is also TEITELBAUM's divorce attorney in a separate divorce action, and is and was at all times an active co-conspirator of ROCHEL, playing a role in the criminal court matters well beyond the scope of an attorney in her divorce action.

35.     Defendants WIEBER, D'ALTO, STEWART, PEREZ, MAMYS, PASO, MALDONADO, MCKINNEY, DOHERTY and JOHN DOES 1-5, are collectively referred to herein as the "individual Government Defendants." Defendants ROCHEL, GREENBERG, MANDEL, TEITELBAUM, EISNER & YACOOB are collectively referred to herein as the "individual Private Defendants." The individual Government Defendants and the individual Private Defendants are collectively referred to herein as the "individual Defendants."

## IV.    NOTICE OF CLAIM

36.     Plaintiff, in furtherance of his supplemental state causes of action for malicious prosecution and related claims, filed a proper and timely notice of claim against the CITY OF NEW YORK in compliance with General Municipal Law § 50, by delivering a copy of the notice to the person designated by law as a person to whom such claims may be served, setting forth the facts underlying Plaintiff's claim.

37.     The notice of claim set out the nature of the malicious prosecution and related claims asserted herein, the time when and the place where and manner by which such claims arose, and the damages and injuries claimed to have been sustained by Plaintiff.

38.     The City assigned a claim number to Plaintiff's claim, and Plaintiff was subjected to an examination pursuant to N.Y. Gen. Mun. L. Sec. 50-h on April 22, 2015. To date, no response has been received by Plaintiff and no compensation has been offered by Defendant CITY OF NEW YORK in response to this claim, which has neglected and failed to adjust the claims within the statutory time period.

39.     This action has been commenced within one year and ninety days of the dates of occurrence of the events giving rise to this Complaint as to the CITY OF NEW YORK and within one year of the dates of occurrence of the events giving rise to the state causes of action herein as to the individual Government Defendants.

## V.   FACTS COMMON TO ALL CLAIMS

### A. **Background Facts**

40.     Prior to their separation in or about February 2010, Plaintiff, JOEL, and his estranged wife, ROCHEL, were a Hassidic Jewish couple living in the Williamsburg section of Brooklyn, New York. Since their separation, they have been embroiled for more than five years in an ongoing high conflict custody/visitation dispute with respect to their three minor sons.

41.     The custody/visitation dispute and related matters lingered about three years in the Kings County Family Court in a neglect proceeding commenced on ROCHEL's behalf, during which time the minor children were temporarily discharged to the care and

custody of ROCHEL, with increasing visitation privileges granted to JOEL. During this time, WIEBER investigated a brawl between JOEL's sisters and ROCHEL.

42.     According to a police report filed by WIEBER, WIEBER met with ROCHEL and KLEIN and interviewed them extensively on June 24, 2011. WIEBER also met with and MANDEL and interviewed him extensively on August 23, 2011. After these meetings, WIEBER cleared ROCHEL of complaints filed by JOEL's sister on February 7, 2011 and June 13, 2011, respectively, and also testified on ROCHEL's behalf in Family Court.

43.  On October 24, 2013, the Family Court greatly expanded JOEL's regular visitation schedule with the Children to include substantial midweek and weekend overnight access.

44.     Thereafter, the custody dispute moved to a New York Supreme Court divorce action in Kings County commenced by ROCHEL, and the parties agreed to have the remaining custody issues litigated there.

45.      On or about November 13, 2013, while appearing in New York State Supreme Court at a proceeding in the divorce action, JOEL was approached by Defendant EISNER outside the courtroom. EISNER stated that he has been retained by ROCHEL and is being paid by KLEIN, GREENBERG and MANDEL. EISNER further stated that JOEL will never get custody of his boys, because he, EISNER, ROCHEL, MANDEL and GREENBERG will have him arrested and locked up if he did not give up custody immediately. EISNER stated "We are more powerful than you think and have a whole gang against you."

46.     On or about April 2, 2014, Defendant YACOOB became ROCHEL's co-counsel in the pending divorce action in New York State Supreme Court.

47.     Shortly thereafter, on April 10, 2014, the October 24, 2013, Family Court Visitation Order was slightly modified by Stipulation and Consent Order as a result of the upcoming Passover holiday. The Stipulation was negotiated and signed by ROCHEL, along with her attorney, YACOOB.  The latter consent order swapped the order of alternate weekend access of JOEL and ROCHEL, effective immediately after the end of the Passover holiday, as a result of the special Passover access schedule.

**B**. **The Events of April 22, 2014 Which Triggered the First False Arrest**

48.     On April 22, 2014, during the last day of Passover, a day the parties do not work, drive cars or use telephones for religious reasons, the three Herman children were to be dropped off at JOEL's residence at 6:00 PM and returned to ROCHEL's residence the following morning. Instead of either MANDEL or GREENBERG, the usual "transporters," who would normally bring the Children from ROCHEL's residence to JOEL's residence more than a mile away by foot, an unknown child about 14 years old (later learned to be MANDEL's son) brought two of three children, but refused to provide his name or state why the third and youngest son, Aron, was missing. The other two children told JOEL that Aron had been injured in a playground fall earlier that day but were short on specific details.

49.     Since JOEL could not use the telephone until late evening due to religious observances, he walked to the local ODA Medical Center where the children frequently visited to see if Aron was or had been there. When he was not, JOEL became increasingly worried and frustrated that he was given no information about Aron's condition.

14

50.     After the end of the Passover holiday, neither ROCHEL, KLEIN, MANDEL, GREENBERG or anyone else on ROCHEL's behalf, called JOEL to tell him what happened to his son or to advise JOEL of his whereabouts. Therefore, JOEL called the 90th police precinct around 10:15 pm, and was told to call "911" and file a missing person complaint. Several minutes later, JOEL did so. The 911 audiotape shows JOEL telling the 911 attendant that he was reporting a "missing child" but then explained the custody issue and the violation of his parenting time ordered by the court without notice.

51.     When Police Officers, Defendant D'ALTO and Daniel Marussich, responded shortly thereafter and came to JOEL's home for about ten minutes, as confirmed by videotape footage, JOEL provided them with the same story, as related in a police report the following day by Officer Marussich. JOEL also gave his father-in-law KLEIN's telephone number and his own cellular phone to D'ALTO, to call KLEIN, as he did not have contact information for ROCHEL.

52.     After Defendant D'ALTO spoke to KLEIN for about nine minutes, the police went to ROCHEL's residence where Aron was asleep. JOEL followed then and waited outside ROCHEL's residence to find out what happened to his son. As relayed to him by D'ALTO, ROCHELL told him she planned to take Aron to his pediatrician the following day.

53.     On April 23, 2014 JOEL's attorney, sent a letter to ROCHEL's attorney alleging that ROCHEL had failed to send Aron with the two other children the day before. She stated: "[e]ither Aron suffered an injury that Ms. Herman is refusing to disclose and to medically treat, or Ms. Herman willfully withheld the child yesterday." No meaningful response was ever given to that letter.

54.     Upon information and belief, the source being ODA Medical Center records, on April 23, 2014, ROCHEL   brought Aron there and reported that he had "slipped and hurt both legs" while at the playground yesterday, and he received treatment for the injuries sustained. However, on April 24, 2014, when JOEL attempted to get health related information regarding Aron, he was informed him that ROCHEL had instructed the ODA staff not to call him because he is not on the HIPPA form."

55.     On or about April 24, 2014, JOEL filed a complaint with the New York City Administration for Children's Services ("ACS") regarding Aron since he was unable to obtain any information about the boy.

56.     In a complaint follow-up by Police Officer Marussich on April 23, 2014, one of two officers responding to the 911 call, he noted that no offense had been committed and that the dispute underlying the April 22, 2014 911 call was one between two parents over custody of their son. This conclusion was approved by Supervising Reviewer Defendant PEREZ on April 29, 2014.

**C.   The Conspiracy to Have JOEL Arrested and Tried on False and Fabricated Charges**

57.     Upon information and belief, Defendant KLEIN arranged for: (i) the Defendants GREENBERG and MANDEL to be major supporters and financial backers of ROCHEL; (ii) the defendant EISNER to be a paid adviser to ROCHEL in connection with her divorce action and (iii) the Defendant YACOOB to be ROCHEL's divorce

attorney and her active co-conspirator. YACOOB is also TEITELBAUM's divorce attorney in a then pending divorce action.

58.     Upon information and belief, the source being ROCHEL's walk-in police complaint of harassment against JOEL on May 5, 2014, given to WIEBER:

> *On 4/25/2014 ACS appeared* at my parents' home then proceeded to where I live. They told me a new allegation was made against me. I had already received in the past, countless notices of false allegations made against me, proven to be unfounded. *ACS investigated me for over an hour, then examined and checked my kids all over for bruises*. *Mr. Herman uses the ACS, as another tool to harass & harm my children and myself. please help me stop this immediately* thank you. Furthermore, the father was indeed notified about the whereabouts of my son. Despite that however, Joel Herman found it very useful to report to ACS again, thus causing much distress. *The transporter, as well as my kids informed him* (emphasis added).

59.     Upon information and belief, the source being a congregant at the same synagogue as KLEIN, MANDEL and GREENBERG, between April 27, 2014, two days after ACS investigators appeared at ROCHEL's residence and began an investigation by checking her kids for bruises (*see* preceding paragraph), ROCHEL, KLEIN, MANDEL, GREENBERG and EISNER met at the Williamsburg synagogue they attend, to deal with the ACS investigation caused by JOEL's complaint, which they agreed had to be derailed immediately, and how to punish JOEL so that he does not file a complaint.

60.     Upon information and belief, the source being a congregant, there and then, they corruptly devised a scheme to enlist WIEBER, who had previously helped them (see ,*supra*) in Family Court, instigate a series of false arrests and malicious criminal prosecutions against JOEL, based on manufactured crimes they knew he had never committed and on false criminal charges that they knew to be unfounded.

61.    Upon information and belief, the source being a congregant at said synagogue,  all the named participants at that meeting agreed that KLEIN, MANDEL and GREENBERG would contact WIEBER and enlist his help to have JOEL arrested on trumped up charges stemming from his purported 911 call on April 22, 2014. To make that call false, MANDEL and GREENBERG stated they would cover WIEBER as to the false claim by giving him false affidavits to the effect that they had advised JOEL about the whereabouts and condition of his son, Aron, when they brought the other two sons there earlier that day.

