UNITED STATES DISTRICT COUT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------X
JOEL HERMAN, )
)
Plaintiff, )
-against- )
)
THE CITY OF NEW YORK,NYPD POLICE ) **JURY TRIAL**
DETECTIVE KENNNETH WIEBER, NYPD POLICE ) **DEMANDED**
OFFICER ANTHONY D'ALTO AND NYPD POLICE )
SERGEANTS  JOHN STEWART AND ROBERT MAMYS, )
)
Defendants. )
-------------------------------------------------------------------------X

# FOURTH AMENDED COMPLAINT

Simon Schwarz, Esq.
THE SCHWARZ FIRM PLLC
Attorney for Plaintiff Joel
Herman 954 Lexington Ave., No.
261 New York, NY 10021-5013
347-852-3514
sschwarz952@gmail.com

# TABLE OF CONTENTS

I.      INTRODUCTION..................................................................................... 1

II.     JURISDICTION AND VENUE............................................................. 6

III.    THE PARTIES.......................................................................                7

IV.     NOTICE OF CLAIM ............................................................................ 9

V.      FACTUAL ALLEGATIONS ............................................................... 10

   A.   The February 2010 Separation and Breakdown of the
        Herman Marriage and the Ensuing Custody/Visitation
        Disputes in Family Court Transferred to Supreme Court
        Divorce Action in November 2013……………………………….….10

   B.   WIEBER's 2011 Investigations Regarding the JOEL-Rochel Herman
        Separation Disputes……………………………………………….. 11

   C.   The Post-Passover 2014 Weekend Visitation Schedule.............................. .13

   D.   The Events of April 22, 2014 that Triggered the First False Arrest
        On May 26, 2014…………………………………………………….. 14

   E.   In a Highly-Irregular Manner, WIEBER Reopens the "Closed"
        911 Call Investigation Without Referral After Receiving a
        Phone Call from Plaintiff's Ex-Wife's friend, Greenberg, on
        April 23, 2014, and Then Makes an Unusual "House Call" to
        Rochel Herman on May 5, 2014, With Greenberg Present, to
        Draft Four "Walk-In" Complaints in Flagrant Violation of
        NYPD Practices…………………………………………………………18

   F.   The Cellular Phone and Text Exchanges Among
        WIEBER and Non-Parties Prior to the False Arrests ……………………  20

   G.   The April 28, 2014 I-Phone Audio-Video Tape of Greenberg as
        Source of 1st Set of False Charges Arising from 5/26/14 Arrest………… 21

   H.   Events Immediately Preceding, and During,
        the Hotel Arrest Scene on May 26, 2014…………….. ……………………22

   I.   The Two False Arrests of JOEL  on May 26, 2014 and May 27,
        2014,  respectively, and the Malicious Prosecution Arising Therefrom
        on May 27, 2014 in NYC Criminal Court, Kings County…………........ 24
            (i)  WIEBER's Fabricated Factual Recitation of What
                 He Falsely Purports to Have Observed (TPO-3)
                 and the Sept. 3, 2014 Dismissal of Those Charges ...............……….25

        (ii) **WIEBER's Fabricated and Perjurious Information**
            **Fraudulently Procured from Lying Witnesses to**
            **Support TPO-2, and the Sept. 3, 2014 Dismissal**..............................**27**

        (iii) **The False Information Contained in TPO-1 and in**
            **Supporting Depositions and the November 17, 2014**
            **Dismissal of Those Charges…………………………………………28**

    **J.**      **WIEBER's Fabricated Report of Suspected Child Abuse**
           **and Mistreatment Sent to ACS on May 27, 2014**…………………………**30**

    **K.**     **WIEBER's Furnishing of Information from NYPD Files to**
           **Non-Parties While Active Criminal Case Pending for Use**
           **by Rochel Herman's Divorce Attorney in State Action As**
           **Basis to Terminate or Diminish JOEL's Visitation Privileges**…………..**31**

    **L.**      **The Third False Arrest of JOEL on May 30, 2014 and His**
           **Malicious Prosecution Arising Therefrom on May 31, 2014 in**
           **NYC Criminal Court, Kings County, and the Oct. 2, 2014**
           **Dismissal of these Charges**…………………………………………………**35**

**VI.**    **CLAIMS FOR RELIEF**……………………………………………………...**40**

## FIRST COUNT

**VIOLATION OF 42 U.S.C. § 1983- DEPRIVATION OF**
**PLAINTIFF'S FOURTH AMENDMENT RIGHT TO BE**
**FREE FROM FALSE ARREST & UNLAWFUL IMPRISONMENT**
**(against Defendants WIEBER and D'ALTO)……………….40**

## SECOND COUNT

**VIOLATION OF 42 U.S.C. § 1983-**
**DEPRIVATION OF PLAINTIFF'S FOURTH AMENDMENT**
**RIGHT TO BE FREE FROM MALICIOUS PROSECUTION**
**(against Defendants WIEBER and D'ALTO)**……………… .**43**

## THIRD COUNT

**VIOLATION OF 42 U.S.C. § 1983-**
**DEPRIVATION OF PLAINTIFF'S 1ST & 14TH AMENDMENT**
**RIGHTS TO ASSOCIATE AND BOND WITH HIS CHILDREN AND**
**TO PROVIDE FOR THEIR CARE, CUSTODY AND WELL-BEING**
**(against Defendants WIEBER and D'ALTO)**.................... **45**

**FOURTH COUNT**

**VIOLATION OF 42 U.S.C. § 1983-
DEPRIVATION OF PLAINTIFF'S FOURTH
AMENDMENT RIGHT TO BE FREE FROM
UNREASONABLE SEARCH AND SEIZURE
(against Defendant WIEBER Only)**........................... **47**

**FIFTH COUNT**

**VIOLATION OF 42 U.S.C. § 1983-
DEPRIVATION OF PLAINTIFF'S FIRST
AMENDMENT RIGHT TO A FAIR TRIAL
(against Defendant WIEBER Only)**...........................**49**

**SIXTH COUNT**

**VIOLATION OF 42 U.S.C. § 1983
DEPRIVATION OF PLAINTIFF'S FOURTH AMENDMENT
RIGHT TO BE FREE FROM MALICIOUS ABUSE OF PROCESS
(against Defendant WIEBER Only)**………………...**50**

**SEVENTH COUNT**

**DELETED PER COURT ORDER**…………………………….**51**

**EIGHTH COUNT**

**VIOLATION OF 42 U.S.C. § 1983-
FAILURE TO INTERVENE
(against Defendant STEWART only)**...................**51**

**NINTH COUNT**

**VIOLATION OF 42 U.S.C. § 1983-
FAILURE TO INTERVENE
(against Defendant MAMYS only)**......................**51**

**TENTH COUNT**

**VIOLATION OF 42 U.S.C. § 1983-
MUNICIPAL LIABILITY FOR DEPRIVATION
OF PLAINTIFF'S CONSTITUTIONAL RIGHTS
(Monell Claim against the CITY OF NEW YORK Only).52**

**ELEVENTH COUNT**

**MALICIOUS PROSECUTION
UNDER NEW YORK LAW
(against Defendants WIEBER and D'ALTO**………. **55**

**TWELFTH COUNT**

**MALICIOUS ABUSE OF PROCESS
UNDER NEW YORK LAW
(against Defendants WIEBER and D'ALTO)**...........**56**

**THIRTEENTH COUNT**

**MALICIOUS INTERFERENCE WITH THE EMOTIONAL
BOND BETWEEN PLAINTIFF AND HIS CHILDREN
AND ABILITY TO PROVIDE FOR THEIR CARE,
CUSTODY AND WELL-BEING
(against Defendants WIEBER and D'ALTO)**………..**57**

**FOURTEENTH COUNT**

**DELETED PER COURT ORDER**………………………… **59**

**FIFTEENTH COUNT**

**UNLAWFUL SEARCH & SEIZURE
UNDER NEW YORK LAW
(against Defendant WIEBER Only)**.............. **59**

**SIXTEENTH COUNT**

***RESPONDEAT SUPERIOR*
UNDER NEW YORK LAW
(against the CITY OF NEW YORK Only)**............ **61**

**SEVENTEENTH COUNT**

NEGLIGENT SUPERVISION,
RETENTION AND TRAINING
(Against the CITY OF NEW YORK Only)…'……..…... 61

**VII.**     **JURY TRIAL DEMAND**……;.. …………………………………...62

**VIII.**    **RELIEF CLAUSE**………………………………………………….. 62

Plaintiff, JOEL HERMAN, by his attorneys, THE SCHWARZ FIRM, PLLC complaining of the Defendants, alleges as follows:

## I.     INTRODUCTION

1.          This is an action pursuant to the Civil Rights Act of 1871, 42 U.S.C. §§ 1983 and 1988, and the laws of the State of New York, by the Plaintiff, JOEL HERMAN ("Plaintiff" or "JOEL"), against the Defendants, CITY OF NEW YORK, Police Detective KENNETH WIEBER ('WIEBER") of the NYPD 90th Precinct Detective Squad; Police Officer ANTHONY D'ALTO ("D'ALTO"), formerly of the NYPD 90th Precinct; POLICE SERGEANT JOHN STEWART, formerly of the NYPD 90th Precinct and POLICE SERGEANT ROBERT MAMYS, formerly of the NYPD 90th Precinct Detective Squad. The abovenamed defendants are sued in different counts for their respective roles, in whole or in part, in the deprivation of JOEL's First, Fourth and Fourteenth Amendment rights under the United States constitution, as well as a number of pendent common law claims under New York law arising from the same underlying facts and circumstances.

2.          As explained in detail in Section V hereof, all of the above-mentioned  claims arise from three false arrests of Plaintiff by Defendant WIEBER on three separate occasions on May, 26, 2014, May 27, 2014 and May 30, 2014, respectively, followed by two malicious prosecutions initiated by WIEBER on May 27, 2014 and May 31, 2014, respectively. In addition to deliberately making baseless arrests of Plaintiff for reasons other than legitimately enforcing the criminal laws of the State of New York, as explained in ¶ 5 below, WIEBER knowingly and willfully forwarded to the Kings County District Attorney's Office ("KCDA") false criminal complaints or accusatory instruments *under oath*, setting forth the criminal charges upon  which

1

Plaintiff was charged and arraigned in the New York City Criminal Court, Kings County, as well as the false and fraudulent factual predicates on which these charges were based.

3.　　　　　As to the first and second arrests, the May 27, 2014 criminal complaint was based in part on WIEBER's own flagrantly false and fabricated observations that he could not possibly observe from the fixed location of his car, but that he nevertheless knowingly forwarded to the KCDA for criminal prosecution. In fact, surveillance video footage from the arrest scene shows that the exact opposite of what WIEBER described actually took place, and that these events could not have been observed by WIEBER but only by Aron Greenberg ("Greenberg"), a friend and long-time financial supporter of Plaintiff's ex-wife, Rochel Herman, and two cohorts of his that he brought to the scene, Joel Teitelbaum and Leon Eisner. All three watched from cars parked directly across the street of the arrest scene. In addition, the criminal complaint also contained additional false and fabricated information knowingly forwarded by WIEBER to the KCDA for prosecution, and later backed up by false sworn supporting depositions, of: (i) Defendant Police Officer D'ALTO-one of two police officers that responded to a 911 call made by JOEL on April 22, 2014, (ii) Plaintiff's ex-wife, Rochel Herman, and (iii) her friend and financial supporter, Greenberg, regarding the April 22, 2014 incident underlying the 911 call.  All such charges were ultimately dismissed on the merits, in part on Sept. 3, 2014 and the balance on November 17, 2014, on motions of the KCDA, upon submission by JOEL's attorneys to the KCDA of  video surveillance footage and text messages between JOEL and Breindy Rosenberg that debunked WIEBER's baseless claims of credit card fraud and criminal impersonation.

2

4.	As to the third arrest on May 30, 2014, WIEBER alleged that JOEL violated a temporary order of protection ("TOP") issued by the criminal court on May 27, 2014, by picking up his child from school upon dismissal even though the Supreme Court-ordered visitation schedule provided to WIEBER and MAMYS by Plaintiff's criminal attorney at the 90th precinct was specifically exempted from the TOPs applicability by the TOP itself, in handwritten insertions written by the judge, at Plaintiff's attorney's request. Moreover, NY State Family, Criminal and Supreme Court files, KCDA files, ACS files and testimony of JOEL's criminal attorney, among other evidence, conclusively demonstrate that the false arrest on May 30, 2014 and the initiation of a malicious prosecution thereafter on May 31, 2014 were knowingly fabricated by WIEBER. Therefore, on October 2, 2014, the Criminal Court dismissed these baseless contempt and custodial interference charges resulting from JOEL's alleged violation of the TOP and vacated the TOP upon JOEL's motion and  the KCDA's consent and admission that these charges were false.

