UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------x
JOEL HERMAN,

Plaintiff,

<u>**MEMORANDUM & ORDER**</u>

- against -                                              15-CV-3059 (PKC) (SJB)

THE CITY OF NEW YORK, NYPD POLICE
DETECTIVE KENNETH WIEBER, NYPD
POLICE OFFICER ANTHONY D'ALTO
AND NYPD SERGEANTS JOHN STEWART
AND ROBERT MAMYS,

Defendants.
---------------------------------------------------------x
PAMELA K. CHEN, United States District Judge:

New York Police Department ("NYPD") Detective Kenneth Wieber, NYPD Officer
Anthony D'Alto, NYPD Sergeant John Stewart, NYPD Sergeant Robert Mamys, and the City of
New York (collectively, "Defendants") seek summary judgment against Plaintiff Joel Herman,
who brought this action under 42 U.S.C. § 1983 and state law.  For the following reasons,
Defendants' unopposed motion is granted in part and denied in part.

**BACKGROUND**

## I.    Factual Background

Plaintiff and Rochel Herman ("Rochel") have three children together.  (*See* Defendants'
Rule 56.1 Statement ("Facts"), Dkt. 247, ¶¶ 1, 11.)[1]  Plaintiff and Rochel alternate custody of their
three children in accordance with family court visitation orders.  (*Id.* ¶¶ 5–7; *see also* Dkt. 246-5.)

---

[1] As discussed below, because Plaintiff failed to timely submit a statement of facts, respond
to Defendants' statement of facts, or submit evidence for purposes of the summary judgment
briefing, the Court deemed Defendants' Rule 56.1 statement to be "undisputed for purposes of
[Defendants'] motion."  Fed. R. Civ. P. 56(e).

1

### A.      The May 26, 2014 Arrest

On April 22, 2014, Plaintiff called 911 to report that one of his three children had not been dropped off for a scheduled visit with him and was "missing." (Facts, Dkt. 247, ¶¶ 8, 12; *see also* Dkt. 246-8, at 3:2–8; Dkt. 246-9, at ECF 8.)  Plaintiff told the 911 operator that he needed immediate assistance and that he wanted to file a "missing person report." (*See* Dkt. 246-8, at 3:11–14.)

Defendant D'Alto responded to the 911 call and went to Plaintiff's building to investigate. (Dkt. 246-9, at ECF 19.)  When D'Alto arrived, Plaintiff told D'Alto that the child "was missing" and that "[h]e had no idea where his son was." (*Id.*)  Officers conducted a search, and ultimately found the child asleep at Rochel's house. (*See* Facts, Dkt. 247, ¶ 19; *see also* Dkt. 246-7, at 87:11–18.)  Rochel told the officers that she had not sent the child to visit with Plaintiff because the child had been injured and needed to go to the doctor. (*See* Dkt. 246-7, at 87:11–18.)

When the officers informed Rochel of Plaintiff's 911 call, Rochel filed a complaint with the NYPD alleging that the call had been false. (*See generally* Dkt. 246-9.)  Defendant Wieber investigated Rochel's complaint. (*See id.*)  On May 5, 2014, Wieber interviewed Aaron Greenberg, who told Wieber that he had dropped off two of the couple's three children with Plaintiff on April 22, 2014, and, contrary to what Plaintiff reported in his 911 call, had told Plaintiff that Rochel had taken their third child to the doctor to be treated for an injury. (Dkt. 246-9, at ECF 15.)  According to Wieber's report, Rochel also told Wieber on May 5, 2014 that Plaintiff "was very much aware and knew where [their third child] was" on April 22, 2014, despite reporting the child missing. (*See* Dkt. 246-9, at ECF 13.)

On May 26, 2014, Wieber went to arrest Plaintiff for making false statements in the 911 call. (Facts, Dkt. 247, ¶ 37.)  When he arrived, Wieber saw Plaintiff driving dangerously, including on the sidewalk. (*See* Dkt. 246-12.)  In addition, Plaintiff's children were in the car without proper

2

seatbelts.  (*Id.*)  Wieber arrested Plaintiff and took him to the precinct.

At the precinct, Wieber searched Plaintiff and removed his wallet.  (Facts, Dkt. 247, ¶ 44.) The wallet contained credit cards and debit cards that were not in Plaintiff's name.  (*Id.* ¶ 45.) Wieber investigated and determined that the cards belonged to somebody Plaintiff knew, but who had not given Plaintiff permission to have the cards.  (*Id.* ¶¶ 47–51.)

Wieber signed a criminal complaint, which charged Plaintiff with "falsely reporting an incident in the third degree" in violation of New York Penal Law §§ 240.50(2) and 240.50(3)(A); "[e]ndangering the welfare of a child" in violation of New York Penal Law § 260.10(1); "[d]riving on sidewalks" in violation of New York Vehicle & Traffic Law § 1225-a; operating a vehicle without proper safety seats or belts in violation of New York Vehicle & Traffic Law § 1229-c; "criminal possession of stolen property" in the fourth and fifth degrees in violation of New York Penal Law §§ 165.40 and 165.45(2), respectively; "criminal impersonation in the second degree" in violation of New York Penal Law § 190.25(4); and "identity theft in the third degree" in violation of New York Penal Law § 190.78(1).  (*See* Dkt. 246-9, at ECF 7, 9.)  On November 17, 2014, all of the criminal charges were dismissed.  (Facts, Dkt. 247, ¶ 61.)

### B.    The May 30, 2014 Arrest

On May 30, 2014, Rochel called NYPD and told Wieber that Plaintiff had picked up one of their children from school in violation of a family court order that had been entered in state court in October 2013 and limited Plaintiff's visitation to every other weekend.  (*See* Dkt. 246-17; *see also* Facts, Dkt. 257, ¶ 6.)  Rochel told Wieber that the court had entered an order specifying which weekends Plaintiff was permitted visitation with the children, and that Plaintiff had picked up the child during an unscheduled time.  (*See* Dkt. 246-18.)  Rochel told Wieber that Plaintiff had signed the visitation order he had violated.  (*See id.*)

3

The same day, Rochel also moved for an order to show cause in state court.  (*See* Dkt. 246-4, at 2.)  The state court ordered, *ex parte*, "that the child [whom Plaintiff had picked up from school] be immediately returned to [Rochel] and any police agency to assist."  (*Id.*)  The court further directed that the Administration for Children's Services, "as well as the [District Attorney] and NYPD," "be notified forthwith of the alleged removal of [the child] by [Plaintiff]."  (*Id.* at 2–3.)  Wieber arrested Plaintiff again.  (Facts, Dkt. 247, ¶ 84.)

There is evidence that, while Plaintiff was at the precinct, his criminal defense attorney arrived and showed Wieber that the family court's visitation schedule had been modified on March 20, 2014, such that Plaintiff was in fact authorized to pick up the child from school on May 30, 2014.  (*See* Dkt. 246-23, at 65:21–66:4; Declaration of Richard Finkel ("Finkel Decl."), Dkt. 156-2, ¶¶ 7–14; *see also* Finkel Decl., Dkt. 156-2, at ECF 22–23 (March 20, 2014 family court order providing that, after a change for the Passover holiday, the alternate weekend visitation schedule would resume, with Rochel having visitation on April 25, 2014, and resulting in Plaintiff having visitation on May 30, 2014).)  Plaintiff's attorney also showed the order to Defendant Mamys, who was the sergeant supervising Wieber.  (*See* Dkt. 246-23, at 65:21–66:4; Finkel Decl., Dkt. 156-2, ¶¶ 7–14.)

Wieber signed a criminal complaint charging Plaintiff with "custodial interference in the second degree" in violation of New York Penal Law § 135.45(1), and "criminal contempt in the second degree" in violation of New York Penal Law § 215.50(3).  (Dkt. 246-18, at ECF 2.)  Wieber did not attach or mention the order showing that Plaintiff was entitled to visitation on May 30, 2014.  (*See* Dkt. 246-18.)  Plaintiff was arraigned on May 31, 2014.  (Facts, Dkt. 247, ¶ 85.)  On various occasions during the prosecution that followed, Plaintiff's defense attorney showed the prosecutor the March 20, 2014 visitation order he had shown Wieber and Mamys, and repeatedly

wrote the prosecutor to argue that Plaintiff should not have been charged.  (*Id.* ¶ 96–97.)  On

October 2, 2014, the criminal charges stemming from the May 30, 2014 arrest were dismissed.