62.    Upon information and belief, the source being the same congregant, KLEIN called YACOOB from that meeting and apprised him of their plans and asked for any ideas. YACOOB then offered to enlist the help of TEITELBAUM, who was his client in a divorce action, and was now the boyfriend of, a friend of JOEL.  Upon information and belief, after TEITELBAUM was paid $10,000 in cash to turn his girlfriend against JOEL and substantial additional fees were paid by KLEIN, GREENBERG and MANDEL to EISNER and YACOOB, EISNER, TEITELBAUM  and YACOOB joined the conspiracy to get JOEL as aforesaid.

63.   Upon information and belief, between April 28, 2014 and on or about May 26, 2014, the day of JOEL's first false arrest, at one or more clandestine face-to-face meetings by WIEBER and some or all of the Private Defendants in Williamsburg, followed by a flurry of telephone calls, text messages and/or email communications between all the co-conspirators, the Private defendants and WIEBER cemented  the conspiracy as aforesaid.

64.  Upon information and belief, during these meeting[s] and follow-up communications heretofore described, the individual defendants discussed and formulated the details of this corrupt conspiracy to have JOEL arrested and tried on trumped up charges, openly discussing the fact that GREENBERG and MANDEL never transported two out of three kids to JOEL's residence, for visitation purposes, on April 22, 2014 and never advised him of his missing son Aron's condition or whereabouts, the type of common scheme contemplated and the method by which the defendants intended to carry out their objectives to have JOEL arrested at a hotel exchange place on May 26, 2014 where he would bring the kids back after visitation, to be returned by transporters to ROCHEL's residence, and for WIEBER to notify ACS of the arrest to stop any investigation initiated by JOEL in its tracks.

65.  Upon information and belief, during these meeting[s] and follow-up communications heretofore described, WIEBER and each of the Private Defendants agreed that WIEBER would also provide police reports and other arrest records to YACOOB for immediate use in New York State Supreme Court to (i) restrict or greatly diminish the extensive and liberal terms of JOEL's access to his children previously ordered by the Family Court on October 24, 2013; (ii) to stop JOEL from unsupervised and weekend visitation of his three kids on a regular basis, and to (iii) ultimately weaken JOEL's chances of obtaining custody of his children and assure that ROCHEL obtains permanent legal custody of the children by ultimately prevailing at a custody/visitation trial.

66.  Upon information and belief, during these meeting[s] and follow-up communications heretofore described, including communications between the co-

conspirators via telephone conversations, text messages, and email communications to those Private Defendants who were not in attendance at the face-to-face meeting[s] with WIEBER, WIEBER and each of the Private Defendants fully discussed (1) the formation and operation of the conspiracy as aforesaid; (2) the objectives, goals and desired results of the conspiracy as aforesaid; (3) the commission of constitutional violations pursuant to the conspiracy as aforesaid, (3) damage to JOEL that would result from those wrongful acts as aforesaid, and (4) the principal roles and specific ways that the individual co-conspirators would implement the planned arrangements which were the subject of the conspiracy, as described in detail herein.

67.     Upon information and belief, at all times thereafter until the dismissal of all charges on November 17, 2014, the individual Private Defendants acted in concert with WIEBER, having reached an understanding with him to cause JOEL's arrests and ensuing prosecutions on false and impermissible grounds, and acted as willful participants in joint activity with WIEBER to perpetuate these baseless prosecutions until their complete dismissal as aforesaid.

68.     Although the exact date and time each co-conspirator joined the conspiracy is not yet known pending discovery in this action, each co-conspirator performed at least one or more unlawful overt acts in furtherance of such conspiracy and is therefore fully responsible for all its consequences.

**D. WIEBER Acts on the Conspiracy by Convincing His Supervisors to Allow Him to Reopen the April 22, 2014 911 Call Investigation**

69.     In his complaint follow-up dated May 5, 2014 to ROCHEL's staged walk-in complaint that same day, without conducting any investigation whatsoever, WIEBER literally copied used the same language employed by ROCHEL in her complaint and

concludes that: "Joel Herman made a false report to the police. This is an example of how he uses the system to attack Rochel."

70.    Without any serious supervision of WIEBER's complete and unsupported reversal of the earlier April 23, 2004 police report of Officer Marusich, effectively closing the case, which was approved by supervising officer, Defendant PEREZ, on April 29, 2014, (*see* , *supra*), WIEBER, with PEREZ's approval, reopened the case on May 5, 2014, by virtue of his claimed expertise and knowledge of the Herman custody dispute.

71.    Upon information and belief, the source being police reports obtained under FOIL, to make the manufactured and perfunctory case against JOEL appear to be legitimate, WIEBER flooded the police record with numerous perfunctory reports to justify the planned arrest of JOEL, all of which were invariably approved in a perfunctory manner by supervising officers STEWART, PEREZ, PASO, MAMYS, MALDONADO, MCKINNEY, and JOHN DOES 1-5.

72.    Upon information and belief, the source being police reports obtained under FOIL, the first false arrest of JOEL on May 26, 2014 was approved by the chief commanding officer of the 9oth PDU,  Defendant DOHERTY,  on May 21, 2014, who shortly thereafter, approved the subsequent second and third arrests on May 27, 2014 and May 30, 2014.

73.    As a direct and proximate result of the individual Defendants, while acting individually, jointly, and/or in conspiracy with each other, JOEL was false arrested and falsely imprisoned on three separate occasions on May, 26, 2014, May 27, 2014 and May 30, 2014, respectively, and maliciously prosecuted thereafter in two separate criminal cases which purportedly arose therefrom.

**E. The Two False Arrests of JOEL on May 26, 2014 and May 27, 2014, respectively, and His Malicious Prosecution Arising Therefrom in NYC Criminal Court, Kings County, P*eople v Herman*, Docket No. 1-2014KN 038594-Filed May 27, 2014 and Dismissed on the Merits on September 3, 2014 and November 17, 2014**

74.    On Monday, May 26, 2014, at approximately 7:10 P.M., JOEL was arrested (Arrest # K14646926) by WIEBER, in the lobby of the Point Plaza Hotel ("hotel") at 2 Franklin Ave., Brooklyn, New York, after he brought his three kids there following visitation,   based on the underlying facts and charges contained in TPO-1 of the accusatory instrument issued the following day.

75.    As stated, the hotel was an established exchange point where JOEL had just returned his three children to ROCHEL, after the completion of their Monday evening visit at the father's nearby residence. Incredulously, waiting across the street in a car, in front of the hotel, with a working camcorder taking pictures, were co-conspirators TEITELBAUM and EISNER, who witnessed the entire arrest scene.

76.    Moments before the arrest, TEITELBAUM's girlfriend called JOEL to advise him that she had just been told by TEITELBAUM that he was going to be arrested soon. At about the same time, after the children were taken away from the hotel by one of ROCHEL's transporters, JOEL walked outside the hotel and noticed the car with TEITELBAUM and EISNER, whom he recognized, sitting across the street.

77.    Frightened by their appearance, JOEL thought he was about to be followed, and called 911 to report what was transpiring. Police 911 records show that the 911 dispatcher called the 90th Precinct and was relayed to WIEBER who told him everything was okay. The hotel videotape footage then shows WIEBER appearing at the scene, long after the children had been dropped off and taken from the hotel, first stopping in front of the TEITELBAUM and EISNER car and directing them with his hands to leave. They

22

immediately did so. WIEBER then approached the hotel with his backup detective, handcuffed JOEL and removed him from the premises. The hotel videotape footage shows that JOEL was never told why he was being arrested, in flagrant violation of police procedures.

78.     At the 90th precinct, while walking JOEL up a staircase in handcuffs to a waiting cell, WIEBER repeatedly shoved his head into the wall in an intimidating manner and told him in sum and substance: "I have been following you for 3 years, a-hole. Now I got you. .I am gonna bury you f-kin a-hole." WIEBER further stated: "Why do you call ACS on her? You want her to lose the kids ha? I will never gonna let this happen. As long you mess with Rochel, I will mess with you in every way possible."

79.     Before going up the staircase, defendant STEWART, acting as the desk sergeant that evening at the 90th precinct front desk, witnessed WIEBER conducting a flagrantly illegal and warrantless search and seizure in his presence, purloining various credit/debit cards contained in a closed wallet in the Plaintiff's pocket and placing them in his own pocket, after Plaintiff had already been brought by WIEBER to the police precinct in handcuffs, without stopping him or reporting his illegal activity.

80.     In one of his many police reports, WIEBER described the purported legitimacy of his search in police reports as having done under the SILA (search incident to an arrest) exception even though such exception did not apply in the circumstances under clearly established federal and state law.

81.     Later that night, about 1:30 A.M., while in custody in a holding cell, JOEL was rearrested again, in an undocketed arrest (Arrest # K14647007) approved by

Defendant DOHERTY, and was fingerprinted and booked again, based on the charges contained in TPO-2 and TPO-3 of the accusatory instrument issued the following day.

82.     While in a holding cell, JOEL heard WIEBER and his co-conspirator TEITELBAUM conversing. TEITELBAUM had left the hotel at WIEBER's direction, but reappeared at the 90th Police Precinct, followed by the appearance of his girlfriend, Breindy Rosenberg ("Rosenberg"), after midnight, to explain why her debit/credit cards were in JOEL's possession. When Rosenberg stated she had given JOEL permission to manage her bank accounts and debit/credit cards, WIEBER and TEITELBAUM pressured her to lie and sign a statement that it was done by JOEL without her authority by telling her that he was a thief and that he had tried to rob her. When she asked for proof of that assertion, she got nothing but more pressure until she relented and signed the statement. WIEBER's police report regarding this incident gives a totally false picture of what transpired.