5.	The ultimate two-fold goals and objectives of the above-described false arrests and malicious prosecutions made or initiated by WIEBER are laid bare in multiple Domestic Incident Reports, Police Complaints, D.D.5s and other Police Reports drafted by WIEBER. First, WIEBER sought  to help Rochel Herman prevail in an ongoing child neglect investigation by the New York City Administration of Children's Services ("ACS") for alleged child neglect investigation stemming from a complaint regarding her alleged neglectful child care on April 22, 2014-the very subject of the first of three sets of charges-for which JOEL was falsely arrested on May 26, 2014. In that vein, WIEBER, on or about May 27, 2014, filed with ACS a separate Report of Suspected Child Abuse and

Mistreatment against JOEL, based on the same false and fabricated arrest information involving the alleged driving of the three Herman children without child booster seats and seat belts and their alleged recklessly endangerment in the manner which they were driven to the Pointe Plaza Hotel visitation drop-off point by JOEL on May 26, 2014. Second, WIEBER sought to help Rochel Herman succeed in cutting off or greatly diminishing and restricting JOEL's visitation rights to the three minor Herman in the pending divorce action and significantly hurt JOEL's chances of getting sole or joint custody of the Herman children-all in order to help Rochel Herman in the bitter custody/visitation rights battle between her and JOEL in that divorce action.. Therefore, WIEBER, on or about May 29, 2014, clandestinely, while an active criminal case had just begun, using Greenberg and/or Rochel Herman,  and in violation of written NYPD policy and procedure, transmitted a series of Police Reports and confidential NYPD documents to Rochel Herman's divorce attorney, for use against Plaintiff in an emergency Order to Show Cause filed the following day, May 30, 2014, in the State divorce action. WIEBER's actions (i) substantially diminished  Plaintiff's visitation rights with his children until January 2016, (ii) significantly hurt his chances of getting sole or joint custody of the Herman children and helped Rochel Herman in the bitter custody/visitation rights battle between her and JOEL in the pending divorce action and (iii) severely damaged JOEL's emotional bond and father-child relationship with his children on a short-term and long-term basis.

6.     As a direct and proximate result of the foregoing, Plaintiff suffered injuries and damages for which he seeks relief in the form of compensatory damages of not less than a total of $2,294,000.00 against the Defendants for their respective roles in the violation of Plaintiff's federal constitutional rights complained of pursuant to 42

4

U.S.C. § 1983, as well as their roles in the violation of his state common law rights, as

follows:

**Emotional injury** including mental anguish, distress, humiliation and embarrassment humiliation, degradation and embarrassment suffered by JOEL as a direct and proximate result of being falsely arrested in the Williamsburg Hassidic Community in violation of his Fourth and Fourteenth Amendment rights in the approximate sum of **$150,000.00**;

**Emotional injury** suffered by Plaintiff as a direct and proximate result of being significantly deprived of his First & Fourteenth Amendment rights to associate and bond with his children and to provide for their care, custody and well-being including, without limitation, (1) the deprivation or diminution of the emotional and paternal bond between Mr. Herman and his three minor sons and (2) the significant reduction and impairment of the quality and amount of visitation time that Plaintiff was restricted to spend with his three children from May 26, 2014 to January 6, 2016 and from the latter date to the present, in the approximate sum of **$2,000,000.00.**

**Financial Injury** suffered by Plaintiff through his incurring unnecessary legal and other expenditures and liability as a direct and proximate result of three false arrests and two malicious prosecutions, including, without limitation, (i) legal defense and costs incurred in the approximate amount of **$55,697.00** for defending against, and obtaining the dismissal on the merits of multiple baseless criminal charges and vacatur of a related temporary order of protection ("TOP") against Plaintiff in two malicious prosecutions commenced against Plaintiff in New York City Criminal Court, Kings County; (ii) unnecessary legal expenditures and costs in the approximate amount of **$ 84,825.00** incurred by Plaintiff in the divorce action commenced by Rochel Herman, ex-wife of Plaintiff, in New York Supreme Court, Kings County solely to restore the *status quo ante* visitation schedule with the three Herman children that existed prior to May 30, 2014, after substantial restrictions were placed on Plaintiff's visitation rights with his children from May 30, 2014 to January 6, 2016 as a result of the false arrests and malicious prosecutions; and (iii) legal defense and appeal costs in the approximate amount of **$ 3,200.00** incurred on a victorious appeal to the New York State Office of Children and Family Services ("ACS") to obtain the sealing of a report made by the New York City Administration for Children's Services, as a result of the same false and fabricated facts and criminal charges sent by WIEBER to ACS, which resulted in a finding of suspected child abuse against JOEL, and to have its classification changed from "indicated" (as originally reported) to "unfounded" in the New York State Child Abuse and Maltreatment Register ("SCR"); and

**Punitive Damages** in the sum of $1,000,000.00 for the willful, deceitful and intentionally malicious conduct with a purpose to injure and damage Plaintiff, against all the Defendants, jointly and severally, except against the CITY OF NEW YORK.

7.          Finally, Plaintiff also seeks an award of reasonable expenses incurred in this action should he prevail, against the Defendants, joint and severally, including reasonable attorney and expert fees, pursuant to 42 U.S.C. §1988 (b) and (c), and costs pursuant to 42 U.S.C. § 1920, in an amount to be determined by the Court but not less than $ 1,200,000.00.

## II. JURISDICTION AND VENUE

8.          This Court has original jurisdiction over Plaintiff's constitutional and federal law claims pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343 in that this action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, to redress the deprivation under color of law of Plaintiff's rights secured by the First, Fourth and Fourteenth Amendments to the United States Constitution.

9.          This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 of all ancillary state law claims or parties in which the Plaintiff seeks relief for the violation of his rights as guaranteed under the laws of the State of New York that derive from the same occurrences and transactions or events which give rise to the federal § 1983 claims and which have a common nucleus of operative fact such that that they form part of the same case or controversy under Article III of the United States Constitution.

10.         Venue is proper in in the Eastern District of New York pursuant to 28 U.S.C. § 1391 in that all the Defendants are subject to personal jurisdiction within the Eastern District of New York and the events that gave rise to the claims asserted herein occurred within its boundaries.

### III. THE PARTIES

11.     Plaintiff, JOEL HERMAN ("JOEL" or "Plaintiff"), was and is, at all times relevant to this action, a natural person and resident of Kings County, New York. He is the ex-husband of Rochel Herman and the father of three minor sons (the "Herman children"). He was the defendant in a divorce action brought by Rochel Herman in New York State Supreme Court, Kings County which only recently culminated in a final divorce and custody order in his favor.

12.     Defendant, CITY OF NEW YORK, is and was, at all relevant times, a municipal corporation duly incorporated under the laws of the State of New York pursuant to § 431 of its Charter, and which, has, among other powers, the power to maintain agencies for the purpose of carrying out the governmental functions of the City of New York, including a police department (the "NYPD"), with multiple police precincts including the 90th police precinct, each of which acts for it in the area of law enforcement within the designated geographic area or precinct, and for whose acts the CITY OF NEW YORK is ultimately responsible. The CITY OF NEW YORK assumes the risks incidental to the maintenance of a police force and for the promulgation and implementation of official NYPD policies, procedures, and practices implemented through the NYPD and its employees, and for injury occasioned thereby.

13.     Defendant, KENNETH M. WIEBER ("WIEBER"), shield number 1755, is and was, at all relevant times, a Police Detective of the 90th PDU (Police Detective Unit) or Detective Squad of the NYPD 90th police precinct. He is employed by the CITY OF NEW YORK. WIEBER is sued in his individual capacity.

14. Defendant, ANTHONY D'ALTO ("D'ALTO"), shield number 9117, was, at all relevant times, a duly appointed Police Officer assigned to the 90th police precinct of the NYPD, employed by the CITY OF NEW YORK. D'ALTO is presently employed as a police officer in the Suffolk County First Precinct, Town of West Babylon, New York. D'ALTO is sued in his individual capacity.

15. Defendant, JOHN STEWART ("STEWART"), was, at all relevant times, a Police Sergeant at the 90th Police Precinct of the NYPD, and employed by the CITY OF NEW YORK. STEWART was the desk sergeant on the evening of JOEL's first arrest on May 26, 2014. Upon information and belief, STEWART is now employed at the Character Assessment Section of the Operations Office of the NYPD Police Academy, 235 E 20th St, New York, NY, doing background investigations of police candidates. He is sued in his individual capacity.

16. Defendant, ROBERT MAMYS ("MAMYS"), was at all relevant times, a Police Sergeant and one of three supervisors at the 90th Police Precinct Detective Squad of the NYPD, and employed by the CITY OF NEW YORK. MAMYS was the supervisor in charge of the NYPD 90th Precinct Detective Squad on the evening of May 30, 2014 at the time Plaintiff was arrested and detained there by WIEBER. MAMYS is now employed at the NYPD 88th Police Precinct, and is sued in his individual capacity.

17. Defendants WIEBER, D'ALTO, STEWART and MAMYS are collectively referred to herein as the "individual Defendants."

18. Non-party, Rochel Herman, is Plaintiff's ex-wife and the mother of the three Herman children. At all times relevant to this action, Rochel Herman was the plaintiff in a divorce action against JOEL in New York State Supreme Court, Kings

County which only recently culminated in a final divorce and custody order in JOEL's favor.

19. Non-party, Aron Greenberg ("Greenberg"), is a friend of Rochel Herman and of Non-Party Defendant, Aron Mandel. He has been a major financial and emotional supporter of Rochel Herman in her custody/visitation disputes with JOEL, including her State Family Court petitions and in State Supreme Court divorce action, since in or about 2011.

20. Non-party, Aron Mandel ("Mandel"), is a friend of Rochel Herman and of Greenberg. He has been a major emotional and financial supporter of Rochel Herman in her custody/visitation disputes with JOEL since in or about 2011. Mandel holds a high administrative position in the private school in which the Herman children attend.

21. Non-parties, Rochel Herman, Greenberg and Mandel, are collectively referred to herein as the "Non-Parties."

## IV. NOTICE OF CLAIM

22. Plaintiff, in furtherance of his supplemental state causes of action for malicious prosecution and related claims, filed a proper and timely notice of claim against the CITY OF NEW YORK on or about December 31, 2014, within ninety days after each such claim arose, in compliance with General Municipal Law § 50(e).

23. For purposes of General Municipal Law § 50(e), a claim of malicious prosecution does not arise in the event of a multi-count charging instrument until the entire case is fully dismissed. Thus, although the first case, Case # 2014KN038594, was dismissed in part on September 3, 2014, it was not dismissed in full until November 17, 2014. The second case, Case #2014KN040353, was fully dismissed on October 2, 2014.

Therefore, the notice of claim which was filed on December 31, 2014, was timely filed within ninety days after each such claim arose, in accordance with General Municipal Law § 50(e).

24.     The notice of claim set out the nature of the malicious prosecution and related claims asserted herein, the time and the place where and the manner by which such claims arose, and the damages and injuries claimed to have been sustained by Plaintiff.

25.     The City assigned a claim number to Plaintiff's claim, and Plaintiff was examined pursuant to N.Y. Gen. Mun. L. Sec. 50-h on April 22, 2015. No response was ever received by Plaintiff to such claim and no offer of compensation was timely made by Defendant CITY OF NEW YORK, which has failed to adjust the claims within the statutory time period.

26.     Accordingly, this action was commenced within one year and ninety days of the dates of occurrence of the events giving rise to this Complaint as to the CITY OF NEW YORK and within one year of the dates of occurrence of the events giving rise to the state causes of action herein as to the individual Defendants WIEBER, D'ALTO, STEWART AND MAMYS.

## V. FACTUAL ALLEGATIONS

### A. The Feb. 2010 Separation and Breakdown of the Herman Marriage and the Ensuing Custody/Visitation Disputes in Family Court Was Transferred to Supreme Court Divorce Action in Nov. 2013

27.     Prior to their separation in or about February 2010, Plaintiff, JOEL, and his wife, Rochel Herman, were a Hassidic Jewish couple living in the Williamsburg section of Brooklyn, New York. Since their separation in or about February 2010, they have been embroiled in rancorous custody/visitation, neglect and protective order disputes for about

three years in Kings County Family Court involving their three minor sons (the "Herman children"). From in or about October 2010 to October 2013, the Herman children were temporarily discharged to the temporary care and custody of Rochel Herman, with increasing visitation privileges granted to JOEL, by the Family Court.

28. On October 24, 2013, the Family Court, in its final visitation order, greatly expanded JOEL's visitation schedule with the Children to include substantial midweek and weekend overnight access in JOEL's apartment in addition to alternating weekends between Rochel Herman. and JOEL at their respective apartments.

29. Thereafter, in or about Nov. 2013, the entire custody/visitation dispute was transferred to the New York Supreme Court, Kings County divorce action on consent of the parties, until JOEL was awarded full custody of the Herman children in or about May 2017 and a final Judgment of Divorce granted in or about December 2018.

## B. **WIEBER's 2011 Investigations Re: JOEL-Rochel Herman Separation Disputes**

30. WIEBER's involvement in the long-running JOEL-Rochel Herman disputes began in 2011 when he first investigated complaints lodged by JOEL's sisters with the NYPD asserting that Rochel Herman had assaulted the youngest one of them with a baby stroller holding one of her sons at a community event held on June 12, 2011. According to police reports filed by WIEBER, WIEBER met with Rochel Herman and her father and interviewed them extensively on June 24, 2011, and was given extensive details about their view of her separation from JOEL in early 2010, their custody/visitation and related court battles in Family Court in which she described her hatred of JOEL and the entire Herman family. JOEL himself was also interviewed by WIEBER on several occasions.