(*Id.* ¶ 98.)

## II.    Procedural Background

On May 26, 2015, Plaintiff sued the City of New York, Wieber, D'Alto, and various others.

(*See* Complaint, Dkt. 1.)  Plaintiff filed a first amended complaint on October 1, 2015 (*see* Dkt.

12), a second amended complaint on March 31, 2016 (*see* Dkt. 30), a third amended complaint on

November 27, 2019 (*see* Dkt. 187), and a fourth amended complaint on December 11, 2019 (*see*

Fourth Amended Complaint ("FAC"), Dkt. 190).  The FAC is now the operative pleading.  It

includes the following causes of action against Defendants:

### Violations of 42 U.S.C. § 1983:

- Wieber and D'Alto deprived Plaintiff of his Fourth and Fourteenth Amendment rights by arresting him without probable cause on May 26, 2014 and May 30, 2014;

- Wieber and D'Alto deprived Plaintiff of his Fourth and Fourteenth Amendment rights by maliciously prosecuting him for the alleged conduct leading to his arrests on May 26, 2014 and May 30, 2014;

- Wieber deprived Plaintiff of his Fourteenth Amendment rights by fabricating evidence related to his alleged conduct leading to his arrests on May 26, 2014 and May 30, 2014;

- Wieber deprived Plaintiff of his Fourth and Fourteenth Amendment rights by searching him after his arrest on May 26, 2014;

- Wieber and D'Alto deprived Plaintiff of his Fourth and Fourteenth Amendment rights by interfering with his familial association;

- Wieber deprived Plaintiff of his Fourteenth Amendment rights by maliciously abusing the criminal process;

- Stewart failed to intervene in the allegedly unconstitutional search of Plaintiff's wallet after the May 26, 2014 arrest, and Mamys failed to intervene in Plaintiff's allegedly false arrest and malicious prosecution on May 30, 2014; and

- The City of New York is liable under a municipal liability theory.

(FAC, Dkt. 190, ¶¶ 124–182.)

**<u>Violations of State Law:</u>**

- Wieber violated state law by unlawfully searching and seizing Plaintiff, and both Wieber and D'Alto violated state law by maliciously prosecuting Plaintiff, maliciously abusing the criminal process, and maliciously interfering with Plaintiff's association with his children; and

- The City of New York is liable under a theory of *respondeat superior* and negligent supervision, retention, and training.

(FAC, Dkt. 190, ¶¶ 183–213.)

On September 29, 2020, after the close of discovery, Magistrate Judge Sanket J. Bulsara adopted the parties' proposed schedule for the briefing of summary judgment motions.  (*See* 9/29/2020 Docket Order.)   Because both parties were moving for summary judgment, their respective opening motions, responses, and replies were to be served on the same dates, with each side filing their motions and replies, along with their oppositions to each other's motion, on the last date.  (*See* 10/26/2020 Docket Order.)   The parties jointly requested three extensions of the briefing schedule, which the Court granted.  (*See* Dkts. 227, 228, 229; 10/26/2020, 11/24/2020, 12/18/2020 Docket Orders.)

On December 21, 2020, Plaintiff requested "a final one-week extension" for the parties to serve their opening motions on each other (*see* Dkt. 230, at 1), which the Court granted (*see* 12/22/2020 Docket Order).  On December 28, 2020, Defendants served their summary judgment motion on Plaintiff.  (*See* Dkt. 231.)  On December 29, 2020, Plaintiff sought another extension to serve his motion.  (*See* Dkt. 232.)  Though Plaintiff had already missed the (extended) deadline, the Court granted him until 5 p.m. the next day to file his motion papers, warning him that it would strike any motion papers if he failed to comply.  (*See* Second 12/29/2020 Docket Order.)  Plaintiff failed to comply, and the Court granted Defendants' motion to strike Plaintiff's summary judgment

motion.  (*See* Dkt. 234; 12/30/2020 Docket Order.)

Plaintiff then missed the deadline, January 27, 2021, to respond to Defendants' motion for summary judgment.  (*See* Dkt. 236.)  On January 29, 2021, Plaintiff moved for an extension to respond to Defendants' motion.  (*See* Dkt. 237.)  The Court denied Plaintiff's request, but allowed him "the opportunity to file a Counter-Statement of Material Facts consistent with Local Civil Rule 56.1, together with the underlying evidence cited therein," by February 26, 2021, with the warning that "**no extensions [would] be granted**."  (2/1/2021 Docket Order.)  Several days later, Plaintiff requested an extension (*see* Dkt. 240), which the Court denied, explaining: "This is not the first time that Plaintiff's counsel has missed deadlines in this case and then asked for leniency afterward.  Enough is enough."  (*See* 2/4/2021 Docket Order.)

On March 1, 2021, Defendants filed their summary judgment papers.  (*See* Dkt. 246; Facts, Dkt. 247; Memorandum in Support of Defendants' Motion for Summary Judgment ("Def. Br."), Dkt. 248.)  Plaintiff missed the deadline to file a counter-statement of facts.  (*See* 3/1/2021 Docket Order.)  The Court thus deemed Defendants' summary judgment motion fully briefed, with no response, factual statement, or evidence from Plaintiff.  (*See id.*)  Defendants' unopposed summary judgment motion is now before the Court.

### LEGAL STANDARD[2]

Summary judgment is appropriate where the submissions of the parties, taken together, "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986) (The summary judgment inquiry is "whether the evidence presents a sufficient

---

[2] Unless otherwise noted, all legal citations in this Memorandum and Order omit any internal quotation marks, citations, brackets, and ellipses.

disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.").  "A fact is material if it 'might affect the outcome of the suit under the governing law.'"  *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 13 F.4th 247, 259 (2d Cir. 2021) (quoting *Anderson*, 477 U.S. at 248).  "To present a 'genuine' issue of material fact sufficient to defeat a motion for summary judgment, the record must contain contradictory evidence 'such that a reasonable jury could return a verdict for the nonmoving party.'"  *Horror Inc. v. Miller*, 15 F.4th 232, 241 (2d Cir. 2021) (quoting *Anderson*, 477 U.S. at 248).

"[A]t the summary judgment stage, the district court is not permitted to make credibility determinations or weigh the evidence . . . ."  *Kee v. City of New York*, 12 F.4th 150, 166 (2d Cir. 2021).  It must "consider the record in the light most favorable to the non-movant" and "resolve all ambiguities and draw all factual inferences in favor of the non-movant 'if there is a "genuine" dispute as to those facts.'"  *Loreley*, 13 F.4th at 259 (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

"The moving party bears the burden to demonstrate the absence of any genuine issues of material fact . . . ."  *Smith v. Barnesandnoble.com, LLC*, 839 F.3d 163, 166 (2d Cir. 2016).  Once this burden is met, the burden shifts to the nonmoving party to proffer some evidence establishing the existence of a question of fact that must be resolved at trial.  *See Spinelli v. City of New York*, 579 F.3d 160, 166–67 (2d Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  A mere "scintilla of evidence" in support of the non-moving party is insufficient; "there must be evidence on which the jury could reasonably find for the non-movant."  *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 743 (2d Cir. 2003).  That is, "the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial."  *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (alteration and emphasis omitted).

"A party asserting that a fact . . . is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record," or "(B) showing that the materials cited do not establish the absence . . . of a genuine dispute . . . ." Fed. R. Civ. P. 56(c).  If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion" and "grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e).  Thus, "a non-response runs the risk of unresponded-to statements of undisputed facts [proffered] by the movant being deemed admitted." *Jackson v. Fed. Exp.*, 766 F.3d 189, 194 (2d Cir. 2014).  Even when a summary judgment motion is unopposed, however, the court may "rely on other evidence in the record even if uncited," and "must determine whether the legal theory of the motion is sound." *Id.*

## DISCUSSION

### I.      Legal Standard – 42 U.S.C. § 1983

Section "1983 does not confer any substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Village of Freeport v. Barrella*, 814 F.3d 594, 600 n.8 (2d Cir. 2016).  "To state a claim under § 1983, a plaintiff must allege that defendants violated plaintiff's federal rights while acting under color of state law." *McGugan v. Aldana-Bernier*, 752 F.3d 224, 229 (2d Cir. 2014).