83.   The next day, JOEL was charged in a felony complaint dated May 27, 2014, Docket No. 1-2014KN 038594, comprising one felony and eight misdemeanors, broken down into three categories for a total of thirteen counts, and released from jail upon his own recognizance. The criminal allegations were as follows:

> (TPO-1) On April 22, 2014, at approximately 10:30 PM, Joel Herman made a purportedly false 911 call reporting a missing child-one of his three minor children that was inexplicably and without notification not brought to his residence for visitation on the last day of the Passover Jewish holiday along with the other two children, thereby committing the offenses of falsely reporting an incident in the third degree, under PL 240.50(2) and PL 240.50(3)(A) (2 counts);

> (TPO-2) On May 26, 2014 at approximately 07:10 PM, at 2 Franklin Avenue, Brooklyn, New York, Joel Herman committed the additional offense(s) of criminal possession of stolen property in the fourth degree; PL 165.45(2); criminal possession of stolen property in the fifth degree,

PL 165.40; criminal impersonation in the second degree, PL 190.25(4); and identity theft, PL 190.78(1).

(TP0-3) On May 26, 2014 at approximately 07:10 PM, at 2 Franklin Avenue, Brooklyn, New York, while driving his three children into the Point Plaza Hotel Parking lot, Wieber purportedly observed Joel Herman committing the offense(s) of (i) driving on a sidewalk, VTL 1225-a; (ii) operating a vehicle without safety belts on each of the three Herman children, VTL 1229-c(1) (3 counts); and endangering the welfare of each of the 3 Herman children, PL 260.10(1) (3 counts).

84.    In point of fact, WIEBER did not personally observe the conduct of JOEL while driving his children in front of the hotel, or how he went into the hotel parking lot or the manner in which his children exited the car because, as the videotape footage clearly shows, WIEBER was not anywhere near the hotel at the time JOEL arrived and dropped-off his kids there. Indeed, only TEITELBAUM and EISNER were across the street, but, as the videotape footage clearly shows, and he could not possibly have observed the events he describes in the criminal complaint, all of which, in any event were false and contrived, and sworn to falsely by WIEBER under penalty of perjury.

85.    WIEBER's completely false criminal complaint, his contention in a police report that he had a witness to back him up as to his description of the events taking place at the hotel,  and his obvious joint activity with EISNER and TEITELBAUM, who otherwise had no business at the hotel,  in effectuating the false arrests, the statements made to JOEL while taking him to a holding cell, and the fraudulent joint efforts to turn his girlfriend into a false witness against JOEL for the second false arrest, plausibly suggest a conspiracy and are entirely inconsistent with any alternative explanation of independent action by WIEBER and the two Private Defendants.

86.    In any event, there was a complete absence of probable cause for the false arrests and imprisonment of JOEL and for the commencement of criminal proceedings

against him. WIEBER had no knowledge or reasonably trustworthy information of facts and circumstances that would have been sufficient to warrant a person of reasonable caution in the belief that the Plaintiff, the person to be arrested for a purported false 911 call on April 22, 2013, the impetus for the first arrest, or that he had in any way actually committed the offenses of falsely reporting an incident in the third degree, under PL 240.50(2) and PL 240.50(3)(A).

87.    In fact, as detailed above, WIEBER actually knew that the underlying facts supporting the charges contained in TPO-2 and TPO-3 were contrived and false, but nevertheless, pursuant to the corrupt agreement and conspiracy with the Private Defendants as aforesaid, effected three false arrests and two malicious prosecutions with actual malice on the part of WIEBER & D'ALTO to harm JOEL, primarily for the purposes stated above, and not for bringing a *bona fide* offender to justice.

88.    Moreover, in accordance with the corrupt agreement and conspiracy with the Private Defendants as aforesaid, WIEBER maliciously filed with ACS a false Report of Suspected Child Abuse & Mistreatment dated May 27, 2014 regarding the charges contained in TPO-3 which states:

> Arresting officer observed the father of the children driving his vehicle with the children inside. None of the children were in child seats or were wearing seatbelts. The father drove his vehicle on the sidewalk directly i/f/o 2 Franklin Ave. in Brooklyn. He then erratically placed vehicle in reverse and drove backward on the sidewalk in an erratic way causing pedestrians to hurriedly move out of his way. Father then placed vehicle in drive and drove forward, again on the sidewalk, and quickly made a sharp right turn into a driveway where the children immediately opened the car door and exited the vehicle.

89.     WIEBER's completely false report filed with ACS further plausibly suggests a corrupt conspiracy and is entirely inconsistent with any alternative explanation of independent action by WIEBER.

### F.  The Sept. 3, 2014 Dismissal of All Charges Contained in TPOs 2 & 3

90.     On Sept. 3, 2013, at the next scheduled court appearance date, all the charges contained in TPO-2 and TPO-3 sections of the accusatory instrument (but <u>not</u> the first two charges for purportedly making a false 911 call contained in TPO-1), were dismissed by the criminal court, at the request of the Assistant District Attorney, who stated:

> THE COURT: What is the reason for dismissing the two TPOs?
>
> MS. ROWE: [TPO-2]-The people received video footage, the defendant's entrance in dropping off area was blocked. The defendant drove in a careful and reasonable manner to obtain access to drop off location. The third TPO [TPO-3] -the defendant and Complaining Witness are known to each other and defendant and Complaining Witness had access to personal-
>
> People are serving and filing three supporting depositions. Announcing Ready. And only on the remaining TPO, AP-3.
>
> THE COURT: So the only surviving TPO will be
>
> TPO-1. MS.ROWE: Yes.

91.     Notably, WIEBER's sworn allegations in the factual portion of the Felony Complaint (TPO-3) and in the aforementioned child abuse report filed with ACS the same day, to the effect that that he had *personally observed* JOEL driving the three Herman children in an erratic and reckless manner, without seat belts, onto the sidewalk in front of the Point Plaza Hotel, were deliberately false and maliciously fabricated-the only conclusion that can be reached ***upon viewing the hotel surveillance camera footage*** which, as noted by the District Attorney, shows that the exact opposite is true.

92.     As to the TPO-2 charges of criminal possession of stolen property in the fourth degree, criminal possession of stolen property in the fifth degree, criminal impersonation in the second degree and identity theft, these charges were based on two debit cards of a third party, Breindy Rosenberg, and an internet purchase receipt of $93.49 charged to one such card, found in JOEL's possession at the time of his arrest. However, Breindy Rosenberg had told WIEBER that very same night, at the police station, that the expenditure and the cards being held by JOEL were authorized, but WIEBER, with the help of her boyfriend, had pressured her to sign a fraudulent and false statement implicating him in a crime. Subsequently, upon review of numerous e-mails and texts between JOEL and Breindy Rosenberg ("Rosenberg"), the Assistant District Attorney concluded that Breindy Rosenberg and JOEL were "known to each other" and that JOEL had authorized access to her personal finances to help her pay her bills and to charge and hold her two debit cards.

93.   Not only did WIEBER pressure Rosenberg to lie at the police precinct that night and sign a false statement to buttress the false charges contained in TPO-2 of the accusatory instrument, but the debit cards and receipt which purportedly formed the basis for these charges were unlawfully seized by WIEBER from JOEL's pockets at the police station, in front of another supervising officer, name unknown, who said nothing, after he had been arrested at the Pointe Plaza hotel and driven to the police station in handcuffs. The debit cards were seized from a closed wallet without a search warrant, in violation of the 4th Amendment of the United States Constitution, as clearly established by the united States Supreme Court, and the New York Constitution and clearly established jurisprudence of the New York Court of Appeals.

**G.    The November 17, 2014 Dismissal of The Purported False 911 Call Charges In TPO 1**

94.    The remaining charges contained in TPO-1 which allege that Joel Herman placed a false 911 call on April 22, 2014, at approximately 10:30 PM, were dismissed by the criminal court on November 17, 2014, upon consent of the District Attorney.

95.    The factual portion of the Felony Complaint alleges that:

> Deponent is informed by Rochel Herman that just prior to the first above time and place, the informant was in the park with Arron Herman and while at same location the child sustained an injury on the playground for which informant brought said child to a doctor's office.
>
> Deponent is informed by Ari Greenberg that informant accompanied two of the three children to the above stated location for said children to have visitation with the defendant, and informant stated to defendant in sum and substance that Aaron Herman, the above stated child, was not present for said visit with the defendant ***because said child was with Rochel Herman at the doctor's office following an injury sustained at the park.***
>
> Deponent is informed by the official records of the New York City Police Department 911 Transmission, kept in the regular course of business that, at the first above time and place, the defendant telephoned 911 reporting an emergency in that defendant stated in sum and substance that defendant's four year old son Aaron Herman was missing.
>
> Deponent is further informed by Police Officer Dalto, Shield No 9117 of 90 Command, that at the first above time and place, the informant responded to Defendant's emergency telephone call and that defendant repeated again to the informant that defendant's son, Aaron Herman was missing, whereupon the informant began a search for said child.
>
> Deponent is further informed by the informant that, at the first above time and place, the defendant claimed ***for approximately thirty minutes*** that defendant does not know the address of Rochel Herman and Arron Herman, ***thereby impeding informant's investigation for the missing child***, and upon finally learning Rochel Herman's address, informant observed that said child, Arron Herman, who lives with Rochel Herman, was at home in bed sleeping. (Emphasis supplied).

96.    Three supporting depositions were subsequently served and filed by the District Attorney: (i) ROCHEL's deposition dated August 13, 2014, (ii) GREENBERG's

deposition dated August 11, 2014 and (iii) D'ALTO's deposition dated June 29, 2014. Each of these verified depositions states that "the facts in the Instrument stated to be on information furnished by me are true to my personal knowledge."

97.     There is no dispute that (1) Chaim and Eliezer Herman were brought to JOEL's residence on the last day of the Passover holiday, April 22, 2014, at about 6:00 P.M., for overnight visitation purposes, and that (2) Joel Herman made a 911 call later that evening, after the conclusion of the Passover holiday, at about 10:30 P.M., regarding his third son, Aron, as a result of his not being brought for visitation with his brothers at 6:00 P.M. The accusatory instrument alleged, however, that the 911 call was "false," and not that of a genuinely concerned father who was clueless as to what happened to his missing, possibly injured son in the midst of a heated custody/visitation dispute with his estranged wife, because (1) "[Ari Greenberg] *stated to defendant in sum and substance that Aaron Herman... was not present for said visit with the defendant because said child was with Rochel Herman at the doctor's office following an injury sustained at the park*" and because, (2) Police Officer D'Alto swore that "the defendant claimed *for approximately thirty minutes* that defendant does not know the address of Rochel Herman and Arron Herman, *thereby impeding informant's investigation for the missing child.*"

98.     However, timed video surveillance footage obtained from two different sites and JOEL's cellular phone records for April 22, 2014 demonstrate beyond any doubt that both GREENBERG's and D'ALTO's sworn statements were deliberately false and malicious.