11

31. According to follow-up police reports filed by WIEBER, WIEBER also met with non-party Mandel and interviewed him extensively on August 23, 2011. During that meeting, MANDEL spoke about his assistance to Rochel Herman. He too exhibited **an intense** dislike and one-sidedness to JOEL and the entire Herman family. Furthermore, Mandel was introduced to WIEBER by a businessman named Benjamin Weiser, a close friend of Mandel and of Rochel Herman's father and a key financial supporter of Rochel Herman, who was also involved in multiple text messages and phone calls to WIEBER's personal cellular phone in the time before and after the false arrests of JOEL in May 2014.

32. Ultimately, on Dec. 12, 2011, WIEBER cleared Rochel Herman of the complaint filed by JOEL's sister and closed the case, adopting the recommendation of the NYPD legal bureau that the case should be dealt with civilly in the ongoing Family Court litigation. Indeed, WIEBER later testified on Rochel Herman's behalf in Family Court.

33. In the midst of the foregoing investigation, Rochel Herman caused another domestic incident report ("D.I.R.") and complaint to be made against JOEL alleging that he committed criminal contempt on June 14, 2011 by attempting to circumvent a Family Court Order of Protection that barred him from any contact with the Herman children except during supervised visitation. According to Rochel Herman, JOEL's father had approached the oldest of the three Herman children in school and handed him a cellphone to speak with JOEL on the other end. After requesting and obtaining a subpoena to Verizon Wireless from the Deputy Police Commissioner, WIEBER obtained cellular records of JOEL's father which conclusively demonstrated Rochel Herman's ability to fabricate lies about JOEL and his family. Indeed, WIEBER was forced to conclude that

no phone calls to or from JOEL were made or received from JOEL's father's cellphone and the case was therefore dismissed at WIEBER's request on Dec. 11, 2011.

## C.    The Post-Passover 2014 Weekend Visitation Schedule

34.    In the divorce action, the October 24, 2013, Family Court Visitation Order was adopted by Supreme Court and continued in effect, but slightly modified, upon the entry of a special 2014 Passover visitation schedule in March 2014 which resulted in a swap of the order of post-Passover alternate weekend schedule, effective immediately after the end of the Passover holiday on April 22, 2014. All this was reflected and set forth in so-ordered stipulations of the Supreme Court dated March 24, 2014 and April 10, 2014.

35.    The so-ordered stipulation dated March 24, 2014, signed by the Honorable Jeffrey Sunshine, JSC, states at paragraph 7: "Following the Passover Holiday, the alternate weekend access schedule shall resume w/the mother having the children on 4/25." Thus, in accord with that Supreme Court order, the alternate weekend schedule was to be as follows:

> Weekend beginning Friday April 25 —ROCHEL
> Weekend beginning Friday  May 2 — JOEL
> Weekend beginning Friday May 9 —  ROCHEL
> Weekend beginning Friday May 16 — JOEL
> Weekend beginning Friday May 23 — ROCHEL
> Weekend beginning Friday May 30 — JOEL

36.    Pursuant to so-ordered stipulations in the Supreme Court divorce action, on April 22, 2014, the last day of Passover-a day that JOEL and Rochel Herman could not drive cars or use telephones for religious reasons-the three Herman children were to be taken from Rochel Herman's apartment to JOEL's apartment by foot at 6:00 PM and returned to Rochel Herman's residence the following morning.

37.

13

**D. The Events of April 22, 2014 that Triggered the First False Arrest**

38.    As shown on video surveillance footage from a 24-hour camera facing the front of JOEL's apartment building, neither Mandel nor Greenberg, the usual "transporters" who would bring the Herman Children from Rochel Herman's apartment to JOEL's apartment for visitation, brought the three Herman children there that day. Instead, Mandel's fourteen- year old son brought *only two of the three* Herman children in a baby stroller capable of holding all three children. Mandel's young son is seen on the video surveillance footage leaving JOEL's building approximately two minutes later with an empty baby stroller.

38.    According to Fraidy Herman, JOEL's sister, who was waiting for the arrival of the three Herman children in front of JOEL's apartment building that day. She saw Mandel and Greenberg accompany Mandel's son, as he pushed the baby stroller with only two of three Herman children, but then departed at the corner of JOEL's block. They left and let Mandel's son bring the two Herman children to JOEL's apartment alone.

39.    According to Fraidy Herman, Mandel's fourteen-year old son refused to provide his name or state why the third and youngest Herman son was missing in response to questions from her brother JOEL in the lobby of the apartment building.

40.    Video surveillance footage from another surveillance camera in front of the entrance to JOEL's apartment show JOEL and his sister, Fraidy, coming up via the staircase several minutes later and entering his apartment with only two Herman children.

41.    Thus, the surveillance cameras in front of the building and in front of JOEL's third floor apartment conclusively demonstrate that nether Mandel nor Greenberg brought the two Herman children to his apartment or had any opportunity to explain to JOEL why

14

the missing third Herman son did not come for visitation at 6:00 pm that day, as Greenberg stated in (1) a sworn deposition falsely authenticating and supporting the statements made to the contrary in his name in WIEBER's criminal complaint dated May 27, 2014 and in (2) a sworn affidavit he executed to the same effect in the New York Supreme Court divorce action in a successful effort to stop JOEL from continuing the extensive visitation privileges then in effect.

42.    In her complaint to WIEBER dated May 5, 2014, Rochel Herman claimed she had advised Mandel, as opposed to Greenberg, to tell JOEL that the missing son was injured in the park that morning and could not come to visitation that day until she took him to the doctor the following day.

43.    Further, video surveillance footage from a surveillance camera of the Marcy Ave. side (near Penn St.) of a residential apartment rental building located at 222 Penn Street, Brooklyn, New York-a building along the walking route from Rochel Herman's apartment building on Flushing Ave. to JOEL's apartment building on Ross Street shortly before 6:00 PM. shows Mandel and Greenberg accompanying Mandel's fourteen-year old son pushing two children in a baby stroller, passing the side of that building facing Marcy Ave shortly before visitation time, and returning shortly after Mandel's son dropped off two kids at JOEL's apartment building, with Mandel's son pushing an empty baby stroller.

44.    Although the other two children told JOEL that the third and youngest son had been injured earlier that day, they could not provide specific details in a satisfactory manner given their tender age. Since JOEL could not use the telephone until the end of the Passover holiday which occurred shortly after 9:00 pm that night, he walked to the local ODA Medical Center where the children frequently visit to see if the youngest

Herman child was or had been taken there. When JOEL learnt that he was not there, he became increasingly worried and frustrated that he was given no information about the missing son's condition or location by or on behalf of Rochel Herman.

45.     After the end of the Passover holiday which occurred shortly after 9:00 PM, neither ROCHEL H. nor anyone on her behalf called JOEL to tell him what happened to his youngest son or to advise JOEL of his whereabouts. Therefore, as evidenced by JOEL's phone bill, JOEL called the 90th police precinct around 10:15 pm and had a four-minute conversation. According to JOEL, he was told to call "911" and file a "missing person" complaint if he wanted immediate help because the local precinct could not possibly respond that evening. According to the 911 call log, JOEL did just that about four minutes later. In fact, as Officer Marussich, one of two police officers that responded to the 911 call, admitted in his deposition testimony, 911 calls by a separated parent when a child does not appear at visitation is a rather common occurrence.

46.     Not surprisingly, the 911 audiotape and transcript of the call at about 10:20 PM show JOEL telling the 911 attendant that he was reporting a "missing child" as the result of a custody dispute but it might just be a violation (of a court visitation order).

47.     As shown on video surveillance footage outside and inside JOEL's apartment, two police officers, Defendant D'ALTO and Police Officer Marussich, responded to the 911 call shortly thereafter. They remained at JOEL's apartment for about ten-eleven minutes before leaving. Upon arrival, surveillance footage shows JOEL being questioned by D'ALTO for approximately one-minute.

48.     According to JOEL, when D'ALTO specifically asked him during that one minute conversation whether he had contacted Rochel Herman about his missing son and

whether he had Rochel Herman's address and phone number, JOEL responded that he did not have any contact information for Rochel Herman except for her address at Flushing Ave. JOEL stated that neither Rochel Herman nor anyone else had contacted him after the Passover holiday had ended to tell him where his youngest son was and what had happened to him. However, JOEL told D'ALTO that he had the phone number of her father, David Klein, and that he might have answers if D'ALTO spoke to him.

49.     The video surveillance footage inside JOEL's residence and JOEL's phone bill show that after JOEL called Mr. Klein's telephone number from his cellular phone to speak to him, Mr. Klein hung up the phone. JOEL then called again and handed the cellphone to D'ALTO.

50.     After D'ALTO spoke to Mr. Klein for about nine minutes in an exasperated manner indicating a lack of cooperation, D'ALTO and Marussich left JOEL's apartment and went to Rochel Herman's apartment where the missing son was apparently found to be asleep. JOEL went there too in his own car and waited outside Rochel Herman's residence to find out what happened to his son. He saw Greenberg waiting outside the premises. The activity logs or minute books of both cops and the 911 call log all indicate that D'ALTO and Marussich concluded right there and then that there was no real missing person but rather a custody dispute, and the child was not in any danger. The case was immediately marked "closed" in their minute books and in the 911 call log at about 11:10 PM that evening.

51.     On a more formal basis, a Domestic Incident Report and a follow-up police report were prepared by Police Officer Marussich the next day, on April 23, 2014, which

oted that no offense had been committed and that the dispute underlying the April 22, 2014, 911 call was one between two parents fighting over custody of their son.

52.     That conclusion was also reviewed and reported on by the 90th Precinct Domestic Violence Officer Lissette Sanabria, who, after speaking to JOEL over the phone and agreeing with him that the matter should be appropriately dealt with thereafter by the Supreme Court in the pending divorce action, concluded that the case was appropriately closed. The case was formally closed by the Domestic Violence Supervising Sergeant, Efrain Perez, on April 29, 2014.

53.     In short, the 911 call investigation so common with separated parents, as testified to by Officer Marussich at his deposition, was "CLOSED" and not referred to the Detective Squad for further investigation, much less to Detective WIEBER, in particular.

**E.     In a Highly-Irregular Manner, WIEBER Reopens the "Closed" 911 Call Investigation without a Referral After Receiving a Phone Call from Greenberg on April 23, 2014 and Makes an Unusual "House Call" to Rochel Herman. on May 5, 2014, With Greenberg Present, to Draft Four "Walk-In" Complaint Reports-In Flagrant Violation of NYPD Practices____**

54.     As shown on WIEBER's cellular phone bills, the next day, April 23, 2014, before the 911 police investigation described above had been formally closed, Greenberg called WIEBER twice on his personal cellular phone at 1:23 pm (2 min.) and at 5:56 pm (4 min), followed by two more phone calls to WIEBER on his cellular phone on April 24, 2014

55.     . In a highly-irregular manner, in violation of express NYPD Policy and Procedure set forth in Detective Guide Procedure Nos. 502-11 and 502:12, effective 12-913, WIEBER apparently reopened the "Closed" 911 call investigation without any referral for further investigation.

56. On May 5, 2014, WIEBER reopened the 911 call investigation. At his deposition, WIEBER admitted that he made a "house call" to Rochel Herman's apartment on May 5, 20014, with Greenberg present, where she made out four complaints against JOEL stemming from the April 22, 2014 visit. Ironically, in his typed-up version of these complaints, WIEBER refers to them as "walk in" complaints, not as "house calls."

57. Of particular significance is Rochel Herman's "walk-in" complaint of harassment against JOEL which states:

> *On 4/25/2014 ACS appeared* at my parents' home then proceeded to where I live. They told me a new allegation was made against me. I had already received in the past, countless notices of false allegations made against me, proven to be unfounded. *ACS investigated me for over an hour, then examined and checked my kids all over for bruises*. *Mr. Herman uses the ACS, as another tool to harass & harm my children and myself. please help me stop this immediately* thank you. Furthermore, the father was indeed notified about the whereabouts of my son. Despite that however, Joel Herman found it very useful to report to ACS again, thus causing much distress. *The transporter, as well as my kids informed him* (emphasis added).

58. Rochel Herman's expressed concern was that WIEBER "help stop this [ACS investigation] immediately," not the normal job or function of an NYPD police detective. Yet, that was exactly what WIEBER did after arresting JOEL on April 26, 2014. Thus, on May 27, 2014, WIEBER filed a Report of Suspected Child Abuse with ACS based on his same fabricated personal observations at the arrest scene, which also served as the basis for one of three categories of charges he brought against JOEL in his May 27 criminal complaint.

59. Furthermore, the ACS investigation notes and the deposition testimony of ACS Child Protective Specialist ("CPS"), Janelle Benjamin, reveals that WIEBER succeeded in getting ACS to drop a serious investigation of Rochel Herman's care of her

children as a result of the April 22, 2014 event and its aftermath, based exclusively on WIEBER's aforementioned report.

60.     In fact, ACS not only cleared Rochel Herman but also made a finding of suspected child abuse against JOEL and classified such finding as "indicated" in the New York State Child Abuse and Maltreatment Register ("SCR"), based on WEIBER's report and his simultaneous arrest of JOEL. Only on JOEL's appeal, after ACS declined to prosecute the appeal in light of the dismissal of the criminal charges, did the hearing officer direct ACS change the entry in the SCR state registry from 'indicated" to "unfounded."