#### A.      Personal Involvement

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Brandon v. Kinter*, 938 F.3d 21, 36 (2d Cir. 2019).

Personal involvement can be established by showing that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference by failing to act on information indicating that unconstitutional acts were occurring.

*Littlejohn v. City of New York*, 795 F.3d 297, 314 (2d Cir. 2015).

### B.    Qualified Immunity

"Qualified immunity is available to officials" in a Section 1983 action "so long as their actions do not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Chamberlain v. City of White Plains*, 960 F.3d 100, 110 (2d Cir. 2020) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "To determine whether defendants enjoy qualified immunity, [courts in this Circuit] consider the specificity with which a right is defined, the existence of Supreme Court or Court of Appeals case law on the subject, and the understanding of a reasonable officer in light of preexisting law." *Id.*

## II.    Federal Law Claims

### A.    False Arrest

Plaintiff alleges that Wieber and D'Alto deprived him of his Fourth and Fourteenth Amendment rights by arresting him without probable cause on May 26, 2014 and May 30, 2014.

#### 1.    Legal Standard

"Claims for false arrest brought under Section 1983 are 'substantially the same' as claims for false arrest under state law." *Ashley v. City of New York*, 992 F.3d 128, 136 (2d Cir. 2021). "Under New York law, to prevail on a claim for false arrest, a plaintiff must show that (1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3)

the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Id.*

"Probable cause is a complete defense to a constitutional claim of false arrest . . . ." *Betts v. Shearman*, 751 F.3d 78, 82 (2d Cir. 2014). "Probable cause exists when one has knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested." *Id.* "More specifically, probable cause exists if a law enforcement officer received information from some person, normally the putative victim or eyewitness, unless the circumstances raise doubt as to the person's veracity." *Id.* "[A] police officer is not liable for a false arrest under Section 1983 if probable cause to arrest the plaintiff existed for *any* crime— whether or not that particular crime was closely related to the offense the officers said was the reason for arrest." *Kee*, 12 F.4th at 158–59.

"[T]he probable-cause-to-arrest inquiry is generally limited to whether the facts known by the arresting officer at the time of the arrest objectively provide probable cause to arrest." *United States v. Pabon*, 871 F.3d 164, 176 n.5 (2d Cir. 2017). "Questions of historical fact regarding the officers' knowledge at the time of arrest are to be resolved by the jury." *Dufort v. City of New York*, 874 F.3d 338, 348 (2d Cir. 2017). "However, where there is no dispute as to what facts were relied on to demonstrate probable cause, the existence of probable cause is a question of law for the court." *Id.* "Review for probable cause should encompass 'plainly exculpatory evidence' alongside inculpatory evidence to ensure the court has a full sense of the evidence that led the officer to believe that there was probable cause to make an arrest." *Stansbury v. Wertman*, 721 F.3d 84, 93 (2d Cir. 2013).

> Even in the absence of probable cause, a police officer is entitled to qualified immunity where (1) her conduct does not violate clearly established statutory or

11

constitutional rights of which a reasonable person would have known, or (2) it was objectively reasonable for her to believe that her actions were lawful at the time of the challenged act.

*Frost v. N.Y.C. Police Dep't.*, 980 F.3d 231, 243 n.8 (2d. Cir. 2020).  "An officer's determination is objectively reasonable if there was 'arguable' probable cause at the time of the arrest—that is, if officers of reasonable competence could disagree on whether the probable cause test was met." *Gonzalez v. City of Schenectady*, 728 F.3d 149, 157 (2d Cir. 2013).  "However, 'arguable' probable cause should not be misunderstood to mean 'almost' probable cause.  If officers of reasonable competence would have to agree that the information possessed by the officer at the time of arrest did not add up to probable cause, the fact that it came close does not immunize the officer."  *Id.*

2.   Analysis

**May 26, 2014 Arrest:** Plaintiff was arrested on May 26, 2014 for "falsely reporting an incident in the third degree" in violation of New York Penal Law §§ 240.50(2) and 240.50(3)(A); "[e]ndangering the welfare of a child" in violation of New York Penal Law § 260.10(1); "[d]riving on sidewalks" in violation of New York Vehicle & Traffic Law § 1225-a; and operating a vehicle without proper safety seats or belts in violation of New York Vehicle & Traffic Law § 1229-c.[3] (Dkt. 246-9, at ECF 7.)  The Court concludes that Defendant Wieber had probable cause to arrest Plaintiff for at least one of these alleged violations.

"A person is guilty of falsely reporting an incident in the third degree when, knowing the information reported . . . to be false or baseless, he or she" (1) reports to certain officials "an

---

[3] Based on his possession of someone else's credit cards, Plaintiff also was charged with "criminal possession of stolen property" in the fourth and fifth degrees in violation of New York Penal Law §§ 165.40 and 165.45(2), respectively; "criminal impersonation in the second degree" in violation of New York Penal Law § 190.25(4); and "identity theft in the third degree" in violation of New York Penal Law § 190.78(1).  (Dkt. 246-9, at ECF 7.)  But these charges stemmed from alleged events that occurred after Plaintiff was arrested, so they do not inform the probable cause inquiry as to the initial arrest, and, as noted below, do not undermine its constitutionality.

alleged occurrence or impending occurrence of a catastrophe or emergency which did not in fact occur or does not in fact exist," or (2) "[g]ratuitously reports to a law enforcement officer or agency . . . the alleged occurrence of an offense or incident which did not in fact occur." N.Y. Penal Law §§ 240.50(2), (3)(A). "Calls to 911 can qualify as 'reports to a law enforcement officer or agency.'" *Davis v. City of New York*, No. 15-CV-5900 (LGS), 2017 WL 1184287, at *3 (S.D.N.Y. Mar. 28, 2017) (citing *People v. Ellis*, 908 N.Y.S.2d 687, 688 (App. Div. 2010); *People v. Brazier*, 5 N.Y.S.3d 329 (App. Term. 2014)).

As noted, Defendant Wieber attested in his report that he believed Plaintiff had violated Sections 240.50(2) and (3)(A) by calling 911 on April 22, 2014 and falsely reporting his child missing, despite knowing that Rochel had taken the child to the doctor. (*See generally* Dkt. 246-9.) As noted, on that date, Plaintiff called 911 to report that one of his three children had not been dropped off for a scheduled visit with him and was "missing." (*See* Dkt. 246-8, at 3:2–8; Facts, Dkt. 247, ¶ 12; *see also* Dkt. 246-9, at ECF 7–8.) Plaintiff told the 911 operator that he needed immediate assistance and that he wanted to file a "missing person report." (*See* Dkt. 246-8, at 3:11–12.) When D'Alto arrived at Plaintiff's building to investigate, Plaintiff told D'Alto that his child "was missing" and that "[h]e had no idea where his son was." (Dkt. 246-9, at ECF 19.) Officers conducted a search, and ultimately found the child asleep at Rochel's house. (*See* Facts, Dkt. 247, ¶ 19; *see also* Dkt. 246-7, at 87:11–18.) Rochel told the officers that she had not sent the child to visit with Plaintiff because the child had been injured and needed to go to the doctor. (*See* Dkt. 246-7, at 87:11–18.)

When the officers informed Rochel of Plaintiff's 911 call, Rochel filed a complaint with the NYPD alleging that the call had been false. (*See generally* Dkt. 246-9.) Wieber investigated Rochel's complaint. (*See id.*) On May 5, 2014, Wieber interviewed Greenberg, who told Wieber

that he had dropped off two of the couple's three children with Plaintiff on April 22, 2014, and, contrary to what Plaintiff reported in his 911 call, had told Plaintiff that Rochel had taken their third child to the doctor to be treated for an injury.  (Dkt. 246-9, at ECF 15–16.)  According to Wieber's police report, Rochel also told Wieber on May 5, 2014 that Plaintiff "was very much aware and knew where [their third child] was" on April 22, 2014, despite reporting the child missing.  (*See* Dkt. 246-9, at ECF 13–14.)  Wieber thus had "knowledge of, or reasonably trustworthy information as to, facts and circumstances that [we]re sufficient to warrant a person of reasonable caution in the belief that" Plaintiff had violated New York Penal Law §§ 240.50(2) and (3)(A).[4]  *See Betts*, 751 F.3d at 82.  Because Plaintiff was lawfully arrested for the false 911 call, his Section 1983 claim against Wieber and D'Alto[5] fails as to the May 26, 2014 arrest, regardless of the validity of the other basis for that arrest.[6]  *See Kee*, 12 F.4th at 158–59 ("[A] police officer

---

[4] Although Plaintiff has indicated that he "will present affidavits, videotapes, photos, documentary and other evidence from which a reasonable jury can conclude that" his arrest stemmed from "fraud [and] false statements under oath by Detectives Wieber and D'Alto and by Private parties Greenberg . . . and Rochel" (Response to City Defendants' Letter Motion for Pre-Summary Judgment Motion Conference, Dkt. 164, at 5), Plaintiff, as discussed, failed to produce any such evidence.  Thus, at this stage, there is no evidence that Wieber had any reason to doubt Greenberg's or Rochel's veracity.  *See Betts*, 751 F.3d at 82.