**False Statement # 1-The Allegation by WIEBER that GREENBERG or MANDEL Brought Two Herman Children to JOEL's Residence on April 22, 2014, at about 6:00 P.M., and Notified Him that his son Aron was Not Present because He Had Been Injured at the Park or Was at the Doctor's Office Is Entirely False and Maliciously Fabricated**

99.   This false allegation is not only attributed to in the accusatory instrument but elaborated upon in GREENBERG's separate Affidavit dated July 28, 2014, which was submitted to the Supreme Court in the divorce case. There, GREENBERG states that "on a weekly basis, since the inception of the litigation between Ms. Rachel Herman and Mr. Joel Herman, [he has] assisted in transporting the parties' children to and from pickup and drop offs" and that MANDEL is "another well-established transporter for the Herman children." GREENBERG further avers that "[o]n April **22, 2014** myself [and] Mr. Aron Mandel...delivered the Herman children named Chaim and Eliezer to Mr. Herman," and that ***"[w]e notified Mr. Herman of a playground incident which had occurred earlier in the day** and was the **reason for Aron Herman not being produced."***

100.   Likewise, in a separate Domestic Incident Report ("DIR") dated **May 5, 2014**, Wieber elaborates on the same story, and without a shred of evidence, adds his own biased commentary as follows:

> There have been ongoing issues between Joel Herman & his ex-wife Rochel Herman for years. Mr. Herman has been psychologically abusing Rochel for years. He & his family have made false accusations about her. On 4/22/14, Rochel took their son Aaron to the park where he got hurt. She took Aaron home and made an appointment with the pediatrician. Aaron was due to visit with his father later on that day along with his 2 brothers. She did not sent Aaron because she wanted him seen Doctor. The person who transports the children to the father is Mr. Aaron Mandel ***She told Mr. Mandel to inform Joel of what happened which he did when he dropped off Chaim & Eliezer***.
>
> Later on that evening, at approximately [10:30 P.M.], Joel Herman called 911 and reported his son Aaron missing. He reported he last saw Aaron the day before and that **today (4/22/14) a "stranger" dropped off 2 of his children and the youngest was missing**. He communicated to the

**police that that he was extremely concerned about Aaron's whereabouts**. Officers from the 90th precinct went to Rochel Herman's residence at approx. [11:00 P.M.] and questioned her about Aaron. She explained to the officers what had occurred and the officers examined Aaron-saw that everything was fine and then left. **Joel Herman made a false report to the police. This an example of how he uses the system to attack Rochel. (Emphasis supplied).**

101.    However, surveillance camera footage shows that neither GREENBERG nor MANDEL ever dropped off two of the three Herman sons at JOEL's residence on April 22, 2014, and could not have possibly advised him of Aron's absence and why that happened. Instead, GREENBERG and MANDEL studiously avoided having any contact with JOEL, although they did accompany MANDEL's 14 year old son, as he drove the kids in a double baby stroller, on a walk from ROCHEL's residence at 32 Walton St. to the apt. building residence of Joel Herman, at 155 Ross St (due to the holiday in which riding in an automobile is prohibited), as they waited at the corner while MANDEL's 14 year old son, whose identity was then unknown to JOEL, dropped off the two kids in less than a minute, without identifying himself or advising why Aaron was not with his brothers.

102.    Only after the 14 year old left JOEL's apt. building with an empty baby carriage did GREENBERG and MANDEL meet up with MANDEL's son on the way back to ROCHEL's residence. Surveillance camera footage conclusively shows that neither of these two persons ever came to the HERMAN building, and could not possibly have advises JOEL of the condition and whereabouts of his missing son Aaron. And of course, GREENBERG did not call JOEL or leave a message with him during the Passover holiday.

103.   To the contrary, GREENBERG's studious avoidance of JOEL that day was apparently calculated to avoid his having any knowledge of the injuries sustained in the park by his minor son Aron.

### H.   False Statement # 2- D'ALTO's Allegation that "the Defendant [JOEL] Claimed *For Approximately Thirty Minutes* that Defendant Does Not Know the Address of ROCHEL or her minor son Aron, *Thereby Impeding Informant's Investigation for the Missing Child*" Is Demonstrably False and Contradicted by Surveillance Camera Footage

104.   Equally proven baseless by surveillance camera footage and telephone records of JOEL's April 22, 2014 cellular phone is D'ALTO's sworn allegation that "the defendant claimed for approximately thirty minutes that defendant does not know the address of ROCHEL and her minor son Aron, thereby impeding Informant's investigation for the missing child."

105.   In fact, pictures taken from footage of surveillance cameras show two police officers arriving in response to the 911 call at about 10:38 P.M. After speaking to JOEL for only about three minutes-*not 30 Minutes as claimed by D'ALTO*-JOEL is seen dialing his cellphone to Defendant KLEIN, ROCHEL's father, first at 10:41 & then again 10:42 P.M., respectively. Each time he handed the phone to D'ALTO, who spoke to Defendant KLEIN about 10 minutes until about 10:51 P.M. Both phone calls to KLEIN are also reflected in the cellular phone co. records.

106.   According to JOEL, he gave ROCHEL's address to D'ALTO immediately but told him that he had no phone number to reach her and that he did not know if the missing child was now at her residence. Instead, he told D'ALTO that only Defendant KLEIN would know. That is why JOEL dialed KLEIN's number on his cellular phone

for D'ALTO. KLEIN hung up at first but changed his mind after he was told D'ALTO wanted to speak to him.

107.    Corroborating these statements, surveillance camera footage shows avisibly frustrated D'ALTO, wagging his fingers at an apparently uncooperative KLEIN, who left JOEL's apartment immediately thereafter at 10:51 P.M. from where he went straight to ROCHEL's residence.

108.    Although JOEL had learned from the other two minor children (ages 5-6) that Aron fell in the park and injured himself, they were unable to furnish details about his condition or his whereabouts. Further, JOEL had no contact person on ROCHEL's side or even a cellphone number to call on an emergency basis. When no one from ROCHEL's side called for about an hour after the end of the Passover holiday to advise as to Aron's condition or where-about, JOEL panicked and called the 90th police precinct. At their suggestion, he then called 911 several minutes later. In fact, the telephone records and the surveillance camera footage confirm JOEL's claim that he first called the 90th Police Precinct on 4-22-14, at 10:18 P.M., and then, at their suggestion, called "911" at 10:22 P.M. Under these circumstances, the District Attorney concluded that there was no evidence to support the allegation that the "911" call made by JOEL the night of April 22, 2014 was anything but genuine.

**I. The Third False Arrest of JOEL on Friday, May 30, 2014 and His Second Malicious Prosecution Arising Therefrom in NYC Criminal Court, Kings County, P*eople v Herman*, Docket No. 1-2014KN 040353--Filed May 31, 2014 and Dismissed on the Merits on October 2, 2014.**

109.    On Friday, May 30, 2014, shortly before the beginning of the Sabbath, JOEL was arrested at his house in front of one of his minor sons who was taken to the 90th Police Precinct in the same police vehicle with his father JOEL, who was arrested

and sat in handcuffs. Defendant MANDEL was waiting at the police station and took the child home to ROCHEL. DOES 7-10 were on duty on the evening of May 30, 2014 and actively participated in the third false arrest of Plaintiff at his residence on May 30, 2014. The alleged false basis for this arrest is explained in the ensuing paragraphs.

110.    At his first appearance in Part AP3 of the King County Criminal Court on May 27, 2014, in Case #1 discussed in Section A above, Docket No. 1-2014KN038594, JOEL was released on his own recognizance, but the AP3 Court issued a complete stay-away temporary order of protection ("T.O.P.") pursuant to CPL § 530.12, as a result of the pending family offenses [endangering the welfare of a child, PL 260.10(1)) (3 Counts for 3 children)], which barred the defendant from having any contact with his estranged wife and their three minor children and from their home, school, business and place of employment.

111.    Because of the pending orders issued in the divorce action in Supreme Court dealing with custody/visitation issues, as well as a prior order of the Family Court, and defense counsel's specific request at arraignment, a combined typed/handwritten sentence was added and initialed by Judge Tully, which specifically made the T.O.P. subject to "SUPREME COURT OR FAMILY COURT ORDERS REGARDING CUSTODY AND VISITATION". The orders themselves were not attached to the T.O.P.

112.    In fact, a March 20, 2014 Supreme Court order had modified and superseded an earlier Family Court Order dated November 23, 2013 by providing for special interim Passover visits and by changing the subsequent alternate weekend schedule to accommodate the effects of such Passover visits. Indeed, the March 20, 2014, interim Passover visitation order had set forth at par. 7, in relevant part, as follows:

"Following the [2014] Passover holiday, the alternate weekend access schedule shall resume w/ [sic] the mother having the children [commencing] on [Friday] 4/25 ..." The alternate weekend access schedule through May 30, 2014, according to the superseding Supreme Court Order was therefore as follows:

- Weekend commencing April 25, 2014 – Rochel;
- Weekend commencing May 2, 2014 – Joel;
- Weekend commencing May 9, 2014 –Rochel;
- Weekend commencing May 16, 2014 –Joel;
- Weekend commencing May 23, 2014 –Rochel;
- Weekend commencing May 30, 2014 –Joel.

113.    In accordance with that order, ROCHEL had the children for the weekend beginning on May 23, 2014. The following weekend commencing on Friday, May 30, 2014, JOEL picked up his son Aaron at yeshiva school (the other 2 children did not go to school that day) and took him to his residence for a full weekend stay over. Nevertheless, at about 5:50 P.M. that Friday, JOEL was falsely and deliberately arrested again at his residence, in the presence of his minor son Aaron, by the same WIEBER, and charged with Custodial Interference, Second Degree, PL 135.45(1), and Criminal Contempt, Second Degree, PL 215.50(3).