61.     Not surprisingly, in a complaint follow-up to Rochel Herman's staged walk-in complaint that same day, May 5, 2014, WIEBER conducted no investigation whatsoever. WIEBER literally copied and used the same language employed by Rochel Herman in her complaint, concluding that: "Joel Herman made a false report to the police. This is an example of how he uses the system to attack Rochel." The same uncorroborated claims of Rochel Herman is repeated in the various police reports supporting the May 26, 2014 arrest of JOEL.

### F.  The Cellular Phone and Text Exchanges Among
### Non-Parties and WIEBER  Prior to the False Arrests

62.     According to WIEBER's and Mandel's personal cellular phone bills, between May 5, 2014 and May 30, 2014, WIEBER had multiple back and forth telephonic and text message exchanges with Greenberg and/or Mandel. According to Mandel's cellular phone bills, numerous exchanges then took place between Mandel and Greenberg. WIEBER also had a flurry of telephonic and text message exchanges with Benjamin Weiser ("Weiser"), a close wealthy businessman friend of Mandel and of Rochel Herman's

father and a key a key financial supporter of Rochel Herman who introduced Mandel to WIEBER in 2011.

63.     WIEBER's total lack of any recollection of the general nature of substance of these telephonic and text message exchanges at his deposition of May 8, 2019 speaks volumes. It is unreasonable to believe that these exchanges involved new investigative facts, as no new facts provided by these three individuals are found in WIEBER's criminal complaint forwarded to the KCDA, on the basis of which JOEL was arraigned on May 27, 2014 or May 31, 2014.

64.     The only reasonable explanation of these multiple telephonic and text exchanges is they centered on WIEBER's true goals and objectives  in making the false arrests and initiating the subsequent malicious prosecutions of Plaintiff, as set forth in ¶ 5 *supra*.

### G.   The April 28, 2014 I-Phone Audio-Video Tape of Greenberg as Source of First Set of False Charges Arising from 5/26/14 Arrest

65.     In an audio-video tape made on JOEL's I-phone on April 28, 2014, only days before the May 5, 2014 "house call," Greenberg Is seen putting the three Herman children in his van to transport them without child booster seats and without seat belts. JOEL is seen walking over to the van and saying in Yiddish: children, there are no booster seats and seat belts-you're going to have to come out."

66.     Greenberg then asked JOEL if he can borrow JOEL's booster seats located in JOEL's Car. JOEL politely responded "yes" if you agree to return them to the lobby of my apartment building when you are done. After Greenberg responded in the affirmative, JOEL proceeded to bring the child booster seats from his car and gave them to

Greenberg, who was then allowed to transport the children after fastening them properly and putting seatbelts on the children.

67. Moreover, in the notes of telephonic interviews of Rochel Herman's selected collateral witnesses by the court-appointed neutral evaluator in the divorce action, as contained in her forensic report, Greenberg expressed deep irritation to what he referred to as JOEL's constant "harassment" of him and Mandel, always unnecessarily checking their cars for child booster seats and seat belts.

68. Based on the fact that WIEBER arrested JOEL about one month later, on May 26, 2014, under the watchful eyes of Greenberg and two of his cohorts sitting in cars across the street from the hotel, based in part on fabricated and false charges that JOEL drove the three Herman children without child seats and seat belts when he brought them back to the Pointe Plaza hotel after visitation, a reasonable, neutral fact-finder would conclude that Greenberg and Mandel recommended these false charges in particular to WIEBER.

## H. Events Immediately Preceding, and During, the Hotel Arrest Scene on May 26, 2014

69. On May 26, 2014, about one hour before the first arrest of JOEL at the Pointe Plaza Hotel at 2 Franklin Ave., WIEBER's memo book shows that he was present at the corner of the block where Mandel and Greenberg reside. Shortly thereafter WIEBER appeared at the arrest scene, lying in wait for JOEL near the Pointe Plaza Hotel ('hotel').According to WIEBER's deposition testimony, Greenberg witnessed JOEL's arrest across the street from the across the street from the hotel with two other people he brought along whose names WIEBER testified he did not remember.

70.     In point of fact, although WIEBER testified he came with Detective Malik joining him in his car, along with two other detectives stationed on the other side of the hotel as backup, the surveillance video footage, the official NYPD 911 call log, the 911 audiotape and a transcript of the 911 call by JOEL show that JOEL called 911 when he walked out of the hotel, after turning over his children to Rochel Herman's "transporter," as he saw two individuals sitting in a car with what later was determined to be a video camera, right across from the hotel parking lot. JOEL has identified these two individuals as Messrs. Leon Eisner and Joel Teitelbaum, two active collaborators of Rochel Herman, Mandel and Greenberg in the divorce action.

71.     WIEBER admitted that the 911 call was immediately transferred to him and that he assured the dispatcher that everything was okay. According to the video tape surveillance footage, WIEBER then proceeded in his unmarked car rapidly from his position on Wallabout Street perpendicular to Franklin Ave from the right-side and turning left on the corner towards the hotel lobby at 20 Franklin Ave. It also shows that upon making a turn on Franklin Ave., WIEBER first stopped in front of the car in which Messrs. Leon Eisner and Joel Teitelbaum were stationed across the street from the hotel and then motioned with his hand in a manner indicating that they should leave the area immediately. They complied and WIEBER's car crossed over Franklin Ave. to the hotel entrance lobby. Detectives Malik and WIEBER then departed from their unmarked car rapidly and arrested a startled JOEL in the lobby of the hotel as Detective Malik placed him in handcuffs.

**I. The Two False Arrests of JOEL on May 26, 2014 and May 27, 2014, respectively, and the Malicious Prosecution Arising Therefrom on May 27, 2014 in NYC Criminal Court, Kings County**

72. On Monday, May 26, 2014, at approximately 7:10 P.M., JOEL was arrested by WIEBER, in the lobby of the Point Plaza Hotel at 2 Franklin Ave., Brooklyn, New York, an established exchange point where JOEL had just returned his three children to Rochel Herman's "transporter," after the completion of Monday evening visitation at his nearby apartment

73. The next day, JOEL was charged and arraigned in New York Criminal Court of Kings County, Docket No. 1-2014KN 038594, based on a felony complaint dated May 27, 2014 comprising one felony and eight misdemeanors, broken down into three categories or TPOs for a total of thirteen counts, and released from jail upon his own recognizance. The criminal allegations signed by WIEBER under oath were as follows:

(TPO-1) On April 22, 2014, at approximately 10:30 PM, Joel Herman made a purportedly false 911 call reporting a missing child-one of his three minor children that was inexplicably and without notification not brought to his residence for visitation on the last day of the Passover Jewish holiday along with the other two children, thereby committing the offenses of falsely reporting an incident in the third degree, under PL 240.50(2) and PL 240.50(3)(A) (2 counts);

(TPO-2) On May 26, 2014 at approximately 07:10 PM, at 2 Franklin Avenue, Brooklyn, New York, Joel Herman committed the additional offense(s) of criminal possession of stolen property in the fourth degree; PL 165.45(2); criminal possession of stolen property in the fifth degree, PL 165.40; criminal impersonation in the second degree, PL 190.25(4); and identity theft, PL 190.78(1).

(TP0-3) On May 26, 2014 at approximately 07:10 PM, at 2 Franklin Avenue, Brooklyn, New York, while driving his three children into the Point Plaza Hotel Parking lot, Wieber purportedly observed Joel Herman committing the offense(s) of (i) driving on a sidewalk, VTL 1225-a; (ii) operating a vehicle without safety belts on each of the three Herman children, VTL 1229-c(1) (3 counts); and endangering the welfare of each of the 3 Herman children, PL 260.10(1) (3 counts).

74. At his arraignment at the King County Criminal Court on May 27, 2014, the Criminal Court issued a temporary order of protection ("T.O.P.") pursuant to NYCPL § 530.12, as a result of the pending family offenses [Endangering the Welfare of a Child, PL 260.10(1)) (3 Counts for 3 children)], which barred JOEL from having any contact with his estranged wife and their three minor children and from their home, school, business and place of employment, "SUBJECT TO SUPREME COURT OR FAMILY COURT ORDERS REGARDING CUSTODY AND VISITATION." (capitalized emphasis added).

75. The criminal complaint dated May 27, 2014 was signed under oath by WIEBER and then forwarded by him to the KCDA for prosecution. As demonstrated in the ensuing sub-sections (i)-(iii), it consisted of fabricated information concerning WIEBER's own purported observations at the first arrest scene that never happened (TPO-3), as well as other false and fabricated information allegedly provided by D'ALTO, Rochel Herman, Greenberg (TPO-1) and un-named individual Breindy Rosenberg (TPO-2), all of which were fraudulently concocted by them with WIEBER, or extracted from them by WIEBER. These false statements served as the basis for the multiple felony and misdemeanor charges contained in the May 27, 2014 criminal complaint, and, at a subsequent point, confirmed as true in sworn supporting depositions given to the KCDA.

### (i) WIEBER's Fabricated Factual Recitation of what He Falsely Purports to Have Observed (TPO-3) and the Sept. 3, 2014 Dismissal of Those Charges

76. The factual portion of the Felony Complaint related to the TPO-3 charges alleges that WIEBER "observed [JOEL] driving with the aforementioned three children as passengers in [his] vehicle"; "observed [JOEL] drive [his] vehicle up onto the sidewalk and continue forward for approximately fifteen feet on that sidewalk, whereupon [JOEL]

drove said vehicle in reverse on the sidewalk, drove backwards, and then drove forward again", and "further observed that the three above-mentioned children were not secured by a seat belt or a child car seat."

77. As to the TPO-3 charges, video surveillance footage from the Pointe Plaza Hotel and the adjoining private school-the Vizhnitzer Yeshiva- provided to the KCDA by JOEL's attorney show that WIEBER's sworn account of his alleged observations of criminal activity by JOEL upon return of the Herman children to a transporter of Rochel Herman at the Pointe Plaza Hotel were false.

78. In fact, the video footage conclusively show that WIEBER could not possibly observe from where his car was stationed down the right side street from the hotel: (i) whether the three Herman children being driven by JOEL were in secure child seats and wearing seatbelts, (ii) JOEL driving his vehicle on the sidewalk in front of the hotel , or (iii) the precise manner in which JOEL drove his vehicle on the side walk in front of the hotel or in the driveway.

79. However, WIEBER's twisted claims of what actually occurred indicates that he had some real-time information as to what JOEL actually did, which was then then distorted to incriminate JOEL. All that information could only have come from Greenberg, or from his cohorts Joel Teitelbaum and Leon Eisner, sitting in cars on Franklin Ave. directly across the street. Thus, his claimed observations about how JOEL drove are conclusively shown to be knowingly and willfully false and malicious by the surveillance footage.

**(ii)** **WIEBER's Fabricated and Perjurious Information**
**Fraudulently Procured from Lying Witnesses to**
**Support TPO-2 and its Sept. 3, 2014 Dismissal**

80.    As to the TPO-2 charges of criminal possession of stolen property in the fourth degree, criminal possession of stolen property in the fifth degree, criminal impersonation in the second degree and identity theft, these charges were based on two debit cards of a third party, Breindy Rosenberg, and an internet purchase receipt of $93.49 charged to one such card, illegally seized from a closed wallet in JOEL's pocket during an inventory search done by WIEBER in front of the desk officer Sergeant STEWART, after he had been brought back to the 90th Precinct in handcuffs following his arrest.

81.    However, while held in a locked room with a hole in the door at the Detective Squad from where JOEL could hear what was going on outside by placing his ear directly on the hole, JOEL heard WIEBER converse with Mr. Joel Teitelbaum and his girl-friend Breindy Rosenberg ("Rosenberg"), after midnight, at the Detective Squad, to explain why her debit/credit cards were in JOEL's possession. According to JOEL, when Rosenberg stated she had given JOEL permission to manage her bank accounts and debit/credit cards, WIEBER and Joel Teitelbaum pressured her to lie and say it was done by JOEL without her authority by telling her that he was a thief and that he had tried to rob her. She asked for proof of that assertion but got nothing.

82.    Further, cellular phone records, police reports and WIEBER's deposition testimony demonstrate that Greenberg, who had arranged for Joel Teitelbaum to be present at the hotel arrest scene on May 26, 2014, sitting in a car across the street from the hotel until instructed by WIEBER to leave, after JOEL had spotted him with Mr. Leon Eisner and called 911, then arranged for Joel Teitelbaum to bring his then girl-friend, Breindy

Rosenberg, to the 90th Precinct to meet with WIEBER after mid-night and pressured her to lie about JOEL and her debit cards.

83. Subsequently, upon review of numerous e-mails and texts between JOEL and Breindy Rosenberg supplied by JOEL's attorney, the Assistant District Attorney from the KCDA assigned to the Case moved to dismiss at the hearing held on Sept. 3, 2014, granted by the court, on the grounds that Breindy Rosenberg and JOEL were "known to each other." This motion tracked memo instructions from both the ADA Assigned to the Case and the First Deputy Bureau Chief, Trial Bureau Grey dated Sept. 2, 2014:

> For the Credit Card T/P/O: People move to dismiss. C/W and Deft are known to each other, and have shared personal information for bank accounts. Would not be able to prove the case beyond a reasonable doubt.