[5] Because Wieber had probable cause to arrest Plaintiff, Plaintiff's claim that D'Alto "knowingly aid[ed] and abet[ed] Wieber in making the first false arrest" also fails.  (FAC, Dkt. 190, ¶ 126.)

[6] In any event, on the day Plaintiff was arrested, Wieber observed him driving on the sidewalk while his children were in the car without seatbelts.  (*See* Dkt. 246-12.)  Except in certain situations not relevant here, New York Vehicle and Traffic Law § 1225-a provides that "[n]o person shall drive a motor vehicle on or across a sidewalk."  N.Y. Veh. & Traf. Law § 1225-a.  Section 1229-c provides that "[n]o person shall operate a motor vehicle in this state unless" children in the vehicle have appropriate safety seats and/or seatbelts.  N.Y. Veh. & Traf. Law § 1229-c.  Under New York law, "[a] police officer may arrest a person for a" traffic violation only when the officer has "reasonable cause to believe that such person has committed such offense in his or her presence."  N.Y. Crim. Proc. Law § 140.10(1)(a), (2); *see also id.* § 1.20(39).  An officer's personal observations can establish probable cause for constitutional purposes.  *See Garcia v. Does*, 779 F.3d 84, 92 (2d Cir. 2015) (concluding "that the defendants . . . had, from their personal observations, sufficient evidence to establish probable cause").  Although

is not liable for a false arrest under Section 1983 if probable cause to arrest the plaintiff existed for *any* crime—whether or not that particular crime was closely related to the offense the officers said was the reason for arrest.").

**May 30, 2014 Arrest:** Plaintiff was arrested on May 30, 2014 for "custodial interference in the second degree" in violation of New York Penal Law § 135.45(1), and "criminal contempt in the second degree" in violation of New York Penal Law § 215.50(3). (Dkt. 246-18, at ECF 2.) The Court concludes that Defendant Wieber had probable cause to arrest Plaintiff for at least one of these alleged violations.

"A person is guilty of criminal contempt in the second degree when he . . . [i]ntentional[ly] disobe[ys] or resist[s] . . . the lawful process or other mandate of a court." N.Y. Penal Law § 215.50(3). After his arrest on May 26, 2014, the state criminal court entered a protective order directing Plaintiff to stay away from Rochel and their children. (*See* Dkt. 246-22.)

As noted, on May 30, 2014, Rochel called NYPD and told Wieber that Plaintiff had picked up their child from school in violation of a court order. (*See* Dkt. 246-17.) Rochel told Wieber that the court had entered an order specifying which days Plaintiff was permitted visitation with their children, and that Plaintiff had picked up the child during an unscheduled time. (*See* Dkt. 246-18.) Rochel told Wieber that Plaintiff had signed the order. (*See id.*)

Rochel also moved for an order to show cause in the family court. (*See* Dkt. 246-4, at 2.) On May 30, 2014, the court ordered, *ex parte*, "that the child [Plaintiff had picked up from school] be immediately returned to [Rochel] and any police agency to assist." (*Id.*) The court further directed that the Administration for Children's Services "be notified forthwith of the alleged

---

Defendants do not seek summary judgment based on these observations creating probable cause, they would be an independent ground for denying Plaintiff's false arrest claim.

removal of [the child] by [Plaintiff] as well as the [District Attorney] and NYPD." (*Id.* at 2–3.) Given Rochel's complaint and the family court's order that the child be returned, Wieber had probable cause to believe that Plaintiff had violated a court order by picking up the child from school.

According to Plaintiff, he did not actually violate a court order because, before directing that the child be returned to Rochel, the family court had entered the order modifying Plaintiff's visitation schedule. (*See* FAC, Dkt. 190, ¶ 107.) Plaintiff alleges that he therefore was in fact permitted to pick up the child from school on May 30, 2014, based on the modified order. (*Id.*)

But even were Plaintiff ultimately correct that he did not violate a court order, Wieber had probable cause to believe he had at the time of the arrest. As noted, "the probable-cause-to-arrest inquiry is generally limited to whether the facts known by the arresting officer *at the time of the arrest* objectively provide probable cause to arrest." *Pabon*, 871 F.3d at 176 n.5 (emphasis added). "Once an officer has probable cause, he or she is neither required nor allowed to continue investigating, sifting and weighing information," and "an officer's failure to investigate an arrestee's protestations of innocence generally does not vitiate probable cause." *Panetta v. Crowley*, 460 F.3d 388, 395–96, 398 (2d Cir. 2006). For example, in *Rheingold v. Harrison Town Police Department*, 568 F. Supp. 2d 384, 391 (S.D.N.Y. 2008), the court determined that an officer had probable cause to arrest a father for violating a court order requiring him to return his children to their mother, even though the order "permitted the parties to make other arrangements," and the father told the officer that the parties had done so. In rejecting the father's false arrest claim, the court explained that the officer "had no reason at the time [of the arrest] to doubt the veracity" of the mother's complaint, and was not required to investigate whether the father "in fact[] violated a valid court order." *Id.* Here, Rochel informed Wieber that Plaintiff had violated a court order

(*see* Dkt. 246-17), and, meanwhile, the family court directed police to assist in the "immediate[] return[]" of Plaintiff's child to Rochel (*see* Dkt. 246-4, at 2).  Wieber did not need to study the family court docket and compare the various orders and modifications to determine whether the family court had misconstrued its own visitation-scheduling order.[7]

*      *      *

Plaintiff's false arrest claims therefore must be dismissed in their entirety.

### B.    Malicious Prosecution

Plaintiff alleges that Wieber and D'Alto deprived him of his Fourth and Fourteenth Amendment rights by maliciously prosecuting him for the alleged conduct leading to his arrests on May 26, 2014, and May 30, 2014.

### 1.    Legal Standard

"Malicious-prosecution claims essentially allege a violation of the plaintiff's right under the Fourth Amendment to be free from unreasonable seizure, the touchstone of which is reasonableness." *Smalls v. Collins*, 10 F.4th 117, 132 (2d. Cir. 2021).  Like false arrest claims, "claims for malicious prosecution under § 1983 are substantially the same as claims for malicious prosecution under state law," except that a Section 1983 claimant must further "show a seizure or other perversion of proper legal procedures implicating his personal liberty and privacy interests

---

[7] As discussed below, there is a question as to whether Wieber had probable cause to believe Plaintiff also violated New York Penal Law § 135.45(1) for purposes of Plaintiff's malicious prosecution claim.  But, as noted, "a police officer is not liable for a false arrest under Section 1983 if probable cause to arrest the plaintiff existed for *any* crime—whether or not that particular crime was closely related to the offense the officers said was the reason for arrest." *Kee*, 12 F.4th at 158–59.  For the reasons discussed, Wieber had probable cause to arrest Plaintiff under New York Penal Law § 215.50(3), so the Court need not decide whether he also had probable cause under Section 135.45(1).

under the Fourth Amendment." *Lanning v. City of Glens Falls*, 908 F.3d 19, 24–25 (2d Cir. 2018).[8]

Under New York law, a plaintiff alleging malicious prosecution must show that "(1) the defendant

initiated a prosecution against [the] plaintiff, (2) without probable cause to believe the proceeding

can succeed, (3) the proceeding was begun with malice, and (4) the matter terminated in [the]

plaintiff's favor." *Rentas v. Ruffin*, 816 F.3d 214, 220 (2d Cir. 2016).