114.    Against this background, it is clear that the factual portion of the resulting misdemeanor complaint sworn to by WIEBER, and the supporting deposition sworn to by ROCHEL on August 13, 2014, which studiously refer only to a Family Court order, without the subsequent Supreme Court Order referred to in the May 27, 2014 TOP, were deliberately false and misleading, and designed to have her husband falsely arrested and charged, so as to further stop him from seeing his children in the liberal manner ordered in April 2014 by the Supreme Court and to obtain a permanent custody award.

115.    The accusatory instrument states:

> **The deponent was informed by Rochel Herman** that, at the above time
> and place, the defendant did pick up their child in common from school
> and bring the child in common to the defendant's residence without
> permission or authority. The deponent further states that the above-
> described conduct by the Defendant was in violation of a 5/27/2014
> Order of Protection, issued by Judge Jane Tully under Docket No.
> 2014KN030594 in effect until 11/28/2014, and ordering the defendant to
> stay away from the home, school, business, and place of employment of
> the informant and the children in common. The deponent further states
> that the above described order of protection is marked subject to family
> court orders regarding visitation and the above-described conduct by the
> defendant was in violation of a 10/24/2013 Kings County Family Court
> Order of Protection issued by Judge Amanda White, granting the
> defendant visitation on alternate Fridays beginning on 10/25/2013.

> **The deponent is further informed by the informant that, the above
> time is not the defendant's weekend for visitation** (darkened emphasis
> added).

116.    That WIEBER acted maliciously and deliberately in causing the
commencement of a baseless criminal prosecution, is clear from the fact that an
experienced criminal defense attorney, Richard Finkel Esq., of Meissner, Kleinberg &
Finkel P.C., appeared on JOEL's behalf at the 90th Precinct on the evening of May 30,
2014, with copies of the applicable Family Court and superseding Supreme Court orders.
Attorney Finkel sought to demonstrate to WIEBER and either Defendant D'OHERTY,
DOE 2 or DOE 3 that JOEL rightfully had visitation with the Herman children at his
residence that weekend and was therefore wrongfully arrested and should be released
forthwith. WIEBER and his supervisor both claimed that it was too late to do anything at
that late hour because the prosecutor was gone, but did nothing to notify the prosecutor
the following day before or after arraignment that the charges were baseless.

117.    In fact, WIEBER did nothing but collect supporting depositions from
D'ALTO, ROCHEL and GREENBERG to uphold the fraudulent charges and personally

appeared before the District Attorney in late August 2014 to unsuccessfully stop the case from being dismissed.

118.    On June 10, 2014, the first appearance date after arraignment, YACOOB appeared at the criminal proceeding and falsely and deliberately told ADA Nash then representing the People that the obviously false contempt and custodial interference charges were correct because the dates in the underlying Family Court and Supreme Court orders were based on the Hebrew lunar calendar. Both JOEL and his criminal attorney, Mr. Fink, heard YACOOB make these false statements. They were also reflected in the notes of the Assistant District Attorney assigned to that case and his supervisor. As ROCHEL's divorce attorney, YACOOB knew this statement to be false, but made it as part of the conspiracy to continue and perpetuate these false charges as long as possible, as he had already received a June 3, 2014 order from the State Supreme Court significantly reducing JOEL's existing access schedule to midweek daytime only visits supervised by a social worker and a temporary stay away restraining order dated May 30, 2014, based on the first set of criminal charges against JOEL.

### J.   The Oct. 2, 2014 Dismissal of the False Charges

119.    On October 2, 2014, the second appearance date after arraignment on the second criminal case, the Criminal Court dismissed the contempt and custodial interference charges on the merits and vacated the outstanding Criminal Court temporary order of protection. That the contempt and custodial interference charges were meritless was confirmed by the District Attorney on October 2, 2014, at which time the Criminal Court dismissed the charges, upon consent of the People:

> Assistant District Attorney Farkas: I looked at the orders from [S]upreme C]ourt [in the divorce action] and according to my

calculation **this arrest should not have happened** .... It looks as though it was the defendant's weekend [to have access with the children]. In light of that I believe that docket should be dismissed. ...

The Court: That docket, 0353, is dismissed. The temporary order of protection is vacated.

120. In addition, there can be no question that ROCHEL knew she had the children the prior weekend beginning on Friday, May 23, 2014. Moreover, when WIEBER arrested JOEL the first time on Monday, May 26, 2014, while returning his children after an extended Monday afternoon visit at his residence, he had to have known that ROCHEL had the children that weekend under the terms of the very Family Court order he cites as the basis for the arrest, that provision was not modified by the subsequent Supreme Court order. Under these circumstances, it is clear that the false arrest, in front of his minor son, who was driven to the police station with his father in handcuffs, was calculated and deliberate and the subsequent malicious prosecution WIEBER instigated, to cause as much harm to JOEL, and for no legitimate purpose.

## CLAIMS FOR RELIEF

### FIRST COUNT

**VIOLATION OF 42 U.S.C. § 1983- DEPRIVATION
OF PLAINTIFF'S FOURTH AMENDMENT
RIGHT TO BE FREE FROM FALSE ARREST & IMPRISONMENT
(Against WIEBER and Each of the Private Defendants)**

121. Plaintiff re-alleges and incorporates by reference the allegations set forth in each preceding paragraph as if fully set forth herein.

122. Pursuant to the Fourth Amendment to the Federal Constitution, it is clearly established law that an arrest and/or imprisonment is unlawful when not supported by probable cause. The Fourth Amendment of the Federal Constitution protects the Plaintiff's right to be free from unreasonable seizures of his person, i.e., the right to be free of

39

unreasonable or unwarranted restraints on personal liberty, and provides that judicial warrants shall issue only upon probable cause, supported by an oath or affirmation, although an arrest without a warrant for a felony or misdemeanor committed in a police officer's presence, is permissible thereunder under certain circumstances not present here.

123.    On or about May 26, 2013, following the return of the three Herman children to the Pointe Plaza Hotel by Plaintiff, WIEBER, acting under color of law within the meaning of 42 U.S.C. § 1983, and in concert with the individual Private Defendants acting as state actors, intentionally and without an arrest warrant, without any crime committed in their presence, probable cause or lawful justification and in willful and/or reckless disregard of the constitutional right of Plaintiff to be free from false arrest and false imprisonment, caused Plaintiff to be falsely arrested, detained and imprisoned without reasonable suspicion or probable cause, taking him to the 90th police precinct, where he was searched, fingerprinted, photographed, interrogated, repeatedly threatened, vulgarly cursed  and assaulted by WIEBER and subsequently imprisoned, thereby depriving Plaintiff of his right to be free from unlawful seizures under the Fourth Amendment to the Constitution of the United States, in violation of 42U.S.C. § 1983.

124.   Pursuant to the Fourth Amendment to the Federal Constitution, it is clearly established law that an arrest and/or imprisonment is unlawful when not supported by probable cause. As the arresting officer, WEIBER did not have knowledge of any reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested.

125.    On or about May 27, 2013, in the early morning hours, WIEBER, acting under color of law within the meaning of 42 U.S.C. § 1983, and in concert with the

individual Private Defendants acting as state actors, caused Plaintiff to be falsely re-arrested a second time, while being detained and imprisoned, without reasonable suspicion or probable cause, for the charges contained in TPO-2 of the first criminal, derived from the fruits of a blatantly illegal and warrantless search and seizure by WIEBER of the Plaintiff's closed wallet and the forced and manipulated statements of an unstable person arranged for by her boyfriend TEITELBAUM, thereby depriving plaintiff of his right to be free from unlawful searches and seizures under the Fourth Amendment to the Constitution of the United States, in violation of 42 U.S.C. § 1983.

126.    On or about May 30, 2013, WIEBER, acting under color of law within the meaning of 42 U.S.C. § 1983, and in concert with the individual Private Defendants acting as state actors, again caused Plaintiff to be falsely arrested, detained and imprisoned for a third time without reasonable suspicion or probable cause, thereby depriving plaintiff of his right to be free from unlawful seizures under the Fourth Amendment to the Constitution of the United States, in violation of 42 U.S.C. § 1983.

127.    At all times relevant herein, in engaging in the actions alleged herein, the individual Government Defendants were acting under color of the laws, statutes, ordinances, regulations, policies, customs and usage of the State of New York, CITY OF NEW YORK and the NYPD, in the course and scope of their duties and functions as officers, agents, servants, and employees of Defendant CITY OF NEW YORK, and with the power and authority vested in them by the CITY OF NEW YORK and the NYPD, and were otherwise performing and engaging in conduct incidental to the performance of their lawful functions in the course of their duties.

128.    At the time of the above-mentioned arrests and during the time of the subsequent detention of Plaintiff, none of the Defendants had in their possession any warrant issued by a judge, court, or magistrate authorizing the arrest of JOEL, or a search of his wallet and its contents upon his arrest.  No warrant had in fact been issued by any court, judge, or magistrate for such arrest and search. The illegal arrests and detentions were unlawful restraints of Plaintiff's physical liberty under circumstances where Plaintiff had a reasonable apprehension that force would be used if he did not submit to the restraints imposed on his physical liberty.

129.    The three false arrests of Plaintiff without probable cause was designed to, and did, cause specific and serious bodily harm, pain and suffering to the Plaintiff and deprived him of his right to be free from false arrest and false imprisonment, as guaranteed by the Fourth and Fourteenth Amendment to the United States Constitution, and was undertaken pursuant to the policies and practices of the NYPD in its 90th police precinct in the manner described more fully above.

130.    Defendant WIEBER further engaged in willful, wanton, malicious, and abusive conduct while falsely arresting and imprisoning Plaintiff under the color of law that deprived Plaintiff of constitutionally protected rights under the Fourth and Fourteenth Amendments of the United States Constitution.