### (iii) The False Information Contained in TPO-1 and in Supporting Depositions and the November 17, 2014 Dismissal of Those Charges

84. The factual portion of the Felony Complaint related to the TPO-1 charges alleges that according to Rochel Herman, in the morning of April 22, 2014 she "was in the park with [the youngest son] and the child sustained an injury on the playground for which [she] brought said child to a doctor's office"; that according to Greenberg, he accompanied only two of the three Herman children to JOEL's apartment that evening, and he so informed JOEL, because the youngest son "was with Rochel Herman at the doctor's office following an injury sustained at the park"; that the NYPD 911 Transmission records show JOEL "telephoned 911 reporting an emergency in that defendant stated in sum and substance that defendant's four-year old [youngest] son was missing"; and that according to *Police Officer Dalto,* he "responded to [JOEL's] emergency telephone call and that [JOEL] repeated again to the informant that [his youngest] son was missing, whereupon the

28

informant began a search for said child" and that "[JOEL] **claimed for approximately** *thirty minutes* **that defendant does not know the address of Rochel Herman** and [the youngest son], *thereby impeding informant's investigation for the missing child*" (Emphasis supplied).

85.     Three supporting "depositions" or sworn statements were subsequently given to the District Attorney: (i) Rochel Herman's deposition dated August 13, 2014, (ii) Greenberg's deposition dated August 11, 2014 and (iii) D'ALTO's deposition dated June 29, 2014. Each of these verified depositions states that "the facts in the Instrument stated to be on information furnished by me are true to my personal knowledge."

86.     However, as demonstrated above, timed video surveillance footage from JOEL's apartment residence and from an intermediate apartment building near Marcy Ave. and Penn St. and JOEL's cellular phone records for April 22, 2014 demonstrate that each of Rochel Herman's, Greenberg's and D'ALTO's sworn statements were unquestionably false.

87.     First, Rochel Herman's sworn allegations are contradicted by the Domestic Incident Report ("DIR") dated May 5, 2014, in which WIEBER sets forth her version of events as follows:

> On 4/22/14, Rochel took their []youngest son to the park where he got hurt. She took [him] home and made an appointment with the pediatrician.
>
> [He] was due to visit with his father later on that day along with his 2 brothers. She did not sent [him] because she wanted him seen Doctor. The person who transports the children to the father is ***Mr. Aaron Mandel***. She told ***Mr. Mandel*** to inform Joel of what happened which he did when he dropped off [the other two children].

88.     Second, video surveillance footage conclusively shows that Greenberg's allegations were entirely false and maliciously fabricated. In fact, the surveillance footage

conclusively shows that neither Greenberg nor Mandel ever stepped foot inn JOEL's apartment building on April 22, 2014, the last day of the Passover holiday, at about 6:00 P.M., and did not drop off two of three Herman children there, but instead waited at the corner as Mandel's 14 year old son dropped the two kids off and returned with an empty stroller. *Id*.

89.    Third, D'ALTO's allegation that JOEL claimed *for approximately thirty minutes* that he did not know the address of Rochel Herman, "thereby impeding [his] investigation for the missing child" is demonstrably false and fabricated-contradicted by video surveillance footage which shows that JOEL answered D'ALTO's questions for about one minute and then was placed by JOEL on his cellular phone with Rochel Herman's father in a heated conversation for about nine-ten minutes, and left JOEL's apartment with Officer Marussich on their way to Rochel Herman's apartment.

90.    It is unreasonable to assume that D'ALTO, having no personal motive to do so, would simply lie to WIEBER in such a blatant fashion unless he was coaxed by WIEBER into doing so.

91.    Fourth, WIEBER's claim that the official records of the New York City Police Department 911 Transmission demonstrate that JOEL, in his 911 call, stated "in sum and substance that defendant's four year old [youngest] son was missing" is false and, at best, deceptive and highly misleading in that the audio record of the call and a transcript thereof show that JOEL actually the 911 audiotape and transcript of the call at about 10:20 PM show JOEL actually telling the 911 attendant that he was reporting a "missing child" as the result of a custody dispute but it might just be a violation (of a court visitation order), at

the instruction of the 90th Police Precinct phone operator- a common occurrence among separated parents.

92. Not surprisingly, the TPO-1 charges related to the false claim that JOEL placed a false 911 call on April 22, 2014, at approximately 10:20 PM, were dismissed by the criminal court on November 17, 2014, upon motion of the District Attorney.

### J. WIEBER's Fabricated Report of Suspected Child Abuse and Mistreatment Sent to ACS on May 27, 2014

93. The same false and fabricated observations contained in the factual portion of TPO-3 of the felony complaint dated May 27, 2014 were provided by on the same day, telephonically and in a written Report of Suspected Child Abuse & Mistreatment dated May 27, 2014 sent to ACS:

> Arresting officer observed the father of the children driving his vehicle with the children inside. None of the children were in child seats or were wearing seatbelts. The father drove his vehicle on the sidewalk directly i/f/o 2 Franklin Ave. in Brooklyn. He then erratically placed vehicle in reverse and drove backward on the sidewalk in an erratic way causing pedestrians to hurriedly move out of his way. Father then placed vehicle in drive and drove forward, again on the sidewalk, and quickly made a sharp right turn into a driveway where the children immediately opened the car door and exited the vehicle.

94. As demonstrated earlier, these claims were entirely fabricated by WIEBER containing largely the same false claims as in the criminal complaint for which JOEL was arraigned, based on WIEBER's purported personal observation that could not possibly have taken place.

95. In fact, WIEBER's fabricated report sent to ACS, does exactly that Rochel Herman requested WIEBER do in one of her complaints dated May 5, 2014.

**K. WIEBER's Furnishing of Investigative Information from NYPD Files to Private Parties While Active Criminal Case Pending for Use in State Divorce Action by Rochel Herman as the Basis to Terminate or Diminish JOEL's Visitation Privileges**

96.    Between May 27, 2014 and May 29, 2014, WIEBER clandestinely furnished to Rochel Herman and/or Greenberg, various hand-written or typed D.I.R.s, complaints, the criminal complaint dated March 27, 2014, additional police reports and the Report of Suspected Child Abuse and Mistreatment he had sent to ACS for use against JOEL in the ongoing divorce action in State Supreme Court. These documents, contained only in the Detective Squad's case file relating to the ongoing criminal investigation and prosecution commenced on May 27, 2014 against JOEL, were kept at the time in WIEBER's desk, as admitted by WIEBER at his deposition.

97.    Nevertheless, in express violation of NYPD policy and procedure classifying the dissemination of such information as "prohibited conduct," WIEBER provided the above-described documents to Greenberg and/or Rochel Herman for the improper purpose noted in flagrant violation of NYPD Policies and Procedures, which expressly lists this type of police activity under "Prohibited Conduct" known to every NYPD police officer or detective.

98.    In fact, court papers filed in the divorce action indicate that Rochel Herman's attorney received these documents on May 29, 2014, at about noon, and attached them as exhibits to an affidavit of Rochel Herman in support of an extensive emergency motion by order to show cause filed on her behalf in the New York Supreme Court divorce action on May 30, 2014 to suspend overnight visitation and to allow henceforth only supervise visitation by JOEL.

99.     This *ex parte* motion, which involved significant misrepresentations and distortions by the attorneys for Rochel Herman of the nature and scope of the order of protection signed by Criminal Court Judge Tully on May 27, 2014, further resulted in an Order to Show Cause signed by the Honorable Supreme Court Justice Jeffrey Sunshine providing emergency relief pending a hearing and determination, upon personal service thereof on JOEL (police to assist), that barred JOEL from any unsupervised visitation with his children and that required immediate return of the youngest son to Rochel Herman "any police agency to assist."

100.     According to the transcript of the proceeding, the emergency hearing before Judge Sunshine ended at 3:30 PM. WIEBER's cellular phone bill shows that Greenberg, who was present in court as an observer, called WIEBER ten minutes earlier to advise him that Judge Sunshine had announced he was signing the order to Show Cause as modified by him and that he would bring it over to WIEBER immediately. Indeed, Greenberg took it over to WIEBER at the 90th precinct immediately.

101.     At about 5:30 PM, WIEBER arrived at JOEL's apartment with a team of more than 5 cops from an emergency police unit armed with tools to break his door, which they threatened to do when a frightened JOEL did not answer their heavy banging. When JOEL told WIEBER through the door that his youngest son is no longer there but is at his parents' home right down the block, Sergeant Mamys went there to pick him up and brought him back to JOEL's apartment.

102.     When JOEL opened the door and came out to speak to WIEBER, he repeatedly told him that it was his weekend and that he was entitled to pick his youngest son up from school at closing time (about 12:00 PM) and bring him to his house for the

weekend. He had the court orders proving it was his weekend and that the criminal order of protection was subject to the Family Court and Supreme Court visitation order then in effect, and tried to show them to WIEBER, who simply kept calling him a liar as they walked down to the lobby of the building.

103.    While in the lobby, ACS child protective specialist ("CPS") Janelle Benjamin arrived at about 5:45 PM to see JOEL with the kids because it was supposed to be his weekend with them. This is what she recorded in her progress notes.

> CPS reported to 155 Ross Street, Brooklyn, NY. CPS met with Detective Wieber outside of the building. Detective Wieber greeted CPS and asked if she was the assigned CPS for the case, which CPS replied yes. CPS informed Detective Wieber that she just left the grandparents' home, where [the youngest son] was observed in the home. Detective Wieber stated that another detective is on the way to that home now to pick up [the child]. Detective Wieber guided CPS into the building. PGF Joseph Herman was present also. Detective Wieber told Mr. Herman that he is not allowed to come in. CPS observed Joel Herman, and Detective Ahern in the lobby of the building. Detective Wieber informed CPS that Mr. Herman was recently arrested, and that there is an OOP in place against him in regard to the children. Detective Wieber stated that it is a full stay away OOP. CPS stated to Detective Wieber that she was not aware that there was a full stay away 00P. Detective Wieber stated that Mr. Herman is saying that he is supposed to continue to get visitation with the children even with the OOP, but that Mr. Herman and his lawyer has shown no documentation stating that he does. Mr. Herman was attempting to make a call on his cell phone. Detective Wieber stated to Mr. Herman that he violated an OOP. Mr. Herman stated that he did not violate an OOP that he is supposed to still get visitation with his children. Detective Wieber stated that Mr. Herman had his visitation with the children is when he was arrested, and that court documents show that visitations is supposed to be every other week.
>
> Detective Wieber stated that Mr. Herman keeps telling different stories and that Mr. Herman is full of lies. Detective Wieber then proceeded to handcuff Mr. Herman. CPS observed Detective Wieber pulling Mr. Herman outside of the building and into the car. In leaving the building Detective Wieber informed CPS that he will be right back to give CPS his contact information. (emphasis added).

104. In fact, WIEBER never told JOEL about any Order to Show cause signed by Judge Sunshine, which had been delivered to him by Greenberg, but was never served on JOEL until he was already in the police lockup at the 90th Precinct-having been arrested at his apartment building and driven there by WIEBER.

105. As to WIEBER's claim to Janelle Benjamin "that Mr. Herman is saying that he is supposed to continue to get visitation with the children even with the OOP, but that Mr. Herman and his lawyer has shown no documentation stating that he does."

### L. The Third False Arrest of JOEL on May 30, 2014 and His Malicious Prosecution Arising Therefrom on May 31, 2014 in NYC Criminal Court, Kings County, *People v Herman*, Docket No. 1-2014KN 03 and the Oct. 2, 2014 Dismissal of these Charges

106. Three days after the commencement of the first criminal action, on Friday, May 30, 2014, at about 5:50 P.M., JOEL was arrested again by WIEBER at his apartment at 155 Ross St., Brooklyn, New York, and charged with Custodial Interference, Second Degree, PL 135.45(1), and Criminal Contempt, Second Degree, PL 215.50(3).

107. These charges arose from Joel picking-up one of his three children from school earlier that day, at about 11:00 A.M(the other two did not go to school that day)., and taking them to his house in accordance with a revised, post-Passover alternate weekend visitation schedule authorized by a Supreme Court Order dated March 30, 2014.

108. In a cruel and deliberate manner calculated to damage JOEL's emotional bond with his youngest son, after he was brought back from the home of JOEL's parents by Defendant Sergeant MAMYS, and taken with his father JOEL in handcuffs to the 90th Police Precinct in the same police vehicle. Mandel was waiting at the police station and took the child home to Rochel Herman.

109.  The factual portion of the misdemeanor complaint dated March 31, 2014,

signed by WIEBER under oath, alleges that:

> **The deponent [WIEBER]was informed by Rochel Herman** that, at the above time and place, the defendant did pick up their child in common from school and bring the child in common to the defendant's residence without permission or authority.
>
> The deponent further states that the above-described conduct by the Defendant was in violation of a 5/27/2014 Order of Protection, issued by Judge Jane Tully under Docket No. 2014KN030594 in effect until 11/28/2014, and ordering the defendant to stay away from the home, school, business, and place of employment of the informant and the children in common.....
>
> The deponent further states that the above described *order of protection is marked subject to family court orders regarding visitation and the above-described conduct by the defendant was in violation of a 10/24/2013 Kings County Family Court Order of Protection issued by Judge Amanda White, granting the defendant visitation on alternate Fridays beginning on 10/25/2013*.
>
> *The deponent is further informed by the informant that, the above time is not the defendant's weekend for visitation. (italicized emphasis added).*

110.  Criminal Attorney Richard Finkel ("Attorney Finkel") was retained by

JOEL, and asked to proceed to the 90th Precinct, in an effort to have the arrest voided.