"To initiate a prosecution, a defendant must do more than report the crime or give

testimony.  He must play an active role in the prosecution, such as giving advice and

encouragement or importuning the authorities to act." *Manganiello v. City of New York*, 612 F.3d

149, 163 (2d Cir. 2010).  "A jury may permissibly find that a defendant initiated a prosecution

where he filed the charges or prepared an alleged false confession and forwarded it to prosecutors."

*Id.*

> [W]hen a plaintiff pursues a claim of malicious prosecution against police officers
> based on an "unlawful arrest," the intervening exercise of independent judgment by
> a prosecutor to pursue the case usually breaks the chain of causation unless the
> plaintiff can produce evidence that the prosecutor was misled or pressured by the
> police.

*Dufort*, 874 F.3d at 352.

### 2.   Analysis

With respect to the May 26, 2014 arrest, there is no genuine dispute that the prosecutor

"exercise[d] . . . independent judgment" in "pursu[ing] the case."  *Id.*  Except for the driving-

related charges, each allegation in the criminal complaint was based on Wieber's interviews with

witnesses.  The driving-related offenses were based on Wieber's personal observation.  The

---

[8] Because "federal law defines the elements of a § 1983 malicious prosecution claim, . . . a
State's tort law serves only as a source of persuasive authority rather than binding precedent in
defining these elements." *Lanning*, 908 F.3d at 25.  By contrast, "for malicious prosecution claims
brought under New York law, federal courts must faithfully apply New York tort law."  *Id.* at 28.

prosecutor had this information in deciding to pursue the case, and thus "exercise[d] . . . independent judgment." *Id.*  Although the FAC *alleges* that Wieber and D'Alto "made deliberately false statements and provided fabricated information to prosecutors" (FAC, Dkt. 190, ¶ 137), there is no summary judgment "*evidence* that the prosecutor was misled or pressured by" Wieber or D'Alto, *Dufort*, 874 F.3d at 352 (emphasis added).  The malicious prosecution claims as to the charges stemming from the May 26, 2014 arrest therefore must be dismissed.

The charges stemming from the May 30, 2014 arrest are another matter.  First, Wieber initiated the prosecution of Plaintiff by signing and filing the criminal complaint.  (*See* Dkt. 246-18, at ECF 2.)  Defendants do not dispute that, in so doing, Wieber "fail[ed] to forward the purportedly exculpatory [March 20, 2014] visitation order to the prosecutor." (Def. Br., Dkt. 248, at 20.)  As noted, the March 20, 2014 order showed that the visitation schedule had been modified such that Plaintiff was in fact scheduled to pick up the child from school on May 30, 2014.  (*See* Dkt. 246-23, at 65:21–66:4; Finkel Decl., Dkt. 156-2, ¶¶ 7–14; *see also* Finkel Decl., Dkt. 156-2, at ECF 22–23 (March 20, 2014 family court order providing that, after the Passover holiday, the alternate weekend visitation schedule would resume, with Rochel having visitation on April 25, 2014, and resulting in Plaintiff having visitation on May 30, 2014).)

Defendants point out that "the prosecutor *continued* to prosecute and investigate the criminal charges for over four months" even after Plaintiff's criminal defense attorney provided the March 20, 2014 family court order to the prosecutor.  (Def. Br., Dkt. 248, at 20.)  Defendants argue that this shows that "the prosecutor utilized their independent judgment in deciding to prosecute [P]laintiff." (*Id.*)  But there is a genuine issue of fact as to whether Wieber's failure to include the March 20, 2014 visitation order in the criminal complaint inhibited the prosecutor's

19

ability to make an independent judgment, or at least to make such a judgment sooner.  As Plaintiff's criminal defense attorney testified, "cases don't suddenly go away just because someone [tells the prosecutor] there's been a mistake once the case is filed."  (Dkt. 246-23, at 54:16–18.)  That is, if Wieber had provided the "purportedly exculpatory visitation order" (Def. Br., Dkt. 248, at 20) at the outset, the prosecutor may have declined to pursue the case in the first place.  But because the document came from Plaintiff's attorney and was not provided in the criminal complaint from the arresting officer, the prosecutor had already begun the prosecution, and, in any event, may have viewed the order more skeptically.  Thus, there is a genuine issue as to whether the prosecutor "exercise[d] . . . independent judgment" in "pursu[ing] the case," or "was misled" by Wieber's omission of the exculpatory visitation order.  *Dufort*, 874 F.3d at 352.

Second, although there was probable cause to *arrest* Plaintiff—on the basis that he had committed criminal contempt as to the family court order, in violation of New York Penal Law § 215.50(3)—there is a genuine dispute as to whether Wieber had probable cause to initiate a prosecution on that charge.  *See Kee*, 12 F.4th at 166 ("[P]robable cause to prosecute should not be conflated with probable cause to arrest.").  Although Wieber did not need to examine the family court docket before arresting Plaintiff for violating a court order, there is evidence that, at the precinct, Plaintiff's criminal defense attorney showed Wieber the "purportedly exculpatory visitation order" (Def. Br., Dkt. 248, at 20) before Wieber signed the criminal complaint (*see* Dkt. 246-23, at 65:21–66:4).  The Court thus rejects Defendants' argument that "as there was probable cause to arrest [P]laintiff, that probable cause extended into [P]laintiff's prosecution."[9]  (Def. Br.,

---

[9] There is also a question as to whether there was probable cause to prosecute Plaintiff for committing "custodial interference in the second degree" in violation of New York Penal Law § 135.45(1).  Section 135.45(1) provides that a parent "is guilty of custodial interference in the second degree when . . . he [or she] takes or entices [his or her] child from [the child's] lawful custodian," "intending to hold such child permanently or for a protracted period, and knowing that

Dkt. 248, at 21.)  Rather, the court concludes that there is a genuine issue of fact as to whether, when he drafted the criminal complaint, Wieber had a basis to believe Plaintiff lacked visitation rights with his child on May 30, 2014, and, in turn, whether a prosecution could be successful.[10]

Third, there is a genuine issue as to malice, which "may be inferred if [the plaintiff] is able to demonstrate a lack of probable cause." *Kee*, 12 F.4th at 167 n.17.  In any case, there is evidence that Wieber "failed to make a complete and full statement of facts to the District Attorney," *see Manganiello*, 612 F.3d at 160, as Defendants do not dispute that Wieber "fail[ed] to forward the purportedly exculpatory visitation order to the prosecutor" (Def. Br., Dkt. 248, at 20).

Fourth, Defendants do not dispute that the dismissal of the charges stemming from the May 30, 2014 arrest was a "favorable termination."  The charges were dismissed on speedy trial grounds (*see* Dkt. 246-16, at ECF 2), which "is generally a favorable termination for the purpose of a New York tort claim for malicious prosecution" and "under Section 1983," *Kee*, 12 F.4th at 162, 165. Defendants provide no reason to deviate from that principle here.[11]

---

he [or she] has no legal right to do so."  N.Y. Penal Law § 135.45(1).  But "[t]he bare allegation that [a] defendant picked the child up from school does not sufficiently allege the intent to hold her either 'permanently or for a protracted period.'"  *People v. Garci*a, 998 N.Y.S.2d 605, 610 (Crim. Ct. 2014).  Here, the criminal complaint alleges that Plaintiff committed "custodial interference" merely because he "pick[ed] up [his and Rochel's] child in common from school and [brought] the child in common to [his] residence without permission or authority."  (*See* Dkt. 246-18, at ECF 2.)  Even so, the prosecutor exercised independent judgment in pursuing this charge, and there is no evidence that Wieber withheld relevant information.

[10] There is also a genuine issue as to "arguable" probable cause for qualified immunity purposes.  If the visitation order Plaintiff's criminal defense attorney gave Wieber showed that Plaintiff did not violate a court order (a question subject to genuine dispute), there was no "arguable" probable cause to prosecute Plaintiff for violating a court order.

[11] Nor do Defendants dispute that Plaintiff can demonstrate "a violation of his rights under the Fourth Amendment" as a result of the alleged malicious prosecution.  *See Fulton*, 289 F.3d at 195.

\*        \*        \*

Plaintiff's malicious prosecution claim is dismissed as to the prosecution stemming from the arrest on May 26, 2014, but may proceed against Wieber as to the prosecution stemming from the arrest on May 30, 2014.[12]

### C.        Fair Trial

Plaintiff alleges that Wieber deprived him of his Fourteenth Amendment rights[13] by fabricating evidence related to his alleged conduct leading to his arrests on May 26, 2014, and May 30, 2014.