131.    As a direct and proximate result of the above-mentioned unconstitutional acts of WIEBER, while acting as an agent, servant, or employee of Defendant CITY OF NEW YORK, the unconstitutional policies, customs and practices of Defendant CITY OF NEW YORK, and the corrupt conspiracy and joint activity engaged in by each of the the Private Defendants, Plaintiff was deprived of his civil rights through false arrests and

false imprisonment, and has suffered, and will continue to suffer, a deprivation of rights and loss of freedom and reputation, as well as damages including physical and emotional injury and psychological harm such as mental anguish, distress, humiliation and embarrassment affecting his psychological well-being, some or all of which may be permanent, as well as financial harm incurred including attorneys' fees and other costs associated with his defense in both the criminal case and in the parallel divorce action in New York State Supreme Court. The amount of compensatory damages will be established at trial.

## SECOND COUNT

### VIOLATION OF 42 U.S.C. § 1983-
### DEPRIVATION OF PLAINTIFF'S FOURTH AMENDMENT
### RIGHT TO BE FREE FROM MALICIOUS PROSECUTION
### (Against WIEBER, D'ALTO and Each of the Private Defendants)

132.    Plaintiff repeats each and every allegation contained in the above paragraphs as if set forth at length herein.

133.     42 U.S.C. § 1983 claims of deprivations of liberty related to criminal prosecutions implicate the Fourth Amendment right to be free of unreasonable seizure of the person.

134.     Defendants, maliciously and without regard for the Plaintiffs liberty and rights, did violate and/or conspire to violate Plaintiffs right to be free from malicious prosecution or a continuing "seizure" of the person under the Fourth Amendment to the United States Constitution, through the post-arraignment deprivation of the Plaintiff's liberty by way of (i) a post-arraignment obligation to answer criminal charges and several court appearances in connection with the criminal proceedings upon his release from custody, (ii) and a travel restriction upon being released on his own

43

recognizance after his arraignment imposed by New York Criminal Procedure Law §
510.40  that a defendant released on his own recognizance "must ordinarily remain in
the state," until such time as the state prosecutions were terminated in the Plaintiff's
favor through pre-trial dismissals of all charges on the merits, on consent of the
prosecution.

135.   Defendants initiated two separate malicious prosecutions against Plaintiff
on May 27, 2013 and again on May 31, 2013, by falsely charging him with a felony and
thirteen other misdemeanor counts, forwarding false information to prosecutors and
swearing to two false criminal court complaints, which resulted in that rises to the level
of a constitutional violation or 'seizure" sufficient to implicate the Fourth Amendment.

136.   At all times, WIEBER and the other individual Government defendants,
acted within the apparent scope of their authority and office, in official, government
capacities, clothed with the authority of the state and therefore under color of state law.

137.   Defendants acted without probable cause to believe that Plaintiff had
committed the crimes for which he was accused in the institution of the prosecution or
during its continuation. The charges initiated against Plaintiff were without legal or
factual justification. Defendants initiated and perpetuated the charges against Plaintiff
until their dismissal with malice, with absolute disregard for his rights and liberties
and with the specific intent to deprive Plaintiff of his constitutional rights.

138.   All of these deprivations were maliciously designed by WIEBER and
D'ALTO, in concert with each of the Private Defendants, to intimidate and harass plaintiff,
and to defeat, interrupt, hinder, or impede and minimize, to the maximum extent possible, the
substantial and ever increasing visitation rights Plaintiff enjoyed with his children under prior

Family Court and Supreme Court orders and his battle for the permanent custody of the three Herman children in Supreme Court.

139.   As a minimum, the Defendants well knew that ROCHEL was an inherently unreliable informant as to the plaintiff because of clear animosity by ROCHEL and WIEBER towards Plaintiff due to Plaintiff's status as husband and defendant in the divorce action, as stated above.   No facts corroborated ROCHEL's unreliable and false statements, or whether WIEBER had a shred of evidence to suggest that the call to 911 was anything but genuine.

140.    The District Attorney was unable to initially make an independent judgment of the probable cause existing in the criminal case against Plaintiff because Defendants presented false evidence with a reckless disregard for the truth that was used to support probable cause.  Although there was no basis for the Plaintiffs' arrest, Defendants continued with the prosecutions until they were ultimately dismissed.

141.    At no point during the duration of the proceedings against Plaintiff in both cases, did Defendants possess any evidence against Plaintiff establishing probable cause and/or a legal basis that Plaintiff was engaged in the criminal acts complained of. Nevertheless, he was prosecuted for a crime he clearly did not commit.

142.    Ultimately, the criminal actions initiated by WIEBER against Plaintiff were dismissed in their entirety, on motion of the district attorney which indicated that Plaintiff was innocent of wrongdoing, and thereby terminated in Plaintiff's  favor.

143.    The misconduct described in this Count was undertaken pursuant to the policies and practices of the NYPD in its 90th Police Precinct in the manner described more fully above.

144.     As a direct and proximate result of WIEBER's, D'ALTO's and the Private Defendants' unlawful actions, Plaintiff has suffered, and will continue to suffer, damages including physical and emotional injury, mental anguish and pain in connection with the deprivation of his constitutional rights in that, among other things, endured almost three months of legal proceedings, suffered the humiliation, degradation and embarrassment of being publicly prosecuted.

145.     As a further direct and proximate result of the misconduct aforesaid, Plaintiff is entitled to compensation for the injury and constitutional harms that the Defendants inflicted upon him, especially the significant reduction and impairment of the quality and amount of visitation time that Plaintiff is allowed to spend with his three children from May 26, 2014 to the present, based on the false arrests and malicious prosecutions New York State Supreme Court has not yet explored at a custody trial.

146.     Because the aforestated actions were willful, deceitful and intentionally malicious with a purpose to injure and damage Plaintiff, punitive damages in the sum of $1,0000,000.00 should be assessed against WIEBER, D'ALTO and the Private Defendants,  jointly and severally.

**THIRD COUNT**

**VIOLATION OF 42 U.S.C. § 1983-**
**DEPRIVATION OF PLAINTIFF'S 1ST & 14TH AMENDMENT RIGHTS**
**TO ASSOCIATE AND BOND WITH HIS CHILDREN AND TO PROVIDE**
**FOR THEIR CARE, CUSTODY AND WELL-BEING BY WAY OF FALSE**
**ARRESTS AND MALICIOUS PROSECUTIONS**
**(Against WIEBER, D'ALTO and Each of the Private Defendants)**

147.     Plaintiff repeats each and every allegation contained in the above paragraphs as if set forth at length herein.

46

148.     By reason of the foregoing false arrests and malicious prosecutions instituted against JOEL under the color of state law, including false charges relating to the safety and care of JOEL's three minor children, the individual Defendants except the DOE Defendants did intend to, and did in fact directly cause, (i) the unwarranted issuance by the criminal court at the prosecution's request of a temporary stay away protective order ("TOP") against JOEL subject to any Family Court or Supreme Court visitation orders, which constituted a substantial restraint upon the exercise by Joel of his First Amendment right to freedom of association with his children for the purpose of preserving a highly personal relationship and emotional bond with his children a deprivation of such First Amendment right, in violation of 42 U.S.C. § 1983, and (ii) the issuance of immediate Supreme Court orders on May 30, 2014 and June 6, 2014 that granted ROCHEL's emergency motion for a temporary order of protection that included, *inter alia*, a complete cessation of overnight parenting time, a severe reduction in midweek parenting time, limited to supervised daytime visits only under the watchful eye of a social worker appointed by the Court at ROCHEL's recommendation, which orders (A) constituted a substantial restraint upon the exercise by Joel of his First Amendment right to freedom of association with his children for the purpose of preserving a highly personal relationship and emotional bond with them, and (B) deprived Plaintiff of his rights privileges or immunities secured by the Due Process Clause of the Fourteenth Amendment, in violation of 42 U.S.C. § 1983, to wit, by causing a loss of the heightened protection against government interference in the state divorce action of JOEL's fundamental and substantive liberty interest in the care, custody, companionship, upbringing, management and nurture of his minor children and in providing for their

physical, emotional, and intellectual needs, through the institution of false and baseless criminal charges against him that would render him a threat to their safety and physical well-being.

149.    The Defendants' conduct as aforesaid deprived Plaintiff of his rights under the First and Fourteenth Amendment to the Constitution of the United States as aforesaid, in violation of the First and Fourteenth Amendments and in violation of 42 U.S.C. § 1983.

150.    As a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered, and will continue to suffer, injury from the substantial harm to the emotional and paternal bond between Joel and his three minor sons and from the significant reduction and impairment of the quality and amount of visitation time that Plaintiff is allowed to spend with his three children from May 26, 2014 to the present, as well as substantial economic harm, including without limitation, unnecessary expenditures and liability in amounts not yet determined but no less than two hundred thousand dollars in legal fees to defend against a baseless TOP issued by the criminal court until its dismissal and against the ongoing adverse impact thereof on the custody/visitation disputes in the divorce action in new York Supreme Court.

151.    Because Defendants' actions were willful, deceitful and intentionally malicious with a purpose to injure and damage Plaintiff, punitive damages in the sum of $1,000,000.00 should be assessed against the Defendants, except the CITY OF NEW YORK, jointly and severally.

## FOURTH COUNT

### VIOLATION OF 42 U.S.C. § 1983- DEPRIVATION OF PLAINTIFF'S FOURTH AMENDMENT RIGHT TO BE FREE FROM UNREASONABLE SEARCH AND SEIZURE
(Against WIEBER and each of the Private  Defendants)

152.    Plaintiff re-alleges and incorporates by reference the allegations set forth in each preceding paragraph as if fully set forth herein.

153.    The Fourth Amendment of the United States Constitution protects against *unreasonable* searches and seizures of a person's effects by governmental authorities.

154.    On or about May 26,  2013, WIEBER, acting under color of law within the meaning of 42 U.S.C. § 1983, searched plaintiff's person without probable cause or reasonable suspicion, thereby depriving plaintiff of his rights under the Fourth and Fourteenth Amendments to the Constitution of the United States in violation of 42 U.S.C. § 1983. WIEBER, acting under color of law, searched Plaintiff's person and a closed wallet taken from his pocket without his permission, probable cause or a warrant, and without exigent circumstances. WIEBER, acting under color of law, searched Plaintiff's person and closed wallet taken from his pocket without his permission, probable cause or a warrant, and without exigent circumstances.