Attorney Finkel travelled to the NYPD 90th Precinct and arrived there at or about 7:00

PM. He left at or about 8:15 PM.

111.  On May 31, 2014, JOEL was arraigned in Kings County Criminal Court

under Docket No. 2014KN040353, in connection with a criminal complaint sworn to by

WIEBER charging Joel with contempt of Judge Tully's May 27, 2014 T.O.P. and

custodial interference crimes. These alleged crimes were presented by WIEBER as the

basis for Joel's arrest.

112.  After Attorney Finkel's arrival, he was allowed to speak to JOEL through the

gate of the jail cell where JOEL was detained. JOEL showed Attorney Finkel copies of

several court orders in his possession. They included Judge Tully's May 27, 2014 TOP),

which, as stated, specifically stated that it was "subject to Family Court or Supreme Court

Orders," as well as the effective Family Court Order dated October 24, 2013 and the

Supreme Court Special Passover 2014 Orders dated March 20, 2014.

113.    Thereafter, Attorney Finkel attempted to persuade WIEBER that the arrest

was a mistake, and that JOEL should be released before the commencement of the Sabbath.

Attorney Finkel showed WIEBER the relevant Family Court and Supreme Court Orders and

explained to him their applicable provisions that entitled Joel to overnight visitation with the

children at his residence that weekend commencing on Friday, May 30, 2014.

114.    In addition, Attorney Finkel explained to WIEBER that (i) it was readily

verifiable that Rochel Herman had the children the prior weekend commencing on

Friday, May 23, 2014; (ii) that the first arrest of JOEL on Tuesday, May 26, 2014, as he

was bringing the children back from an after-school visitation session to the Pointe Plaza

exchange point, proves that Rochel Herman had the children the past weekend

commencing on Friday, May 23, 2019, under the unmodified provision of the Family

Court Order then still in effect that provides for such mid-week visits only if ROCHEL

had the children the prior weekend; and (iii) that a simple counting of the weekends post-

Passover (which ended on April 22, 2014) pursuant to the terms of the Supreme Court's

Special Passover 2014 Orders stablished that the weekend commencing on May 30, 2014

was clearly Joel's weekend to have the children overnight at his residence until their

return to school Monday morning.

115.    After WIEBER rejected Attorney Finkel's explanations, Attorney Finkel

asked to speak to WIEBER's supervisor. Attorney Finkel was then led to supervising

Sergeant MAMYs' room where Attorney Finkel repeated the same arguments and showed the same court orders to Sgt. MAMYS.

116.    Attorney Finkel pointed out the terms of the applicable TOP underlying the arrest, which specifically permits under its "subject to" provision, any contact made by Joel with the Herman children pursuant to the existing visitation schedule, as authorized by the Family Court or Supreme Court visitation order then in effect.

117.    In the end, Attorney Finkel left the offices of the KCDA at about 8:15 PM after both WIEBER and MAMYS had rejected his arguments, and then claimed that the KCDA intake unit for processing arrests was already closed and could not be contacted at that late hour. The NYPD therefore continued to process the arrest.

118.    The above stated claims by WIEBER and MAMYS were simply and knowingly false. Not only did they fail to attempt to have the arrest voided immediately, the next morning or at any time thereafter, in accordance with established NYPD policy stated in the NYPD Patrol Guide, or to stop any prosecution or move to have any criminal case based on that third arrest dismissed, but the KDCA files show that WIEBER worked frantically until close to mid-night that evening to return a final signed version of the criminal complaint to prosecutors.

119.    In fact, at 8:09 PM, while Attorney Finkel was apparently locked in a room pleading with MAMYS to free Plaintiff because he did not violate any order of protection when he picked up his child from school since it was his visitation weekend, WIEBER faxed a thirteen page packet to the KCDA intake unit that included a copy of the actual order of protection signed by Judge Tully on May 27, 2014 which had a handwritten

38

addition to a pre-printed version which cumulatively stated that the order of protection was "subject to Family Court or Supreme Court" orders of visitation.

120.    Incredibly, in clear and unambiguous bad faith, WIEBER knowingly and fraudulently did not attach in this packet copies of the October 24, 2013 Family Court order or the stipulated modification order of the Supreme Court dated March 24, 2014 just given to him by Attorney Finkel, which would have been sufficiently exculpatory to free JOEL immediately and not commence any criminal proceeding against him, but instead stated that the order of protection was "subject to Family Court orders," and that he was advised that it was not his alternate weekend of visitation.

121.    Not surprisingly, as shown in the transcript of the October 2, 2014 proceeding before the Criminal Court, these charges were eventually dismissed at the recommendation of the assistant chief of the KCDA "green zone," who stated:

> I looked at the orders from [S]upreme [C]ourt [in the divorce action] and according to my calculation this arrest should not have happened. It looks as though it was the defendant's weekend [to have access with the children]. In light of that I believe that docket should be dismissed. ...
>
> The Court: That docket, 0353, is dismissed.

122.    Thus, the same obvious arguments presented to, but rejected by, WIEBER and MAMYS on May 30, 2014 were ultimately the basis for the District Attorney's Motion to Dismiss.

123.    Against this background, it is clear that the factual portion of the resulting misdemeanor complaint sworn to by WIEBER, which studiously refer only to a Family Court order, without the subsequent Supreme Court Order referred to in the May 27, 2014 temporary order of protection signed by Judge Tully, and the supporting depositions sworn to by Greenberg on August 11, 2014 and by Rochel Herman on August 13, 2014, were

39

deliberately false and misleading, and designed to have JOEL falsely arrested and charged, so as to further stop him from seeing his children in the liberal manner ordered in April 2014 by the Supreme Court.

## VI. CLAIMS FOR RELIEF

### FIRST COUNT

**VIOLATION OF 42 U.S.C. § 1983- DEPRIVATION OF
PLAINTIFF'S FOURTH AMENDMENT RIGHT TO BE
FREE FROM FALSE ARREST & UNLAWFUL IMPRISONMENT
(against Defendants WIEBER and D'ALTO)**

124.    Plaintiff re-alleges and incorporates by reference the allegations set forth in each preceding paragraph as if fully set forth herein, particularly ¶¶ 1-21 and 27-123, *supra.*

125.    Pursuant to the Fourth Amendment to the Federal Constitution, it is clearly established law that an arrest and/or imprisonment is unlawful when not supported by probable cause, or at least arguable probable cause. Although WEIBER did not have knowledge of any reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested, WIEBER had Plaintiff arrested three times on May 26, 2014, May 27, 2014 and May 30, 2014 without reasonable suspicion or probable cause, thereby depriving Plaintiff of his right to be free from unlawful seizures under the Fourth Amendment to the Constitution of the United States, as made applicable to the states under the Fourteenth Amendment, in violation of 42U.S.C. § 1983.

126.    Defendants WIEBER and D'ALTO, by knowingly aiding and abetting WIEBER in making the first false arrest by providing him with false information and a false

supporting deposition , further engaged in willful, wanton, malicious, and abusive conduct while falsely arresting and imprisoning Plaintiff under the color of law that deprived Plaintiff of constitutionally protected rights under the Fourth and Fourteenth Amendments of the United States Constitution.

127. Further, WIEBER did not have any *arguable* probable cause and is not protected by the doctrine of qualified immunity because he violated clearly established constitutional rights of which any reasonable person would have known at the time of the arrests and commencement of the criminal proceedings at issue. Although a law enforcement official has probable cause to arrest if he received his information from the putative victim of a crime or an eyewitness, if the circumstances raise doubt as to either such person's veracity, such as here where WIEBER admittedly knew at the relevant time all about the breakdown of the JOEL-Rochel Herman marriage in 2010, the intense hatred of the latter to the former, her propensity to make up lies and seek the arrest and prosecution of JOEL by reporting such lies to the police for that purpose, and the intricate and equally intense, and hateful and one-sided involvement of community supporters of Rochel Herman such as Mandel and Greenberg. WIEBER admitted his knowledge of these facts at his deposition and in his investigative packets of his two 2011 investigations.

128. Armed with knowledge of the foregoing, any reasonable police officer would find criminal allegations made against JOEL by Rochel Herman or her zealous supporters in May 2014- allegations that underly the three arrests and two prosecutions at issue herein be unreliable without independent corroboration from neutral sources. Yet, as demonstrated herein, WIEBER purportedly relied exclusively on allegations made by

41

Rochel Herman, corroborated only Greenberg and Mandel, in arresting JOEL three times on May 26-27, 2014 and May 30, 2014, and causing him to be charged and arraigned for multiple criminal charges on May 27, 2014 and May 31, 2014.

129. Moreover, because all supporting information to the factual allegations contained in the two criminal complaints signed by WIEBER under oath were either based on (i) false and deliberately fabricated observations of alleged criminal activity conveyed to the prosecutors, or (ii) procured from a putative victim or witnesses by fraud, perjury, the suppression or fabrication of evidence, or other bad faith conduct, and conveyed to prosecutors to demonstrate the assertion of probable cause and to obtain approval for filing a criminal prosecution, and later reduced to sworn depositions supporting such information contained in the first and second criminal complaint, WIEBER's misconduct as stated above, is never shielded by qualified immunity.

130. Otherwise, the qualified immunity doctrine would make a mockery of the notion that Americans enjoy the protection of due process of the law and fundamental justice.

131. Additionally, it is not "objectively reasonable" for any police officer to believe that there was probable cause for prosecution of the Plaintiff where he or she intentionally or recklessly omits material information in order to demonstrate the assertion of probable cause. At best, this is exactly what WIEBER did when he conveyed the final and signed third criminal complaint to prosecutors on May 26, 2019 shortly before midnight.

132. As a direct and proximate result of the above-mentioned unconstitutional acts of WIEBER, Plaintiff was deprived of his civil rights through false arrests and false

imprisonment, and has suffered a deprivation of rights and loss of freedom and reputation, as well as damages including physical and emotional injury and psychological harm such as mental anguish, distress, humiliation and embarrassment affecting his psychological well-being, some or all of which may be permanent, as well as financial harm incurred including attorneys' fees and other costs associated with his defense in both the criminal case and in the pending divorce action in New York State Supreme Court. The amount of compensatory damages will be established at trial.

## SECOND COUNT

### VIOLATION OF 42 U.S.C. § 1983-
### DEPRIVATION OF PLAINTIFF'S FOURTH AMENDMENT
### RIGHT TO BE FREE FROM MALICIOUS PROSECUTION
### (Against Defendants WIEBER and D'ALTO)

133.    Plaintiff re-alleges and incorporates by reference the allegations set forth in each preceding paragraph as if fully set forth herein, particularly ¶¶ 1-21 and 27-123, *supra*.

134.    42 U.S.C. § 1983 claims of deprivations of liberty related to criminal prosecutions without probable cause implicate the Fourth Amendment right to be free of unreasonable seizure of the person.

135. Defendant WIEBER, with the knowing and willful false supporting deposition of D'ALTO for the purpose of casing a malicious prosecution of Plaintiff, caused Plaintiff to be falsely accused and charged with engaging in criminal activity in violation of the laws of the State of New York for which WIEBER and D'ALTO knew there was a complete absence of probable cause, and caused Plaintiff to be improperly subjected to criminal proceedings that were undertaken with malice, willfulness, and

reckless indifference to the rights of Plaintiff, for a wrong and improper purpose other than that of bringing a true offender to justice or to see the ends of justice served.

136. At no point during the duration of the proceedings against Plaintiff in both cases, did Defendants WIEBER and D'ALTO possess any evidence against Plaintiff establishing probable cause and/or a legal basis that Plaintiff was engaged in the criminal acts complained of. Nevertheless, he was prosecuted for a crime he clearly did not commit.

137. WIEBER and D'ALTO, made deliberately false statements and provided fabricated information to prosecutors with the intent of exerting influence to institute and continue the criminal proceedings. Such statements regarding Plaintiff's alleged culpability were made with knowledge that said statements were false and perjured, and undertaken with malice, willfulness, and reckless indifference to the rights of Plaintiff.

138. The District Attorney was unable to initially make an independent judgment of the probable cause existing in the criminal case against Plaintiff because WIEBER presented false evidence with a reckless disregard for the truth that was used to support probable cause. Although there was no basis for the Plaintiffs' arrest, Defendants continued with the prosecutions until they were ultimately dismissed.

139. Ultimately, the criminal actions, instituted and continued maliciously caused to be continued by WIEBER against Plaintiff, with the help of false information provided in a supporting deposition by D'ALTO, were terminated in Plaintiff's favor in a manner not inconsistent with Plaintiff's innocence.

140. As a direct and proximate result of the unlawful actions of WIEBER and D'ALTO, Plaintiff has suffered injury and damages including emotional injury and mental anguish in connection with the deprivation of his constitutional rights in that,

among other things, endured more than five months of legal proceedings and suffered the humiliation, degradation and embarrassment of being publicly prosecuted.