### 1.        Legal Standard

To establish a section 1983 fair-trial claim based on fabrication of evidence, a plaintiff must show that (1) an investigating official (2) fabricated information (3) that is likely to influence a jury's verdict, (4) forwarded that information to prosecutors, and (5) the plaintiff suffered a deprivation of life, liberty, or property as a result. *Smalls*, 10 F.4th at 132.

> To succeed on a claim for a denial of the right to a fair trial against a police officer based on an allegation that the officer falsified information, an arrestee must therefore prove by a preponderance of the evidence that the officer created false information, the officer forwarded the false information to prosecutors, and the false information was likely to influence a jury's decision.

*Id.*  "[G]overnment officials may be held liable for fabricating evidence through false statements or omissions that are both material and made knowingly." *Morse v. Fusto*, 804 F.3d 538, 547 (2d

---

[12] Plaintiff's malicious prosecution claim against D'Alto is dismissed because there is no evidence that D'Alto was personally involved in the decision to omit the potentially exculpatory visitation order from the criminal complaint.  *See Brandon*, 938 F.3d at 36 ("[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.").

[13] The FAC lists this as a First Amendment violation, but "[a] section 1983 fair-trial claim . . . vindicates a different constitutional right – the right to due process protected by the Fifth and Fourteenth Amendments." *Smalls*, 10 F.4th at 133.

Cir. 2015).  "The plaintiff need not have been tried to make out this claim so long as some deprivation of liberty occurred." *Ashley*, 992 F.3d at 139.  A plaintiff cannot "bring his fabricated-evidence claim under § 1983 prior to favorable termination of his prosecution." *McDonough v. Smith*, 139 S. Ct. 2149, 2156–57 (2019).

"A section 1983 fair-trial claim . . . will not be defeated by evidence of probable cause because it covers kinds of police misconduct not addressed by malicious prosecution claims and vindicates a different constitutional right – the right to due process protected by the Fifth and Fourteenth Amendments." *Smalls*, 10 F.4th at 133.  Finally, a plaintiff "may assert a fabricated-evidence claim related to his pretrial detention under the Due Process Clause." *Id.* at 141.

2.  Analysis

Plaintiff's fabrication of evidence claim is based on Wieber's alleged "actions in falsely arresting Plaintiff without probable cause on fabricated charges that he created" and "caus[ing] to be submitted to the [prosecutor] supporting depositions under oath containing . . . fabricated information."  (FAC, Dkt. 190, ¶ 156.)  Because there is evidence that Wieber omitted crucial information from the criminal complaint he forwarded to the prosecutor (that is, the exculpatory visitation order), the fabrication claim may proceed against Wieber as to the May 30, 2016 arrest. *See Morse*, 804 F.3d at 547 ("[G]overnment officials may be held liable for fabricating evidence through false statements or omissions that are both material and made knowingly."); *see also Timmer v. City Univ. of New York*, No. 20-CV-2554 (PKC) (RLM), 2021 WL 3603465, at *17 (E.D.N.Y. Aug. 13, 2021) ("If one of a number of integrally related causes of action have to be tried, it makes little sense to grant a motion to dismiss as [to] one or more of them, as it may prove necessary to hold yet another trial in the event that it is determined on appeal that the motion to dismiss was improperly granted.").  For the reasons discussed, however, the fabrication claim must be dismissed as to the May 26, 2014 arrest.

23

D.    **Unreasonable Search**

Plaintiff alleges that Wieber deprived him of his Fourth and Fourteenth Amendment rights by searching him after his arrest on May 26, 2014 and opening his wallet.

1.    Legal Standard

"The Fourth Amendment provides that 'the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause.'" *United States v. Iverson*, 897 F.3d 450, 458 (2d Cir. 2018) (quoting U.S. Const. amend. IV).   "A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." *Id.* (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)).   "While searches and seizures conducted without a warrant are presumptively unreasonable, several exceptions to the warrant requirement have been fashioned when circumstances demand an immediate police response." *United States v. McCargo*, 464 F.3d 192, 196 (2d Cir. 2006) (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 454–55, (1971); *Terry v. Ohio*, 392 U.S. 1, 20 (1968)).   "If a [person] has shown that he had a reasonable expectation of privacy in the place or object in question, the government has the burden of showing that the entry, search, or seizure was lawful because it fell within one of the exceptions to the warrant requirement." *Iverson*, 897 F.3d at 458.

"[A] search incident to an arrest 'constitutes an exception to the warrant requirement' the Fourth Amendment otherwise imposes." *Sloley v. VanBramer*, 945 F.3d 30, 37 (2d Cir. 2019) (quoting *Riley v. California*, 573 U.S. 373, 382 (2014)).   "A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; *that intrusion being lawful*, a search incident to the arrest requires no additional justification." *Virginia v. Moore*, 553 U.S. 164, 177 (2008).

24

Further, "[w]hen the police impound vehicles or detain suspects, they frequently perform inventory searches." *United States v. Mendez*, 315 F.3d 132, 137 (2d Cir. 2002) (citing *Illinois v. Lafayette*, 462 U.S. 640, 648 (1983); *South Dakota v. Opperman*, 428 U.S. 364, 376 (1976)). "Such searches are constitutional under the Fourth Amendment because they 'serve to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger.'" *Id.* (quoting *Colorado v. Bertine*, 479 U.S. 367, 372 (1987)). "[T]he inventory search constitutes a well-defined exception to the warrant requirement." *Id.* (quoting *Lafayette*, 462 U.S. at 643). "[L]aw enforcement officials may open closed containers as part of an inventory search" if "they act in good faith pursuant to standardized criteria . . . or established routine." *Id.* "The existence of such a valid procedure may be proven by reference to . . . written rules and regulations." *Id.*

2. <u>Analysis</u>

As discussed above, Wieber had probable cause to arrest Plaintiff on May 26, 2014. While Plaintiff alleges that "[t]here was no reason to believe that Plaintiff was armed or presented any kind of danger or threat" (FAC, Dkt. 190, ¶ 150), "[t]he interests justifying search are present whenever an officer makes an arrest," so a search incident to arrest "requires no additional justification," *Moore*, 553 U.S. at 177. And even if there was, as Plaintiff alleges, "plenty of time to secure a warrant" (FAC, Dkt. 190, ¶ 150), "the long-established exception for searches incident to a lawful arrest . . . has never turned on case-specific variables such as how quickly the officer will be able to obtain a warrant in the particular circumstances he faces," *Birchfield v. North Dakota*, 136 S. Ct. 2160, 2180 (2016). In any event, "the search of a wallet or address book does not have to take place immediately upon the arrest of the defendant," and "[t]he fact that the object is no longer at risk of being accessed by the defendant, because it is in the exclusive control of the

arresting officers, is immaterial." *United States v. Vaneenwyk*, 206 F. Supp. 2d 423, 426 (W.D.N.Y. 2002).

Further, Wieber also was entitled to search Plaintiff's wallet at the precinct, after Plaintiff's arrest, as an inventory search, which, as noted, is "a well-defined exception to the warrant requirement." *Mendez*, 315 F.3d at 137 ("[L]aw enforcement officials may open closed containers as part of an inventory search" if "they act in good faith pursuant to standardized criteria . . . or established routine."). The New York City Police Department Patrol Guide provides that "[u]pon arrival at the precinct," the officer "shall conduct a thorough search of the prisoner's person and clothing to ensure the safety of all persons within the facility and to remove weapons, contraband, and evidence not discovered by the frisk." NYCPD Patrol Guide, Arrests – General Search Guidelines, Proc. No. 208-05, at 1 (effective Mar. 18, 2019).[14] This "includes the removal of outer garments" including wallets, and "[a]ll pockets are to be emptied." *Id.* Here, the record supports that Wieber acted in good faith pursuant to standard NYPD inventory procedure, and there is no evidence to the contrary. *See United States v. Wells*, No. 20-CR-633 (NRB), 2021 WL 5401494, at *3 (S.D.N.Y. Nov. 18, 2021).

In any event, "qualified immunity shields police officers who conduct warrantless searches so long as they could 'reasonably have believed that the search' fit within an exception to the warrant requirement." *Vassiliou v. City of New York*, No. 18-CV-0779 (EK) (VMS), 2021 WL 76916, at *8 (E.D.N.Y. Jan. 7, 2021) (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)).