155.    Defendant STEWART witnessed WIEBER conduct this flagrantly illegal and warrantless search and seizure in his presence at the 90th precinct front desk, purloining various credit/debit cards contained in a closed wallet in the Plaintiff's pocket and placing them in his own pocket, after Plaintiff had already been brought by WIEBER to the police precinct in handcuffs, without stopping him or reporting his illegal activity.

156.    Specifically, STEWART and WIEBER violated Plaintiff's right to be free from unreasonable warrantless searches of a person's effects prohibited by the Fourth Amendment. There was no reason to believe that Plaintiff was armed or presented any kind of danger or threat. There was no exigent circumstances or compelling need for official action and plenty of time to secure a warrant to examine the contents of the closed wallet, although there was no probable cause to obtain a warrant, let alone to associate any emergency with the subject of the search, and no consent by JOEL to such search.

157.    Based on this illegal search WIEBER rearrested plaintiff a second time while in a holding cell at the 90th Police Precinct and added a number of false and baseless charges in TPO-2 of the criminal complaint alleging that JOEL committed the additional offense(s) of criminal possession of stolen property in the fourth degree (PL 165.45(2)); criminal possession of stolen property in the fifth degree (PL 165.40); criminal impersonation in the second degree (PL 190.25(4)); and identity theft (PL 190.78(1)) with respect to credit cards in plaintiff's wallet belonging to Rosenberg that JOEL held for her while managing her assets with her permission.

158.    WIEBER acted with malice or reckless indifference to JOEL's constitutional rights.

159.    As a direct and proximate result of the foregoing, Plaintiff was subjected to great physical and emotional pain and humiliation, was deprived of his liberty, and was otherwise damaged and injured.

### FIFTH COUNT

**VIOLATION OF 42 U.S.C. § 1983**
**CONSPIRACY TO DEPRIVE PLAINTIFF OF**
**HIS CONSTITUTIONAL RIGHTS**
**(Against WIEBER, D'ALTO and Each of the Private Defendants)**

160.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

161.    After Plaintiff filed a complaint with ACS against ROCHEL as a result of her conduct during and after the April 21, 2014 park injury to one of her minor children, the Defendants reached an agreement amongst themselves to retaliate against Plaintiff by framing him for a series of crimes he never committed to thereby deprive Plaintiff of his constitutional rights, all as described above. .

162.    Independently, before and after Plaintiff's three false arrests on May 26, May 27, and May 30, 2014 and the commencement of two related malicious prosecutions on May 27, 2014 and May 31, 2014,  WIEBER and D'ALTO and each of the individual Private Defendants further conspired, and continue to conspire, to deprive Plaintiff of his constitutional rights to be free from false arrests, malicious prosecutions and unlawful, warrantless searches and seizures by submitting false information and perjurious depositions to prevent JOEL's exoneration of the false charges as described in the various Paragraphs of this Complaint.

163.    In this manner, WIEBER and D'ALTO, acting in concert with rthe Private Defendants have conspired by concerted action to accomplish an unlawful purpose by an unlawful means.

164.    In furtherance of the conspiracy, each of the coconspirators committed overt acts and was an otherwise willful participant in joint activity. The misconduct

described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

165.   As described more fully above, WIEBER, D'ALTO and each of the Private Defendants also conspired and participated in a common design through a concert of action, directly or indirectly, for the ulterior motives and purposes stated above. In so doing, they took actions in furtherance of this conspiracy, causing injury to Plaintiff.

166.   The misconduct described in this Count was undertaken pursuant to the policies and practices of the NYPD in its 90th precinct in the manner described more fully in the preceding paragraphs, and was tacitly ratified by policy-makers for the CITY OF NEW YORK with final policymaking authority.

167.   The conspiratorial conduct described above, under of color of law, and effected through ways and means of an applied city policy, deprived Plaintiff of fundamental liberty rights guaranteed to him by the First, Fourth, and Fourteenth Amendments of the United States Constitution for which each is liable to him under 42 U.S.C. §1983 for damages.

168.   As a direct and proximate result of the illicit prior agreement referenced above, Plaintiff's rights were violated, and he suffered financial damages, as well as severe emotional distress and anguish, as is more fully alleged above.

## SIXTH COUNT

### VIOLATION OF 42 U.S.C. § 1983- MUNICIPAL LIABILITY FOR CONSTITUTIONAL VIOLATIONS

### (*Monell* Claim Against the City of New York Only)

169.   Plaintiff re-alleges and incorporates by reference the allegations set forth in each preceding paragraph as if fully set forth herein.

170.    The CITY OF NEW YORK directly caused the constitutional violations suffered by Plaintiff, and is liable for the damages suffered by Plaintiff as a result of the conduct of its employees.   In fact, WIEBER, D'ALTO and the other individual Government Defendants, did not act as renegades in violation of agency policies, but these employees were merely implementing the 90th Police Precinct's official customs, policies, and practices, which were the moving force behind the violation of federal law, being so persistent and widespread as to practically have the force of law. Therefore, the conduct of the individual Government Defendants was a direct consequence of policies and practices of Defendant CITY OF NEW YORK, as there is there is an "affirmative link" between the conduct of the CITY OF NEW YORK, through the actions of the 90th Police Precinct of the NYPD, by way of its police officers and detectives, especially the commanding officer and supervising officers of its detective squad, and the constitutional deprivation complained of.

171.    On information and belief, Defendant CITY OF NEW YORK has, acting through the 90th precinct of its NYPD, developed, implemented, enforced, encouraged and sanctioned a de facto policy, practice, and/or custom of unlawfully interfering with and/or arresting, without reasonable suspicion or probable cause, individuals who are targeted by unprincipled or corrupt police officers for reasons other than enforcing the criminal laws of the State of New York.

172.    At all times relevant to this complaint Defendant CITY OF NEW YORK, acting through the NYPD and its 90th precinct, had in effect policies, practices, and customs that condoned and fostered the unconstitutional conduct of the individual

defendants through a complete lack of adequate training and perfunctory supervision, and were a direct and proximate cause of the damages and injuries complained of herein.

173.   At all times relevant to this complaint, Defendant CITY OF NEW YORK, acting through the NYPD and its 90th precinct, and through the individual Government Defendants, had policies, practices, customs, and usages of encouraging and/or tacitly sanctioning the constitutional violations complained of herein through a complete lack of adequate training and perfunctory supervision. These policies, practices, customs, and usages were a direct and proximate cause of the unconstitutional conduct alleged herein.

174.   The existence of these unconstitutional customs and policies in the 90th police precinct of the NYPD is evidenced by the repeated and blatant false arrests and malicious prosecutions, all of which were approved without hesitation by supervisory officers of WIEBER in the 90th police precinct and/or detective squad, or Defendant DOHERTY, the commanding officer of the 90th police precinct detective squad, as well as a blatantly illegal and warrantless search and seizure of plaintiff's closed wallet and credit/debit cards by WIEBER in front of the desk sergeant, Defendant STEWART.

175.   In addition, WIEBER was able to sidestep the findings and conclusions that no crime was committed by the police officer appearing on the scene in response to a 911 call on April 22, 2014 and its approval by Supervising officer PEREZ on April 29, 2014, only to have it reopened on a blatantly one-sided complaint of ROCHEL, after facing an ACS investigation, on May 5, 2015, and its approval by a supervising officer on May 21, 2014, as a prelude to a false arrest on May 26, 2014.

176.    Finally, WIEBER's fearless ability to present blatantly perjurious complaints to the district attorney's office for prosecution, with the approval of supervisory staff, and D'ALTO's blatantly perjurious supporting deposition orchestrated by WIEBER only further the conclusion that the widespread practices described in the preceding two paragraphs were allowed to take place because the NYPD declined to implement sufficient training and/or any legitimate mechanism for oversight or punishment. Indeed, the system in the 90th precinct of the NYPD for investigating and disciplining police officers accused of the type of misconduct which befell Plaintiff was, and is, for all practical purposes, nonexistent.

177.    As a result, Police Detectives and Officers in the 90th precinct of the NYPD who manufactured criminal cases against individuals such as Plaintiff had every reason to know that they enjoyed *de facto* immunity from departmental discipline. In this way, this system proximately caused abuses, such as the misconduct at issue in this case. This widespread practice demonstrated by the duration and frequency thereof warrants a finding of either actual or constructive knowledge by the governing body with responsibility for oversight and supervision that the practices have become customary among its employees.

178.    The custom, usage and practices of the 90th Police Precinct in connection with the acts complained of, or otherwise, demonstrate that an illegal official policy, usage or custom existed, that officials with final decision making authority ratified illegal actions and that a policy of wholly inadequate training and supervision existed. More specifically, supervisory command personnel of the 90th precinct were aware of, and acquiesced in, a pattern of constitutional violations involving the exercise of police

discretion and put them and the CITY OF NEW YORK on notice that its officers regularly confronted the particular constitutional requirements, but nevertheless continued a policy of inadequate training or supervision, and often participated themselves in such practices. At the very least, their actions and inactions demonstrate the existence of a custom or tolerance or acquiescence of federal rights violations.

179.    The CITY OF NEW YORK knew or should have known of the Defendant police officers and detectives' propensity to engage in misconduct of the type alleged herein. Upon information and belief, prior to May 26, 2014, the CITY OF NEW YORK was aware of several complaints of false arrest by members of the 90th Police Precinct of NYPD. Despite its knowledge of such incidents of prior misconduct, the CITY OF NEW YORK failed to take remedial action.

180.    Additionally, the CITY OF NEW YORK knew or should have known, more specifically of Defendant WIEBER's propensity to engage in false arrests and other police misconduct of the type alleged herein including getting himself involved in assisting ROCHEL in civil proceedings in court and before ACS and other administrative agencies. Despite its knowledge of such incidents of prior misconduct, the CITY OF NEW YORK failed to take remedial action.

181.    It was the policy and/or custom of the CITY OF NEW YORK to inadequately and improperly investigate citizen complaints of police misconduct, and acts of misconduct were instead tolerated by the CITY OF NEW YORK, including, but not limited to, the incidents listed above. It was the policy and/or custom of the CITY OF NEW YORK to inadequately train, supervise and discipline its police officers, including the defendant officers, thereby failing to adequately discourage further constitutional violations on the part of its police

officers. The City did not require appropriate in-service training or re-training of officers who were known to have engaged in police misconduct.