## THIRD COUNT

### VIOLATION OF 42 U.S.C. § 1983- DEPRIVATION OF PLAINTIFF'S 1ST & 14TH AMENDMENT RIGHTS TO ASSOCIATE AND BOND WITH HIS CHILDREN AND TO PROVIDE FOR THEIR CARE, CUSTODY AND WELL-BEING
### (Against Defendants WIEBER and D'ALTO)

141.  Plaintiff re-alleges and incorporates by reference the allegations set forth in each preceding paragraph as if fully set forth herein, particularly ¶¶ 1-21, 27-61,72-79, and 84-123, *supra*.

142.  By reason of the foregoing false arrests and malicious prosecutions instituted against JOEL under the color of state law, including false charges relating to the safety and care of JOEL's three minor children, Defendant WIEBER, aided and abetted by Defendant D'Alto, did intend to, and did in fact directly cause, (i) the unwarranted issuance by the criminal court at the prosecution's request of a temporary stay away protective order ("TOP") against JOEL subject to any Family Court or Supreme Court visitation orders, which constituted a substantial restraint upon the exercise by JOEL of his First Amendment right to freedom of association with his children for the purpose of preserving a highly personal relationship and emotional bond with his children a deprivation of such First Amendment right, in violation of 42 U.S.C. § 1983, and (ii) the issuance of immediate Supreme Court orders on May 30, 2014 and June 6, 2014 that granted ROCHEL H.'s emergency motion for a temporary order of protection that included, *inter alia*, a complete cessation of overnight parenting time, a severe reduction in midweek parenting time, limited to supervised daytime visits only under the watchful eye of a social worker

appointed by the Court at ROCHEL H's recommendation, which orders (A) constituted a substantial restraint upon the exercise by Joel of his First Amendment right to freedom of association with his children for the purpose of preserving a highly personal relationship and emotional bond with them, and (B) deprived Plaintiff of his rights privileges or immunities secured by the Due Process Clause of the Fourteenth Amendment, in violation of 42 U.S.C. § 1983, to wit, by causing a loss of the heightened protection against government interference in the state divorce action of JOEL's fundamental and substantive liberty interest in the care, custody, companionship, upbringing, management and nurture of his minor children and in providing for their physical, emotional, and intellectual needs, through the institution of false and baseless criminal charges against him that would render him a threat to their safety and physical well-being.

143. As a direct and proximate result of the foregoing, Plaintiff has suffered injury and constitutional harms inflicted upon him, especially the significant reduction and impairment of the quality and amount of visitation time that Plaintiff is allowed to spend with his three children from May 26, 2014 to on or about January 6 2016, based on the false arrests and malicious prosecutions which the New York State Supreme Court in the divorce action was not able to explore until a custody trial was held.

144. Further, as a direct and proximate result of the unlawful actions of WIEBER and D'ALTO, Plaintiff has suffered, and will continue to suffer, injury from the substantial harm to the emotional and paternal bond between JOEL and his three minor sons.

145. Because WIEBER's actions were willful, deceitful and intentionally malicious with a purpose to injure and damage Plaintiff, punitive damages in an amount to be determined at trial should be assessed against WIEBER.

**FOURTH COUNT**

**VIOLATION OF 42 U.S.C. § 1983-**
**DEPRIVATION OF PLAINTIFF'S FOURTH AMENDMENT**
**RIGHT TO BE FREE FROM UNREASONABLE SEARCH AND SEIZURE**
**(against Defendant WIEBER Only)**

146. Plaintiff re-alleges and incorporates by reference the allegations set forth in each preceding paragraph as if fully set forth herein.

147. The Fourth Amendment of the United States Constitution protects against unreasonable searches and seizures of a person's effects by governmental authorities.

148. On or about May 26, 2014, WIEBER, acting under color of law within the meaning of 42 U.S.C. § 1983, searched plaintiff's person while doing an inventory search and without probable cause or reasonable suspicion, thereby depriving plaintiff of his rights under the Fourth and Fourteenth Amendments to the Constitution of the United States in violation of 42 U.S.C. § 1983. WIEBER, acting under color of law, searched Plaintiff's person and a closed wallet taken from his pocket without his permission, probable cause or a warrant, and without exigent circumstances.

149. WIEBER conducted an unlawful inventory search in front of the desk Sergeant Defendant STEWART, violating JOEL's 4th Amendment right to be free from a lawless and unreasonable search and seizure of his wallet and its content, and also purloined various credit/debit cards contained in a closed wallet in Plaintiff's pocket and placing them in his own pocket, after Plaintiff had already been brought by WIEBER to the police precinct in handcuffs, which resulted in a new arrest and false charges, as

47

contained in TPO-2 of the criminal complaint on which Plaintiff was arraigned on May 27, 2014.

150.     WIEBER violated Plaintiff's right to be free from unreasonable warrantless searches of a person's effects prohibited by the Fourth Amendment. There was no reason to believe that Plaintiff was armed or presented any kind of danger or threat. There was no exigent circumstances or compelling need for official action and plenty of time to secure a warrant to examine the contents of the closed wallet, although there was no probable cause to obtain a warrant, let alone to associate any emergency with the subject of the search, and no consent by Plaintiff to such search.

151.     Based on the foregoing illegal search, WIEBER rearrested Plaintiff a second time while in a holding cell at the 90th Police Precinct and added a number of false and baseless charges in TPO-2 of the criminal complaint alleging that JOEL committed the additional offense(s) of criminal possession of stolen property in the fourth degree (PL 165.45(2)); criminal possession of stolen property in the fifth degree (PL 165.40); criminal impersonation in the second degree (PL 190.25(4)); and identity theft (PL 190.78(1)) with  respect to credit cards in plaintiff's wallet belonging to Rosenberg that JOEL held for her while managing her assets with her permission.

152.     All of the foregoing charges were dismissed in their entirety on motion of the district attorney which indicated that Plaintiff was innocent of wrongdoing, and thereby terminated in Plaintiff's favor.

153.     As a direct and proximate result of the foregoing, Plaintiff was subjected to great physical and emotional pain and humiliation, was deprived of his liberty, and was otherwise damaged and injured.

154.     Because the actions of Defendant WIEBER was willful, deceitful and intentionally malicious with a purpose to injure and damage Plaintiff, punitive damages in the sum of $1,000,000.00 should be assessed against them, but not against the CITY OF NEW YORK, jointly and severally.

## FIFTH COUNT

### VIOLATION OF 42 U.S.C. § 1983-
### DEPRIVATION OF PLAINTIFF'S FIRST
### AMENDMENT RIGHT TO A FAIR TRIAL
### (against Defendant Wieber Only)

155.     Plaintiff re-alleges and incorporates by reference the allegations set forth in each preceding paragraph as if fully set forth herein, particularly ¶¶ 1-21 and 27-123, supra.

156.     By reason of the foregoing, WIEBER's actions in falsely arresting Plaintiff without probable cause on fabricated charges that he created or knowingly had others cause to be submitted to the KCDA supporting depositions under oath containing such fabricated information that was likely to influence a factfinder's decision and to deprive Plaintiff of his constitutional right to a fair trial.

157.     WIEBER's provision of fabricated information to prosecutors with the intent of exerting influence as to the factfinder's decision and to deprive Plaintiff of his constitutional right to a fair trial. Such statements regarding Plaintiff's alleged culpability were made with knowledge that said statements were false and perjured, and undertaken with malice, willfulness, and reckless indifference to the rights of Plaintiff.

158.     As a direct and proximate result of the foregoing, Plaintiff was injured and damaged and is entitled to compensation therefore.

## SIXTH COUNT

### VIOLATION OF 42 U.S.C. § 1983-
### DEPRIVATION OF PLAINTIFF'S FOURTH AMENDMENT
### RIGHT TO BE FREE FROM MALICIOUS ABUSE OF PROCESS
### (against Defendant WIEBER Only)

159.    Plaintiff re-alleges and incorporates by reference the allegations set forth in each preceding paragraph as if fully set forth herein, particularly ¶¶ 1-21 and 27-123, supra.

160.    By reason of the foregoing, Defendant Wieber employed regularly issued legal process to compel performance or forbearance of some act, namely, the arrests and malicious prosecutions through false criminal complaints with intent to do harm without excuse or] justification, and in order to obtain the collateral objective that is outside the legitimate ends of process, to wit, to help Rochel Herman (i) prevail in an ongoing child neglect investigation by ACS for alleged child neglect investigation stemming from a complaint by Plaintiff regarding her child care based on events that took place on April 22, 2014-the very subject of the first of three sets of charges for which Plaintiff was falsely arrested on May 26, 2014 and arraigned on May 27, 2014, (ii) and succeed in cutting off or greatly diminishing and restricting Plaintiff's visitation rights to the three minor Herman children then in effect and (iii) ultimately to prevail in a bitter custody/visitation rights battle between Rochel Herman and Plaintiff in a New York State Supreme Court, Kings County divorce action.

161.    Plaintiff therefore seeks to redress the harm occasioned by WIEBER's unconscionable action as aforesaid in this action for damages under 42 U.S.C. § 1983.

## SEVENTH COUNT

### DELETED BY ORDER OF COURT
### ¶¶ 162-167

## EIGHTH COUNT

### VIOLATION OF 42 U.S.C. § 1983-
### FAILURE TO INTERVENE
### (against Defendant STEWART only)

168.    Plaintiff re-alleges and incorporates by reference the allegations set forth in each preceding paragraph as if fully set forth herein, particularly ¶¶ 146-153, *supra*.

169.    By reason of the foregoing, and as a direct and proximate result of STEWART's failure to intervene, and stop an illegal search and seizure by WIEBER when he had the opportunity to do so, while serving as the desk sergeant at the 90th Police Precinct the evening of May 26, 2014, as WIEBER conducted an unlawful inventory search in front of him, violating JOEL's 4th Amendment right to be free from a lawless and unreasonable search and seizure of his wallet and its content, and also purloined various credit/debit cards contained in a closed wallet in Plaintiff's pocket and placing them in his own pocket, after Plaintiff had already been brought by WIEBER to the police precinct in handcuffs, which resulted in a new arrest and false charges, as contained in TPO-2 of the criminal complaint on which Plaintiff was arraigned on May 27, 2014, and Plaintiff suffered injury and damages, as more fully alleged above.

## NINTH COUNT

### VIOLATION OF 42 U.S.C. § 1983-
### FAILURE TO INTERVENE
### (against Defendant MAMYS only)

170.    Plaintiff re-alleges and incorporates by reference the allegations set forth in each preceding paragraph as if fully set forth herein, particularly ¶¶ 110-119, supra.

171.    By reason of the foregoing, and as a direct and proximate result of MAMYS' failure to intervene by voiding and/or stopping the third arrest on the evening of May 30, 2014 and/or any malicious prosecution from going forward that night, the next day before arraignment or at any time thereafter, while being the supervising sergeant at the 90th Police Precinct Detective Squad, when he had the opportunity to do so. Plaintiff suffered injury and damages, as more fully alleged above.

### TENTH COUNT

**VIOLATION OF 42 U.S.C. § 1983-
MUNICIPAL LIABILITY FOR DEPRIVATION
BY MUNICIPAL EMPLOYEES OF
PLAINTIFF'S CONSTITUTIONAL RIGHTS
(Monell Claim against the CITY OF NEW YORK Only)**

172.    Plaintiff re-alleges and incorporates by reference the allegations set forth in each preceding paragraph as if fully set forth herein.

173.    At all times material to the allegations herein, Defendants WIEBER, D'ALTO, STEWART and MAMYS, acted under color of state law, including the laws, statutes, ordinances, regulations, policies, customs and usages of the State of New York, the CITY OF NEW YORK and the NYPD. The actions and conduct of each of the foregoing persons, individually and/or in concert one with the other, were taken in and during the course of his duties and functions as employee and agent of the Defendant CITY OF NEW YORK and incidental to the otherwise lawful performance of his duties and functions as an employee and agent of Defendant CITY OF NEW YORK.

174.    At all times relevant to this action, Defendant CITY OF NEW YORK, acting through the NYPD and its 90th precinct, had in effect official policies, practices, and customs that condoned and fostered the unconstitutional conduct of the individual

government defendants through perfunctory supervision and so-called supervisor approvals of virtually all police detective/officer actions and reporting, a complete lack of adequate training, and were a direct and proximate cause of the damages and injuries complained of herein.

175. Further, the NYPD official policies practices, and customs were entirely inconsistent with federal constitutional law as it relates to unlawful searches and seizures under the fourth amendment and under New York law, as enunciated by the Court of Appeals, and was directly responsible for the unlawful conduct of WIEBER and STEWART in connection with the search of a closed wallet in Plaintiff's pocket during an inventory search on the evening of May 26, 2014 after JOEL's arrest by WIEBER.

176. The existence of these unconstitutional customs and practices of the NYPD with regards to supervisor approvals, is evidenced by the repeated and blatant false arrests and malicious prosecutions, all of which were approved without hesitation by supervisory officers at n the 90th police precinct such as Sergeants Stewart, Perez, MAMYS, Paso, Maldonado and Lieutenant Doherty, the commanding officer of the 90th Police Precinct Detective Squad, as well as a blatantly illegal and warrantless search and seizure of plaintiff's closed wallet and credit/debit cards by WIEBER in front of the desk sergeant, Defendant STEWART.

177. Further, there was deposition testimony by STEWART and Lieutenant Doherty that these customs and practice are pervasive in virtually all Police Precincts of the NYPD throughout the City of New York.