---

[14] The Court may take judicial notice of the Patrol guide. *See, e.g.*, *Makinen v. City of New York*, 722 F. App'x 50, 53 (2d Cir. 2018) (summary order) (taking "judicial notice of the Patrol Guide pursuant to Federal Rule of Evidence 201"); *United States v. Bignon*, No. 18-CR-783 (JMF), 2019 WL 643177, at *4 (S.D.N.Y. Feb. 15, 2019) (judicially noticing NYPD Patrol Guide Procedure No. 218-13), *aff'd*, 813 F. App'x 34 (2d Cir. 2020).

Here, Wieber could reasonably have believed the search of Plaintiff's wallet was valid under the exceptions for inventory searches and searches incident to arrest.

Plaintiff's search claim therefore must be dismissed.

### E.   Interference with Familial Association

Plaintiff alleges that Wieber and D'Alto deprived him of his Fourth and Fourteenth Amendment[15] rights by interfering with his familial association.

#### 1.   Legal Standard

"[T]he Supreme Court [has] recognized a right to intimate association that allows individuals to 'enter into and maintain certain intimate human relationships without undue intrusion by the State.'"  *United States v. Thompson*, 896 F.3d 155, 166 (2d Cir. 2018) (quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 617–18 (1984)).  "The Court identified 'the personal affiliations that exemplify these considerations' as including 'those that attend the creation and sustenance of a family—marriage, childbirth, the raising and education of children, and cohabitation with one's relatives.'"  *Id.* (quoting *Roberts*, 468 U.S. at 619–20).  The Second Circuit "has not determined whether the right to intimate association finds its roots in the First Amendment or in the Due Process Clauses of the Fifth and Fourteenth Amendments."  *Id.* at 166 n.12.  Even so, it has held that a "claim for infringement of the right to familial association requires conduct so shocking, arbitrary, and egregious that the Due Process Clause would not countenance it even were it accompanied by full procedural protection."  *Gorman v. Rensselaer Cty.*, 910 F.3d 40, 47 (2d Cir. 2018).  Further, "a claim under the Due Process Clause for infringement of the right

---

[15] Defendants argue that Plaintiff's counsel waived his familial association argument during Plaintiff's deposition.  (*See* Def. Br., Dkt. 248, at 29 & n.5.)  Regardless of the validity of this point, the Court dismisses the familial association claim on the merits.

to familial associations requires the allegation that state action was specifically intended to interfere with the family relationship." *Id.* at 48.

      2.   <u>Analysis</u>

For substantially the same reasons that the Court dismisses Plaintiff's false arrest claims, it also must dismiss his familial association claims. Plaintiff contends that the state court orders and arrests on May 26, 2014, and May 30, 2014, which limited his visitation with his children, deprived him of his constitutional right to familial association. But, as discussed, the arrests on those dates were based on probable cause. Arresting Plaintiff because the "facts and circumstances . . . warrant[ed] a person of reasonable caution in the belief that an offense ha[d] been or [was] being committed," *Betts*, 751 F.3d at 82, obviously was not "shocking, arbitrary, and egregious," *Gorman*, 910 F.3d at 47. And to the extent Plaintiff challenges the family court orders "grant[ing] Rochel Herman's emergency motion for a temporary order of protection" (FAC, Dkt. 190, ¶ 192), Plaintiff has introduced no evidence linking any "shocking, arbitrary, and egregious" conduct by Wieber or D'Alto to the court's decision to grant a third-party's motions. Further, though there is factual dispute regarding Wieber's failure to advise the prosecutor about the revised visitation schedule that is relevant to Plaintiff's malicious prosecution and fair trial claims, Plaintiff has introduced no evidence that Wieber's omission prevented Plaintiff from being with his children. Plaintiff's familial association claim therefore must be dismissed.

### F.   **Malicious Abuse of Process**

Plaintiff alleges that Wieber deprived him of his Fourteenth Amendment rights by maliciously abusing the criminal process.

      1.   <u>Legal Standard</u>

To prove abuse of process, [a] plaintiff must show that the defendant (1) employs regularly issued legal process to compel performance or forbearance of some act

(2) with intent to do harm without excuse [or] justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process.

*Hernandez v. United States*, 939 F.3d 191, 204 (2d Cir. 2019).  "As to the third prong of this test, to state a claim for abuse of process, a plaintiff must establish that the defendants had an improper purpose in instigating the action and that they aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution." *Id.*  "A malicious motive alone does not give rise to a cause of action for abuse of process." *Id.*

### 2.   Analysis

Plaintiff's malicious abuse of process claim must be dismissed because he has not introduced any evidence that Wieber sought "to obtain a collateral objective that is outside the legitimate ends of the process." *Id.* at 204.  While the FAC alleges that Wieber sought to help Rochel prevail in various child-custody matters, there is no evidence that Wieber had such a motive.

### G.   Failure to Intervene

Plaintiff claims that Defendant Stewart failed to intervene in the allegedly unconstitutional search of his wallet after the May 26, 2014 arrest, and that Defendant Mamys failed to intervene in his allegedly false arrest and malicious prosecution on May 30, 2014.

### 1.   Legal Standard

"[A]ll law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Sloley*, 945 F.3d at 46–47.  "An officer who fails to intercede in the use of excessive force or another constitutional violation is liable for the preventable harm caused by the actions of other officers." *Terebesi v. Torreso*, 764 F.3d 217, 243 (2d Cir. 2014).  "Whether the officer had

a realistic opportunity to intervene is normally a question for the jury, unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." *Id.* at 244.

2.   Analysis

Plaintiff's failure to intervene claims must be dismissed against Stewart, but may proceed against Mamys relating to malicious prosecution.  As to Stewart, Plaintiff alleges only that he failed to intervene in the search of Plaintiff's wallet, which, as noted, was lawful.  Since "there can be no failure to intervene where there was no constitutional violation," *Hardy v. Daly*, 748 F. App'x 379, 381 (2d Cir. 2018) (summary order), Plaintiff's claim against Stewart fails.  The same is true as to Mamys regarding Plaintiff's arrest on May 30, 2014, given that there was probable cause for the arrest.  Both of these claims therefore must be dismissed.

But Plaintiff also alleges that Mamys "fail[ed] to intervene by [not] voiding and/or stopping the . . . malicious prosecution from going forward [on May 30, 2014]."  (FAC, Dkt. 190, ¶ 171.) As discussed, there is a genuine issue of fact as to whether Wieber initiated a malicious prosecution on May 30, 2014, when he allegedly failed to include the "purportedly exculpatory visitation order" (Def. Br., Dkt. 248, at 20) in the criminal complaint he forwarded to the prosecutor, despite evidence that Plaintiff's criminal defense attorney showed Wieber the order on the night of the arrest (*see* Dkt. 246-23, at 65:21–66:4).  There also is evidence that Mamys was supervising Wieber on May 30, 2014, and that Plaintiff's attorney also showed Mamys the purportedly exculpatory order.  (*See* Dkt. 246-23, at 65:21–66:4, 154:23–155:5.)  "Whether [Mamys] had a realistic opportunity to intervene" and direct Wieber to include the potentially exculpatory order is "a question for the jury."  *See Terebesi*, 764 F.3d at 244.

In fact, Defendants do not appear to seek summary judgment as to Plaintiff's claim that Mamys failed to intervene in the alleged *malicious prosecution* stemming from the May 30, 2014 arrest.  Rather, they argue that "there was probable cause to *arrest* [P]laintiff on May 30, 2014,"

30

and no evidence that "Mamys should have intervened to stop [P]laintiff's *arrest*." (Def. Br., Dkt. 248, at 34–5 (emphases added).) As noted, "probable cause to prosecute should not be conflated with probable cause to arrest." *See Kee*, 12 F.4th at 166. Given that Defendants do not challenge the malicious prosecution aspect of this failure to intervene claim, and there is a genuine issue of material fact, this claim may proceed.

### H. Municipal Liability

Plaintiff alleges that the City of New York is liable under a municipal liability theory.