182.    As a result of the above described policies and customs, police officers of the CITY OF NEW YORK, including the defendant officers, believed that their actions would not be properly monitored by supervisory officers and that misconduct would not be investigated or sanctioned, but would be tolerated.

183.    The wrongful policies, practices, customs and/or usages complained of herein, demonstrated a deliberate indifference on the part of policymakers of the CITY OF NEW YORK to the constitutional rights of persons within the city, and were the direct and proximate cause of the violations of Plaintiffs' rights alleged herein and the damages suffered as a result thereof for which the CITY OF NEW YORK is liable.

**PENDENT STATE COMMON LAW CLAIMS**

**<u>SEVENTH COUNT</u>**

**MALICIOUS PROSECUTION**

184.    Plaintiff re-alleges and incorporates by reference the allegations set forth in each preceding paragraph as if fully set forth herein.

185.    By their conduct, as described above, Defendants are liable to Plaintiff for having twice maliciously commenced criminal proceedings against Plaintiff having caused malicious prosecutions under the laws of the State of New York with malice toward the victim. Ultimately, all the charges were ultimately dismissed on the merits in Plaintiff's favor and not inconsistence with his innocence.

186.    Defendant WIEBER, in conspiracy with the other individual Private Defendants, falsely accused the Plaintiff of criminal activity and falsely charged the Plaintiff with violations of the laws of the State of New York for which WIEBER knew

57

there was a complete absence of probable cause, and caused Plaintiff to be improperly subjected to criminal proceedings that were undertaken with malice, willfulness, and reckless indifference to the rights of Plaintiff, for a wrong and improper purpose other than that of bringing a true offender to justice or to see the ends of justice served.

187.    Thereafter, Defendants WIEBER, D'ALTO, ROCHEL, GREENBERG, MANDEL, TEITELBAUM and YACOOB made statements to prosecutors with the intent of exerting influence to institute and continue the judicial proceedings. Such statements regarding Plaintiff's alleged culpability were made with knowledge that said statements were false and perjured, and undertaken with malice, willfulness, and reckless indifference to the rights of Plaintiff.

188.    These judicial proceedings, which were instituted and continued maliciously as aforesaid, resulting in injury, and all charges were terminated in Plaintiff's favor in a manner not inconsistent with Plaintiff's innocence.

189.    Defendant CITY OF NEW YORK, as an employer of the individual Defendants, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

190.    As a direct and proximate result of the misconduct and abuse of authority stated above, Plaintiff sustained, and continues to sustain, injuries and damages alleged herein.

## EIGHTH COUNT

### CIVIL CONSPIRACY

191.    Plaintiff re-alleges and incorporates by reference the allegations set forth in each preceding paragraph as if fully set forth herein.

192.     Searches or seizures that both intrude upon a person's legitimate expectations of privacy in "their persons, houses, papers, and effects" and conducted outside the judicial process, without a search warrant signed by a judge or magistrate, are *per se* unreasonable under the Fourth Amendment, subject only to a few specifically established and well-delineated exceptions, none of which are applicable here, including a search incident to an arrest or an inventory search.

193.     As described more fully in the preceding paragraphs, the Government Defendants, acting in concert with other known and unknown co-conspirators, conspired by concerted action with the individual Private Defendants to accomplish an unlawful purpose by unlawful means.

194.     In furtherance of the conspiracy, the Individual Government Defendants and the Individual Private Defendants committed overt acts and were otherwise willful participants in joint activity.

195.     The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

196.     All the Defendants (a) had an object to be accomplished; (b) had an agreement on the object or course of action, to wit, to deprive Plaintiff of his First, Fourth and Fourteenth rights to be free from false arrests, malicious prosecutions and unlawful search and seizures of personal effects, as well as the right to associate and bond with his children and to the custody, care and/or access to them; (c) performed one or more unlawful overt acts; and (d) caused Plaintiff damages that were a direct result of those acts. The individual Private Defendants initiated and played an active role in the malicious prosecution of Plaintiff, such as giving advice, encouragement and active

assistance or importuning the authorities to act and knowingly providing false information to the police or withhold pertinent information from the police.

197.   In furtherance of their object, the Individual Private Defendants did two or more overt acts against the Plaintiff, as fully described above. Those unlawful overt acts include, but are not limited to, the facts outlined in Count 3, *supra*, conspiracy under section 1985(3). All of the Defendants are liable for their acts.

198.   As a proximate result of Defendants' conspiracy, Plaintiff suffered damages, including severe emotional distress and anguish, as is more fully alleged above.

## NINTH COUNT

### UNLAWFUL SEARCH & SEIZURE

199.   Plaintiff re-alleges and incorporates by reference the allegations set forth in each preceding paragraph as if fully set forth herein.

200.   The New York Constitution protects against *unreasonable* searches and seizures of a person's effects by governmental authorities.  N.Y. Const. Art. I, sec.12.

201.   On or about May 26, 2014, WIEBER searched plaintiff's person allegedly as a search incident to an arrest, after he had already been arrested at the Pointe Plaza Hotel and taken to the 90th Police Precinct in handcuffs. No search was conducted incident to the arrest at the hotel.

202.   WIEBER placed Plaintiff's belongings in a plastic bag identified as such. However, after WIEBER found a closed wallet in plaintiff's pocket he slipped it into his pocket and went into his office. All this was done in front of the desk sergeant, Defendant STEWART who witnessed the whole search but said nothing. Thereafter, WIEBER confronted Plaintiff in the holding room with the debit /credit cards he had searched and

taken from the wallet, and additional charges involving identity theft and larceny were added to the Complaint drafted by WIEBER for the following day's arraignment and Plaintiff was arrested and booked a second time as a result.

203.    Plaintiff was searched without a warrant and without probable cause or reasonable suspicion, in violation of the New York Constitution and established New York law, as interpreted by the court of Appeals.

204.  The conduct of WIEBER was wanton, malicious, willful, or in bad faith.

205.    The City of New York is liable for WIEBER's conduct, as he was acting within the line and scope of his employment.

206.      As a direct and proximate result of WIEBER's unlawful actions, Plaintiff has suffered, and will continue to suffer, financial and non-monetary damages including, physical, mental and emotional injury and pain, mental anguish, suffering, humiliation and embarrassment.

## TENTH COUNT

### RESPONDEAT SUPERIOR LIABILITY
### OF THE CITY OF NEW YORK FOR STATE LAW VIOLATIONS
#### State Common Law Claim

207.    Plaintiff re-alleges and incorporates by reference the allegations set forth in each preceding paragraph as if fully set forth herein.

208.    The misconduct of the individual Government Defendants occurred while they were on duty, in and during the course and scope of their duties and functions as NYPD detectives, police officers and supervisors in the 90th police precinct of the  NYPD and while they were acting as agents and employees of the Defendant CITY OF NEW YORK. Defendant CITY OF NEW YORK is therefore vicariously liable to Plaintiff

under the common law doctrine of *respondeat superior* as principal for all torts committed by its agents.

## ELEVENTH COUNT
## NEGLIGENT SUPERVISION, RETENTION AND TRAINING

209.     Plaintiff re-alleges and incorporates by reference the allegations set forth in each preceding paragraph as if fully set forth herein.

210.     Defendant CITY OF NEW YORK negligently trained, retained, and supervised Defendants WIEBER and D'ALTO. The acts and conduct of Defendants WIEBER and D'ALTO were the direct and proximate cause of injury and damage to Plaintiff and violated his statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

211.     As a result of the foregoing, Plaintiff was deprived of his liberty, was subjected to great physical and emotional pain and suffering, and was otherwise damaged and injured.

## JURY TRIAL DEMANDED

212.     Plaintiff, JOEL HERMAN, demands a trial by jury pursuant to Federal Rules of Civil Procedure 38(b) and (c) on each and every one of his claims as pleaded herein, and on all counterclaims and third party claims, if any,  asserted in this action.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff demands the following relief against the Defendants:

a.      Compensatory damages against all Defendants, jointly and severally, except Defendants STEWART, PEREZ, PASO, MAMYS, MALDONADO, MCKINNEY and JOHN DOES 1-5, sued in their official capacity only, for violations of Plaintiff's federal rights pursuant to 42 U.S.C. § 1983, in an amount appropriate to the proof adduced at trial, as determined by a jury, to the maximum extent permitted by law;

b.      Punitive damages pursuant to 42 U.S.C. § 1983 against all the Defendants, joint and severally, excluding Defendants STEWART, PEREZ, PASO, MAMYS, MALDONADO,  MCKINNEY, JOHN DOES 1-5, sued in their official capacity only, and the CITY OF NEW YORK, but including Defendants WIEBER and D'ALTO individually (not in their official capacities), in an amount appropriate to the proof adduced at trial, as determined by a jury, to the maximum extent permitted by law;

c.      The convening and ☐impaneling of a jury to consider the merits of each of the counts herein;

d.      An award of reasonable expenses incurred in this litigation, including reasonable attorney and expert fees, pursuant to 42 U.S.C. §1988 (b) and (c), and costs pursuant to  42 U.S.C. § 1920, against all Defendants, joint and severally, except Defendants STEWART, PEREZ, PASO, MAMYS, MALDONADO,  MCKINNEY and JOHN DOES 1-5, sued in their official capacity only;

e.      Compensatory damages against all defendants, jointly and severally, except Defendants STEWART, PEREZ, PASO, MAMYS, MALDONADO, MCKINNEY and JOHN DOES 1-5, sued in their official capacity only, for violations of

state common law rights, in an amount appropriate to the proof adduced at trial, as determined by a jury, to the maximum extent permitted by law; and

f.      Such other and further relief as this Court may deem just and proper.


Dated: March 31, 2016
New York, New York

Respectfully submitted,


Simon Schwarz, Esq.


THE SCHWARZ FIRM PLLC
Attorney for Plaintiff Joel Herman
954 Lexington Ave., No. 261
New York, NY 10021-5013
(Ph.): 347-852-3514
(Fax): 646-893-7870
 E-mail: sschwarz@justice.com