178. As a result, WIEBER and other police detectives and officers in the 90th precinct of the NYPD who manufactured criminal cases against individuals such as

Plaintiff had every reason to know that they enjoyed de facto immunity from departmental discipline. This widespread practice demonstrated by the duration and frequency thereof warrants a finding of either actual or constructive knowledge by the governing body with responsibility for oversight and supervision that the practices have become customary among its employees.

179.	The CITY OF NEW YORK knew or should have known of the Defendant police officers and detectives' propensity to engage in misconduct of the type alleged herein. Prior to May 26, 2014, the CITY OF NEW YORK was aware of prior police misconduct in substantial and ongoing public lawsuits between 2009 and 2013, such as in Floyd et al. v. City of New York, 959 F. Supp. 2d 540 (SDNY 2013) and Ligon v. City of New York, 925 F. Supp. 2d 478 (SDNY 2013), but failed to take the necessary remedial action until such remedial action was imposed by the courts.

180.	This is especially true with respect to the policies, procedures and customs of the NYPD with respect to supervising sergeant approvals of paperwork and actions by NYPD police officers and detectives. Many high-ranking officials with policy making authority testified at depositions and trial in the above cases and blindly insisted that these approvals function effectively despite overwhelming evidence to the contrary.

181.	As a result of the above described policies and customs, police officers of the CITY OF NEW YORK, including Defendant WIEBER, believed that their actions would not be properly monitored by supervisory officers and that misconduct would not be investigated or sanctioned, but would be tolerated.

182.	The wrongful policies, practices, customs and/or usages complained of herein, demonstrated a deliberate indifference on the part of policymakers of the CITY

OF NEW YORK to the constitutional rights of persons within the city, and were the direct and proximate cause of the violations of Plaintiffs' rights alleged herein and the damages suffered as a result thereof for which the CITY OF NEW YORK is liable.

**PENDENT STATE COMMON LAW CLAIMS**

**ELEVENTH COUNT**

**MALICIOUS PROSECUTION UNDER NEW YORK LAW**
**(Against Defendants WIEBER and D'ALTO)**

183. Plaintiff re-alleges and incorporates by reference the allegations set forth in each preceding paragraph as if fully set forth herein, particularly ¶¶ 1-21 and 27-123, supra.

184. By their conduct, as described above, Defendant WIEBER is liable to Plaintiff for having twice maliciously commenced criminal proceedings against Plaintiff, and defendant D'ALTO is liable for assisting, aiding and abetting WIEBER in causing Plaintiff to be maliciously prosecuted despite a complete absence of probable cause and subjected to criminal proceedings that were undertaken with malice, willfulness, and reckless indifference to the rights of Plaintiff, for a wrong and improper purpose other than that of bringing a true offender to justice or to see the ends of justice served.

185. Defendants WIEBER and D'ALTO made statements to prosecutors, or to WIEBER who forward such statements to prosecutors, with the intent of exerting influence to institute and continue the judicial proceedings. Such statements and supporting depositions regarding Plaintiff's alleged culpability were made with knowledge that said statements were false and perjured, and undertaken with malice, willfulness, and reckless indifference to the rights of Plaintiff.

186.    These judicial proceedings, which were instituted and continued maliciously as aforesaid, resulting in injury, and all charges were terminated in Plaintiff's favor in a manner not inconsistent with Plaintiff's innocence.

187.    As a direct and proximate result of the foregoing, stated above, Plaintiff sustained, and continues to sustain, injuries and damages alleged herein.

## TWELFTH COUNT

### MALICIOUS ABUSE OF PROCESS
### UNDER NEW YORK LAW
### (Against Defendants WIEBER and D'ALTO)

188.    Plaintiff re-alleges and incorporates by reference the allegations set forth in each preceding paragraph as if fully set forth herein, particularly ¶¶ 1-21 and 27-123, supra.

189.    By reason of the foregoing, Defendant WIEBER, aided and abetted by D'ALTO and each of the Private Party Defendants, employed regularly issued legal process to compel performance or forbearance of some act, namely, the arrests and malicious prosecutions through false criminal complaints with intent to do harm without excuse or justification, and in order to obtain the collateral objective that is outside the legitimate ends of process, to wit, to help Rochel Herman (i) prevail in an ongoing child neglect investigation by ACS for alleged child neglect investigation stemming from a complaint regarding her child care based on events that took place on April 22, 2014-the very subject of the first of three sets of charges for which Plaintiff was falsely arrested on May 26, 2014 and arraigned on May 27, 2014, (ii) and succeed in cutting off or greatly diminishing and restricting Plaintiff's visitation rights to the three minor Herman children then in effect and (iii) ultimately to prevail in a bitter custody/visitation rights battle

between Rochel Herman and Plaintiff in a New York State Supreme Court, Kings County divorce action.

190.    As a direct and proximate result of the misconduct and abuse of authority stated above, Plaintiff sustained, and continues to sustain, injuries and damages alleged herein.

**THIRTEENTH COUNT**

**MALICIOUS INTERFERENCE WITH THE EMOTIONAL BOND
BETWEEN PLAINTIFF AND HIS CHILDREN AND ABILITY
TO PROVIDE FOR THEIR CARE, CUSTODY AND WELL-BEING
(Against Defendants WIEBER and D'ALTO)**

191.    Plaintiff re-alleges and incorporates by reference the allegations set forth in each preceding paragraph as if fully set forth herein, particularly ¶¶ 1-21, 27-61, 72-79, and 84-123, *supra*.

192.    .        By reason of the foregoing false arrests and malicious prosecutions instituted against JOEL, with the aiding and abetting of his conduct by D'ALTO, including false charges relating to the safety and care of JOEL's three minor children, Defendant WIEBER did intend to, and did in fact directly cause, (i) the unwarranted issuance by the criminal court at the prosecution's request of a temporary stay away protective order ("TOP") against JOEL subject to any Family Court or Supreme Court visitation orders, which constituted a substantial restraint upon the exercise by Joel of his First Amendment right to freedom of association with his children for the purpose of preserving a highly personal relationship and emotional bond with his children a deprivation of such First Amendment right, and (ii) the issuance of immediate Supreme Court orders on May 30, 2014 and June 6, 2014 that granted Rochel Herman's emergency motion for a temporary order of protection that included, inter alia, a

complete cessation of overnight parenting time, a severe reduction in midweek parenting time, limited to supervised daytime visits only under the watchful eye of a social worker appointed by the Court at Rochel Herman's recommendation, which orders (A) constituted a substantial restraint upon the exercise by JOEL of his First Amendment right to freedom of association with his children for the purpose of preserving a highly personal relationship and emotional bond with them, and (B) deprived Plaintiff of his rights privileges or immunities secured by the Due Process Clause of the Fourteenth Amendment, in violation of 42 U.S.C. § 1983, to wit, by causing a loss of the heightened protection against government interference in the state divorce action of JOEL's fundamental and substantive liberty interest in the care, custody, companionship, upbringing, management and nurture of his minor children and in providing for their physical, emotional, and intellectual needs, through the institution of false and baseless criminal charges against him that would render him a threat to their safety and physical well-being.

193. As a direct and proximate result of the foregoing, Plaintiff has suffered injury inflicted upon him, especially the significant reduction and impairment of the quality and amount of visitation time that Plaintiff is allowed to spend with his three children from May 26, 2014 to in or about January 6, 2016, based on the false arrests and malicious prosecutions which the New York State Supreme Court in the divorce action was not able to explore until a custody trial was held.

144. Further, as a direct and proximate result of the unlawful actions of WIEBER and D'ALTO, Plaintiff has suffered, and will continue to suffer, injury from the

substantial harm to the emotional and paternal bond between Joel and his three minor sons.

195.    As a direct and proximate result of the misconduct and abuse of authority stated above, Plaintiff sustained, and continues to sustain, injuries and damages alleged herein.

<u>**FOURTEENTH COUNT**</u>

**DELETED BY ORDER OF COURT**
**¶¶ 196-200**

<u>**FIFTEENTH COUNT**</u>

**UNLAWFUL SEARCH & SEIZURE**
**UNDER NEW YORK LAW**
**(Against Defendant WIEBER Only)**

201.    Plaintiff re-alleges and incorporates by reference the allegations set forth in each preceding paragraph as if fully set forth herein.

202.    The New York Constitution protects against unreasonable searches and seizures of a person's effects by governmental authorities. N.Y. Const. Art. I, sec.12.

203.    Plaintiff was searched without a warrant and without probable cause or reasonable suspicion, in violation of the New York Constitution and established New York law, as interpreted by the New York Court of Appeals.

204.    On or about May 26, 2014, after he had already been arrested at the Pointe Plaza Hotel and taken to the 90th Police Precinct in handcuffs, without conducting any search whatsoever before or upon his arrest. After having been brought to the police precinct in handcuffs, and during an inventory search in front of the desk sergeant Defendant STEWART, WIEBER placed all of Plaintiff's belongings in a plastic bag identified as an inventory repository. However, when WIEBER found a closed wallet in

plaintiff's pocket, he slipped it into his pocket and went to conduct a search of the contents of the wallet in his office. Weiber had no lawful basis to conduct such a search of a closed container. After finding and photocopying eight credit/debit cards in the names of JOEL's father, mother and sister, WIEBER copied them and later supplied them to ROCHEL H.'s divorce attorney for use in the divorce litigation, WIEBER also found two debit cards in the name of Breindy Rosenberg. which he kept as evidence of a series of new charges for which Plaintiff was rearrested and booked a second time in the early morning hours of May 27, 2014. Additional charges involving identity theft and larceny were added to the criminal complaint signed by WIEBER for the following day's arraignment.

205.    The conduct of WIEBER was in flagrant violation of established decisions of the New York Court of Appeals and was wanton, malicious, willful, or in bad faith.

206.    As a direct and proximate result of WIEBER's unlawful actions, Plaintiff has suffered, and will continue to suffer, financial and non-monetary damages including, physical, mental and emotional injury and pain, mental anguish, suffering, humiliation and embarrassment.

## SIXTEENTH COUNT

### RESPONDEAT SUPERIOR
### UNDER NEW YORK LAW
### (Against the City of New York Only)

207.    Plaintiff re-alleges and incorporates by reference the allegations set forth in each preceding paragraph as if fully set forth herein.

208.    Pursuant to New York law and independent of the federally based claim against the Defendant City of New York, the City of New York is responsible for the acts

of Defendants WIEBER, D'ALTO, STEWART and MAMYS heretofore complained of, as they occurred in and during the course and scope of their duties and functions as agents and employees of the Defendant CITY OF NEW YORK.

209.   The actions and conduct of each of the foregoing persons, individually and/or in concert one with the other, while unlawful and unconstitutional, were taken in and during the course of his duties and functions as employees and agents of the Defendant CITY OF NEW YORK and incidental to the otherwise lawful performance of their duties and functions as employees and agents of Defendant CITY OF NEW YORK.

210.   Defendant CITY OF NEW YORK is therefore vicariously liable to Plaintiff under the common law doctrine of *respondeat superior* as principal for all torts committed by its agents.

## SEVENTEENTH COUNT

## NEGLIGENT SUPERVISION, RETENTION AND TRAINING
### (Against the City of New York Only)

211.   Plaintiff re-alleges and incorporates by reference the allegations set forth in each preceding paragraph as if fully set forth herein.

212.   Defendant CITY OF NEW YORK negligently supervised and/or inadequately trained Defendants WIEBER, D'ALTO, STEWART and MAMYS and other supervising sergeants in the NYPD 90th precinct The acts and conduct of the aforenamed Defendants were the direct and proximate cause of injury and damage to Plaintiff and violated his statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

213. As a result of the foregoing, Plaintiff was deprived of his liberty, was subjected to great physical and emotional pain and suffering, and was otherwise damaged and injured.

## VII.   JURY TRIAL DEMANDED

Plaintiff, JOEL HERMAN, demands a trial by jury pursuant to Federal Rules of Civil Procedure 38(b) and (c) on each and every one of his claims as pleaded herein, and on all counterclaims and third-party claims, if any, asserted in this action.

## VIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands the following relief against the Defendants:

a.   Compensatory damages of not less than $2,294,000.00 against all Defendants, jointly and severally, for violations of Plaintiff's federal rights pursuant to 42 U.S.C. § 1983, as well as his state common law rights, in an amount appropriate to the proof adduced at trial, as determined by a jury, to the maximum extent permitted by law;

b.   Punitive damages pursuant to 42 U.S.C. § 1983 against Defendant WIEBER, in an amount appropriate to the proof adduced at trial, as determined by a jury, to the maximum extent permitted by law, but not less than $1,000,000.00;

c.   The convening and impaneling of a jury to consider the merits of each of the counts herein;

d.   An award of reasonable expenses incurred in this litigation, including reasonable attorney and expert fees, pursuant to 42 U.S.C. §1988 (b) and (c), and costs pursuant to 42 U.S.C. § 1920, against all Defendants, joint and severally, in an amount to be determined by the Court but not less than $ 1,500,000.00; and

e.   Such other and further relief as this Court may deem just and proper.

Dated: December 9, 2019
　　　New York, New York

　　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　/simon schwarz/_____
　　　　　　　　　　　Simon Schwarz, Esq.
　　　　　　　　　　　THE SCHWARZ FIRM PLLC

Attorney for Plaintiff Joel Herman
954 Lexington Ave., No. 261
New York, NY 10021-5013