#### 1. Legal Standard

"Although § 1983 subjects only 'persons' to liability," the 1978 Supreme Court case, *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), "established that a municipality . . . is a person within the meaning of Section 1983." *Bellamy v. City of New York*, 914 F.3d 727, 756 (2d Cir. 2019). "To establish liability under *Monell*, a plaintiff must show that he suffered the denial of a constitutional right that was caused by an official municipal policy or custom." *Id.* "*Monell* liability attaches only where an infringement of constitutional rights is caused by a local government policy." *Id.* at 757. "In searching for the proper *local* government that is subject to liability on a given *Monell* claim[,] [courts] look for 'those official or governmental bodies who speak with final policymaking authority concerning the action alleged to have caused the particular violation at issue.'" *Id.* (quoting *Jett v. Dallas Ind. Sch. Dist.*, 491 U.S. 701, 737 (1989)).

"'Official municipal policy includes' not only 'the decisions of a government's lawmakers,' but also 'the acts of its policymaking officials, and *practices* so persistent and widespread as to practically have the force of law.'" *Outlaw v. City of Hartford*, 884 F.3d 351, 372 (2d Cir. 2018) (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011)). "These are actions for which the municipality is actually responsible." *Id.* (quoting *Connick*, 563 U.S. at 61). In such

31

cases, "the plaintiff must show a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *Hernandez*, 939 F.3d at 207 (quoting *Connick*, 563 U.S. at 61).

       2.   <u>Analysis</u>

Plaintiff has not identified any "acts of [NYPD's] policymaking officials," nor any evidence of a practice "so persistent and widespread as to practically have the force of law," *Outlaw*, 884 F.3d at 372, let alone "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation," *Hernandez*, 939 F.3d at 207. His municipal liability claim therefore must be dismissed. *See, e.g.*, *Arroyo v. City of New York*, 683 F. App'x 73, 75 (2d Cir. 2017) (summary order) (affirming summary judgment when the plaintiff "offered no evidence of a citywide policy or custom," let alone "linked such a policy to her treatment by the Officers"); *Castro v. Cty. of Nassau*, 739 F. Supp. 2d 153, 172 (E.D.N.Y. 2010) (granting summary judgment when the plaintiff "produced no evidence of a municipal policy or custom," but "simply assert[ed], without citing to any evidence, that the facts suggest[ed] a custom, pattern or practice of officers failing to adequately investigate an allegation before making an arrest, thereby causing violations of an individual's civil rights"); *Ceparano v. Cty. of Suffolk*, No. 10-CV-2030 (SJF) (AKT), 2013 WL 6576817, at *7 (E.D.N.Y. Dec. 13, 2013) ("[C]onclusory allegations of municipal liability will not defeat a motion for summary judgment on a *Monell* claim.").

## III.   State Law Claims

Plaintiff brings state law claims against Wieber for unlawful search and seizure, and against both Wieber and D'Alto for malicious prosecution, malicious abuse of process, and malicious interference with Plaintiff's association with his children.

### A.      Legal Standard

"[A] federal court has subject-matter jurisdiction over specified state-law claims, which it may (or may not) choose to exercise." *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) (citing 28 U.S.C. §§ 1367(a), (c)).  The Court may exercise supplemental jurisdiction if the claim is "so related to claims in the action within [the Court's] original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 245 (2d Cir. 2011) (quoting 28 U.S.C. § 1367(a)).  "For purposes of section 1367(a), claims form part of the same case or controversy if they derive from a common nucleus of operative fact." *Id.*  Further, district courts may "decline jurisdiction of state-law claims on discretionary grounds without determining whether those claims fall within their pendent jurisdiction." *United States ex rel. Hanks v. United States*, 961 F.3d 131, 137 (2d Cir. 2020) (quoting *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 585 (1999)).

### B.      Analysis

Defendants seek summary judgment on the grounds that "Plaintiff's state law claims fail for the same reasons his federal analogue claims fail," and, "[a]lternatively, should any state law claim survive," that "this Court could decline to exercise supplemental jurisdiction over them." (Def. Br., Dkt. 248, at 38.)

As to false arrest and abuse of process, the Court agrees with Defendants that the state law claims must be dismissed for the same reasons as their federal analogues.  As noted, "[c]laims for false arrest brought under Section 1983 are substantially the same as claims for false arrest under state law." *Ashley*, 992 F.3d at 136.  Likewise, "[w]hen a plaintiff asserts an abuse-of-process claim under Section 1983," the court must "turn to state law to find the elements." *Mangino v. Inc. Vill. of Patchogue*, 808 F.3d 951, 958 n.5 (2d Cir. 2015).  Plaintiff's state law claims for false

arrest and abuse of process therefore must be dismissed.[16]   Similarly, the Court must dismiss Plaintiff's state law malicious prosecution claim relating to the May 26, 2014 arrest.  *See Lanning*, 908 F.3d at 24–25.

The Court also must dismiss Plaintiff's state law claim for "malicious interference with the emotional bond between Plaintiff and his children."  (FAC, Dkt. 190, at 57.)  The FAC does not identify any New York law on which this claim is based.  Instead, it appears that Plaintiff merely copied and pasted his federal claim under a state law heading, alleging that Wieber and D'Alto violated "his First Amendment right to freedom of association with his children," and "deprived Plaintiff of his rights privileges or immunities secured by the Due Process Clause of the Fourteenth Amendment, in violation of 42 U.S.C. § 1983."  (*Id.* ¶ 192.)  Plaintiff's purported state law claim for interference with a familial relationship therefore must be dismissed.

The Court also dismisses Plaintiff's state unlawful search claims, which have been rejected under state court precedent.  *See People v. Lawrence*, 120 N.Y.S.3d 391, 392 (App. Div. 2020) (rejecting an arrestee's argument that "the search of his wallet [at the police station] violated the Federal and State Constitutions because it was neither a lawful search incident to an arrest" or "a lawful inventory search"), *leave to appeal denied*, 149 N.E.3d 879 (N.Y. 2020).

Next, the Court notes that Plaintiff brings claims against New York City based on a theory of *respondeat superior* and negligent supervision, retention, and training.  (*See* FAC, Dkt. 190, at 60–62.)  Because Plaintiff has introduced no evidence to support his federal municipal liability claim, there are no remaining federal claims against New York City.  The Court therefore declines to exercise supplemental jurisdiction over the state law claims against the City, and dismisses those

---

[16] Although the FAC appears to include a new aiding and abetting claim against D'Alto in the state law abuse of process claim, Plaintiff has not, as noted, provided sufficient evidence to sustain that claim.

claims without prejudice to refiling in state court.  *See Greenport Gardens, LLC v. Vill. of Greenport*, No. 19-CV-2330 (PKC) (ARL), 2021 WL 4480551, at \*19 (E.D.N.Y. Sept. 30, 2021) (declining to exercise supplemental jurisdiction over state claims against "parties not involved in the remaining federal action").

Plaintiff's remaining state law claims may proceed in part.  Like false arrest and abuse of process, a federal malicious prosecution claim is roughly analogous to its state law counterpart.  *See Lanning*, 908 F.3d at 24–25.  Since the Court has concluded that there is a genuine dispute as to whether Wieber initiated a malicious prosecution against Plaintiff on May 30, 2014, Defendants' recitation of their federal arguments fails to provide a basis for dismissing the state law analogue, insofar as that claim pertains to Wieber's May 30, 2014 omission of the potential exculpatory visitation order.[17]

### CONCLUSION

Defendants' motion for summary judgment is granted in part and denied in part.  All claims against Defendants D'Alto and Stewart are dismissed with prejudice.  The federal claims against the City of New York are dismissed with prejudice.  The state law claims against the City of New York are dismissed without prejudice to refiling in state court.

The state and federal false arrest, unreasonable search, interference with familial association, and malicious abuse of process claims also are dismissed with prejudice as to Wieber.  The malicious prosecution and fair trial claims against Wieber are dismissed with prejudice insofar as they concern Plaintiff's May 26, 2014 arrest and resulting prosecution.  The federal claim for

---

[17] The claim against D'Alto is dismissed because there is no evidence he was involved in any malicious prosecution.

failure to intervene against Mamys is dismissed with prejudice insofar as it concerns Plaintiff's

May 26, 2014 arrest and resulting prosecution.

The malicious prosecution and fair trial claims may proceed against Wieber to the extent

they concern the events stemming from the May 30, 2014 arrest.  The federal failure to intervene

claim may proceed against Mamys to the extent it concerns the alleged malicious prosecution

stemming from the May 30, 2014 arrest.


SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: March 28, 2022
        Brooklyn, New York